1

2                    UNITED STATES DISTRICT COURT

3                          DISTRICT OF NEVADA

4

5    FERNANDO NAVARRO HERNANDEZ,          Case No. 3:09-cv-00545-LRH-WGC

6          Petitioner,

7          v.                             ORDER

8

9    WILLIAM GITTERE, *et al.*,

           Respondents.
10

11

12   Introduction

13        This action is a petition for writ of habeas corpus by Fernando Navarro

14   Hernandez, a Nevada prisoner sentenced to death. The case is before the Court with

15   respect to a motion to dismiss filed by the respondents. In the motion to dismiss, the

16   respondents seek dismissal of Hernandez's Claims 30, 31 and 32, which are the three

17   new claims in Hernandez's fifth amended habeas petition. The Court will grant the

18   motion to dismiss in part and deny it in part. Claim 32 will be dismissed. The motion to

19   dismiss will be denied with respect to Claims 30 and 31.

20   Background

21        In its opinion on Hernandez's direct appeal, the Nevada Supreme Court

22   described the factual background of this case as follows:

23             Hernandez and Donna Hernandez were married on October 6,
          1991, and their daughter Ana was born in February 1996. In October
24        1998, the marriage ended in divorce. Ana lived with Donna, but
          Hernandez was permitted custody of Ana from 8 a.m. on Wednesdays
25        until 5 p.m. on Fridays.

26             Francisco Landeros rented a room from Donna from late August
          until mid-December 1998. He and Donna were friends but did not have a
27        romantic relationship. During that time, Hernandez left insulting messages
          on Donna's answering machine, calling her a whore and a fool. Landeros
28        testified that a couple of times Hernandez threatened to kill her.

                                         1

In January 1999, Donna informed the Las Vegas Metropolitan Police Department (LVMPD) of a threat. She was very upset and excited, reporting that when she went to pick her daughter up from Hernandez, he said that he would "make her life very sorry" and was going to take Ana to Mexico. Donna feared for her own safety.

In March 1999, Landeros gave Donna a ride home from work in his pickup one evening. When they got to the house, Hernandez was there in his car and drove toward them. Landeros was forced to pull to the side of the road to avoid him. Donna activated the garage door opener, and Landeros drove into the garage. As the garage door was closing, Hernandez drove under it, causing it to open again. He got out of his car and tried to hit Landeros. Landeros grabbed and held Hernandez, who pleaded to be let go so he would not get in trouble with the police. After Landeros let Hernandez get back into his car, Hernandez threatened to kill Landeros and said "you're going to die, dogs." Late that same night, Hernandez called Donna's mother three times. He threatened to kill Donna. He also said that he had money in Mexico and was going to take Ana there to raise her because Donna was an unfit mother.

Immediately after these incidents, Donna obtained a protective order against Hernandez. She later had it extended until April 13, 2000. It was therefore in effect at the time of the subject offense in October of 1999.

About two weeks before Hernandez killed Donna, he told a friend that he wanted to kill her, their daughter, and himself. He was intoxicated at the time.

Around 7 a.m. on October 6, 1999, LVMPD Officer David Swoboda was driving an unmarked police car south on Highway 95 towards Laughlin, Nevada. A car passed him going well over the speed limit. Swoboda turned on his red lights and gave chase. The car reached a speed of 96 miles per hour and traveled about eight miles before Swoboda was able to pull it over. Hernandez, who was driving the car, got out. He was crying, raised his hands, and said, "just shoot me, just kill me." He walked around the car to the passenger side and said, "I'm sorry, baby." Because of his unusual behavior, Swoboda handcuffed him and placed him in front of the police car.

Swoboda went to Hernandez's car, where Ana sat in a car seat in the back, crying. He tried to calm her and then returned to Hernandez and obtained his driver's license. He noticed that Hernandez had cuts on his face and hand and asked him what happened. Hernandez said that he had fought with his ex-wife. Swoboda learned through his police computer of Donna's protective order against Hernandez, so Swoboda suspected a domestic violence situation and requested that officers be sent to Donna's home.

LVMPD Detective Tom Allen arrived at the scene of the confrontation with Hernandez. Swoboda left Allen with Hernandez and returned to Ana. He noticed a blood stain on the seat near her. She was still crying and said, "daddy hurt mommy real bad."

Hernandez smelled of alcohol and admitted to drinking three beers. He failed a horizontal gaze nystagmus test administered by Detective Allen and was placed under arrest. Swoboda put him in his police car. Hernandez alternated between calm and almost hysterical moments. He asked to kiss Ana goodbye. Allen brought her to him, Hernandez kissed her, and Allen took her away. Hernandez began crying and said, "I killed them" and "I killed her." Swoboda advised Hernandez of his Miranda rights, and Hernandez continued to say, "I killed them" and "I killed her."

Detective Allen found some children's clothing and underwear in Hernandez's car and noticed bloodstains on the pajamas that Ana was wearing. Allen eventually took her to his vehicle where she told him that her father had hurt her mother on the stairs. Ana also told him that she and her father were going to Mexico.

Hernandez was driven to the police facility in Laughlin, and analysis of his breath showed blood alcohol levels of 0.165 and 0.154 percent. He was then driven to the Clark County Detention Center. During the drive he acted erratically, sometimes yelling and crying. At one point he tried to jump out of the moving vehicle. He stated that his life was over and asked the police officer to shoot him. After Hernandez was in the booking area at the jail, he began to hit the back of his head against the concrete wall behind the bench he was sitting on and had to be restrained. Property taken from Hernandez included, among other things, a ring from his right hand and over $1,000 in cash.

LVMPD officers went to Donna's residence, broke open the door, and found her body lying on the stairs. There was blood all over the body and the walls by the stairs, and a broken knife lay nearby. There was no sign of forced entry (other than by the police), and the home otherwise appeared undisturbed. A crime scene analyst found blood elsewhere in the house, including around the kitchen sink. The broken knife by Donna's body was a kitchen knife with a seven-and-a-half-inch serrated blade. Another analyst identified a palm print taken from the knife as Hernandez's. DNA analysis of the blood found at the crime scene showed it to be both Donna's and Hernandez's. Donna's blood was also found on Ana's pajamas and on the ring taken from Hernandez.

The autopsy showed that the cause of Donna's death was strangulation, with significant contributing conditions including multiple stab and slash wounds and blunt head trauma. Some of the bruises on Donna's neck were caused by fingers and others by an object such as a foot or knife placed against her neck. She suffered numerous contusions on her body and face and numerous defensive slash wounds on her hands. A stab wound in the area of her heart pierced her left lung, striking a rib in the back; stab wounds to each side of her neck penetrated into the area of the carotid arteries. It appeared that Hernandez was able to inflict these three major wounds to such vital areas because Donna had ceased to struggle against the attack. Finally, the autopsy revealed the tip of the handle of a dinner knife protruding from her vagina. The knife had been thrust to the left of the cervix, perforating the vaginal wall and penetrating into the abdominal cavity. This last wound caused minimal hemorrhaging and likely occurred after Donna's death.

Hernandez presented the following evidence. In April 1999 he alleged to Child Protective Services (CPS) that Landeros was sexually

1    molesting Ana. However, an investigation proved the allegation groundless.

2
3       The director of Ana's preschool testified that a couple of days before Donna's murder she saw Donna and Hernandez together at the preschool. She was surprised because she knew that they did not get along. She did not know whether they had driven there in the same car.

4    The director said that Hernandez usually picked Ana up on Wednesdays, but occasionally, if Donna called first to give the preschool her approval, he picked her up on a different day.

5

6       Nelly Hernandez, a friend of Hernandez's, testified that she helped him with translations during his divorce and custody proceedings.

7    Hernandez was upset because he still wanted to be married and have his family together. He was also upset when he filed his complaint with CPS

8    against Landeros. After Hernandez's arrest, Nelly went to his house to gather his belongings. She did not see any blood or signs that he had

9    been packing, and she recovered his passport and Ana's birth certificate from the house. Another friend, Juan Trillo, testified that in the month

10   before Donna's murder, Hernandez repeatedly said that he was trying to get Donna back. Trillo saw them together in Hernandez's car a couple of

11   times. Trillo also went with Nelly to gather Hernandez's belongings and saw no blood or indications that he had been packing. Hernandez's

12   neighbor testified that he had seen Donna at Hernandez's house a few times in the afternoon, but he could give no dates.

13

14      The prosecution and defense stipulated that the caller ID on Donna's telephone showed that a call was received from Hernandez's phone at 9:32 p.m. on October 5, 1999.

15

16      In rebuttal, the prosecution presented videotape of family court proceedings involving Donna and Hernandez in November 1998, soon after their divorce. In the proceedings, Hernandez expressed his desire to

17   take Ana on vacation to Mexico. Donna told the court, "He tells me all the time that I'm a bad mother, and he's going to take my child away from me.

18   I'm afraid of him."

19      On July 14, 2000, the jury returned verdicts finding Hernandez guilty of burglary while in possession of a weapon, first-degree murder

20   with use of a deadly weapon, second-degree kidnapping, and unlawful sexual penetration of a dead human body.

21

22      During the penalty phase, the State presented victim impact evidence through the testimony of Donna's mother and brother and Ana's therapist. The evidence showed that Donna's murder had severely

23   affected her brother, sister, mother, and father, but Ana had been particularly traumatized and would likely require therapy until she was

24   sixteen to eighteen years old. Hernandez called a number of witnesses, including his brother, an employer, and friends and fellow workers.

25   According to their testimony, he held multiple jobs, was hard-working, was polite and friendly, and was a loving and devoted father. Hernandez spoke

26   in allocution.

27      At the end of the penalty phase, the jury found three aggravating circumstances: Hernandez subjected the victim to nonconsensual sexual

28   penetration immediately before, during, or immediately after the

4

commission of the murder; the murder was committed while Hernandez was engaged in the commission of a burglary; and the murder involved the torture and/or mutilation of the victim. Seven mitigating circumstances were found: Hernandez had no significant history of prior criminal activity; he committed the murder while under the influence of extreme mental or emotional disturbance; he had accepted responsibility for the crime; he had expressed remorse for the crime; he was intoxicated at the time of the crime; he had been gainfully employed throughout his adult life; and he spared the life of his daughter even though he had threatened to kill her. The jury found that the aggravating circumstances outweighed the mitigating and returned a verdict of death.

*Hernandez v. State*, 118 Nev. 513, 517-20, 50 P.3d 1100, 1103-06 (2002) (copy of opinion filed as Exhibit 2, at ECF No. 14-2, pp. 9-41). The judgment of conviction was filed on September 28, 2000. *See* Judgment of Conviction, Exh. B (ECF No. 53-3).

Hernandez appealed, and the Nevada Supreme Court affirmed the judgment of conviction on August 2, 2002. *See Hernandez*, 118 Nev. 513, 50 P.3d 1100 (2002). The United States Supreme Court denied certiorari on February 24, 2003. *See Hernandez v. Nevada*, 537 U.S. 1197 (2003).

Hernandez filed a petition for writ of habeas corpus in state court on March 12, 2003. *See* Proper Person Post-Conviction Petition for Writ of Habeas Corpus, Exh. 232 (ECF No. 117-5). After holding an evidentiary hearing, the state district court denied Hernandez's petition. *See* Findings of Fact, Conclusions of Law and Order, Exh. 3 (ECF No. 14-2, pp. 42-50). Hernandez appealed, and the Nevada Supreme Court affirmed the denial of the petition on October 30, 2008. *See Hernandez v. State*, 124 Nev. 978, 194 P.3d 1235 (2008) (copy of opinion filed as Exhibit 4, at ECF No. 14-2, pp. 51-79). The Nevada Supreme Court denied rehearing. *See* Order Denying Rehearing, Exh. 236 (ECF No. 117-9). The Nevada Supreme Court's remittitur was issued on February 3, 2009. *See* Remittitur, Exh. H (ECF No. 53-9).

Hernandez initiated this federal habeas corpus action, by filing a *pro se* habeas petition, on September 18, 2009 (ECF No. 1). The Court appointed counsel for Hernandez, and, with counsel, Hernandez filed a first amended habeas petition on December 21, 2009 (ECF No. 13).

///

1    The respondents filed a motion to dismiss (ECF No. 52), arguing that several of

2  the claims in the amended petition were not exhausted in state court. In response,

3  Hernandez moved for leave to further amend his petition and for a stay of this action to

4  allow him to return to state court to exhaust his unexhausted claims (ECF Nos. 59, 61).

5  On May 21, 2010, the Court granted Hernandez leave to file his second amended

6  petition and granted his motion for a stay. *See* Order filed May 21, 2010 (ECF No. 71).

7  Hernandez's second amended habeas petition was filed on that date (ECF No. 72), and

8  the action was stayed pending completion of Hernandez's second state habeas action.

9    In Hernandez's second state habeas action, the state district court denied relief

10  on procedural grounds. *See* Decision, Exh. 196, p. 5 (ECF No. 98, p. 6). Hernandez

11  appealed, and the Nevada Supreme Court affirmed on September 24, 2014, ruling that

12  Hernandez's second state action was untimely, and that he did not show cause and

13  prejudice to overcome the procedural bar. *See* Order of Affirmance, Exh. 203 (ECF No.

14  98-7). The Nevada Supreme Court denied rehearing on November 25, 2014. *See* Order

15  Denying Rehearing, Exh. 205 (ECF No. 98-9).

16    The stay of this action was lifted on February 20, 2015 (ECF No. 94). Hernandez

17  filed a third amended petition on June 22, 2015 (ECF No. 97), and then a fourth amended

18  petition on March 6, 2017 (ECF No. 147).

19    The respondents filed a motion to dismiss Hernandez's fourth amended petition

20  on March 5, 2018 (ECF No. 161). Respondents argued that several claims in the fourth

21  amended petition were barred, in whole or in part, by the procedural default doctrine.

22  Respondents also argued that Claim 21 was not ripe for review, and that Claims 28 and

23  29 were without merit. On February 4, 2019, the Court granted that motion to dismiss in

24  part and denied it in part; the Court dismissed all of Claims 2 and 16 except the

25  ineffective assistance of trial counsel claims, and Claims 7, 9, 10, 11, 13G, 14, 15 and

26  19. *See* Order entered February 4, 2019 (ECF No. 184). Hernandez filed a motion for

27  reconsideration (ECF No. 186), and the Court denied that motion on September 27,

28  2019. *See* Order entered September 27, 2019 (ECF No. 218).

1    In the meantime, on July 2, 2019, Hernandez filed a motion to amend (ECF No.

2    204), requesting leave of court to file a fifth amended habeas petition, to add three

3    claims—Claims 30, 31 and 32—to his petition. The Court granted that motion in the

4    September 27, 2019, order (ECF No. 218). Hernandez filed his fifth amended petition,

5    which is now his operative petition, on October 11, 2019 (ECF No. 221).

6    On December 24, 2019, Respondents filed the motion to dismiss that is now

7    before the Court (ECF No. 224), arguing: that Claim 30 is, in part, unexhausted and

8    procedurally defaulted; that Claim 31 is barred by the statute of limitations, is

9    unexhausted and procedurally defaulted, and does not state a viable claim of ineffective

10   assistance of counsel; and that Claim 32 is barred by the statute of limitations and is

11   unexhausted and procedurally defaulted. *See* Motion to Dismiss (ECF No. 224).

12   Hernandez filed an opposition to the motion to dismiss on June 8, 2020 (ECF No. 234).

13   Respondents replied on July 16, 2020 (ECF No. 240).

14   Statute of Limitations

15   The Antiterrorism and Effective Death Penalty Act (AEDPA), enacted in 1996,

16   established a one-year statute of limitations for federal habeas petitions filed by

17   prisoners challenging state convictions; the statue provides:

18       (1)  A 1-year period of limitation shall apply to an application for a
19       writ of habeas corpus by a person in custody pursuant to the judgment of
         a State court.  The limitation period shall run from the latest of --

20           (A)  the date on which the judgment became final by
21           the conclusion of direct review or the expiration of the time
             for seeking such review;

22           (B)  the date on which the impediment to filing an
23           application created by State action in violation of the
             Constitution or laws of the United States is removed, if the
24           applicant was prevented from filing by such State action;

25           (C)  the date on which the constitutional right asserted
             was initially recognized by the Supreme Court, if the right
26           has been newly recognized by the Supreme Court and made
             retroactively applicable to cases on collateral review; or

27           (D)  the date on which the factual predicate of the
             claim or claims presented could have been discovered
28           through the exercise of due diligence.

7

1  28 U.S.C. 2244(d)(1). The one-year AEDPA limitations period is tolled during the time

2  that a properly filed application for state post-conviction or other collateral review is

3  pending in state court. *See* 28 U.S.C. § 2244(d)(2). The limitations period is also subject

4  to equitable tolling; a habeas petitioner is entitled to equitable tolling if the petitioner

5  shows "'(1) that he has been pursuing his rights diligently, and (2) that some

6  extraordinary circumstance stood in his way' and prevented timely filing." *Holland v.*

7  *Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418

8  (2005)); *Ramirez v. Yates*, 571 F.3d 993, 997 (9th Cir. 2009).

9        In this case, Hernandez's conviction became final on February 24, 2003, when

10  the United States Supreme Court denied certiorari after the Nevada Supreme Court

11  affirmed his conviction. *See Hernandez*, 537 U.S. 1197 (2003). The AEDPA limitations

12  period then began to run, and it ran for 16 days before Hernandez initiated his first,

13  timely, state habeas action, resulting in statutory tolling. *See* Proper Person Post-

14  Conviction Petition for Writ of Habeas Corpus, Exh. 232 (ECF No. 117-5). That action

15  concluded on February 3, 2009, when the Nevada Supreme Court issued its remittitur

16  after affirming the lower court's denial of relief. *See* Remittitur, Exh. H (ECF No. 53-9).

17  The limitations period then began to run again, and the remaining 349 days ran out, and

18  the AEDPA limitations period expired, on January 18, 2010.

19        Hernandez's original petition, filed on September 18, 2009 (ECF No. 1), and his

20  first amended petition, filed on December 21, 2009 (ECF No. 13), were filed before the

21  limitations period expired. His fifth amended petition, which is under consideration in this

22  order, was filed more than nine years after the expiration of the limitations period.

23        Therefore, the question of the timeliness of the claims added in Hernandez's fifth

24  amended petition turns on whether those claims relate back to the filing of his original

25  petition or his first amended petition. Under Federal Rule of Civil Procedure 15(c)(1)(B),

26  "[a]n amendment to a pleading relates back to the date of the original pleading when ...

27  the amendment asserts a claim or defense that arose out of the conduct, transaction, or

28  occurrence set out—or attempted to be set out—in the original pleading[.]" In *Mayle v.*

1  *Felix*, 545 U.S. 644 (2005), the Supreme Court held, in the context of a federal habeas

2  corpus action, that "[s]o long as the original and amended petition state claims that are

3  tied to a common core of operative facts, relation back will be in order." *Mayle*, 545 U.S.

4  at 664. "An amended habeas petition ... does not relate back (and thereby escape

5  AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts

6  that differ in both time and type from those the original pleading set forth." *Id*. at 650.

7  The *Mayle* Court instructed that "conduct, transaction, or occurrence," as used in Rule

8  15(c), is not synonymous with "trial, conviction, or sentence." *Id*. at 656–64.

9  <u>Exhaustion and Procedural Default</u>

10        A federal court may not grant relief on a habeas corpus claim not exhausted in

11  state court. 28 U.S.C. § 2254(b). The exhaustion doctrine is based on the policy of

12  federal-state comity, and is designed to give state courts the initial opportunity to correct

13  alleged constitutional deprivations. *See Picard v. Conner*, 404 U.S. 270, 275 (1971). To

14  exhaust a claim, a petitioner must fairly present that claim to the highest available state

15  court and must give that court the opportunity to address and resolve it. *See Duncan v.*

16  *Henry*, 513 U.S. 364, 365 (1995) (per curiam); *Keeney v. Tamayo–Reyes*, 504 U.S. 1,

17  10 (1992). The "fair presentation" requirement is satisfied when the claim has been

18  presented to the highest available state court by describing the operative facts and the

19  legal theory upon which the federal claim is based. *See Anderson v. Harless*, 459 U.S.

20  4, 6 (1982); *Batchelor v. Cupp*, 693 F.2d 859, 862 (9th Cir.1982), *cert. denied*, 463 U.S.

21  1212 (1983).

22        Under certain circumstances it may be appropriate for a federal court to

23  anticipate a state-law procedural bar of an unexhausted claim, and to treat such a claim

24  as subject to the procedural default doctrine. "An unexhausted claim will be procedurally

25  defaulted, if state procedural rules would now bar the petitioner from bringing the claim

26  in state court." *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (citing *Coleman v.*

27  *Thompson*, 501 U.S. 722, 731 (1991)).

28  ///

1    In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails

2  to comply with the State's procedural requirements in presenting his claims is barred by

3  the adequate and independent state ground doctrine from obtaining a writ of habeas

4  corpus in federal court. *Coleman*, 501 U.S. 722, 731–32 (1991) ("Just as in those cases

5  in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has

6  failed to meet the State's procedural requirements for presenting his federal claims has

7  deprived the state courts of an opportunity to address those claims in the first

8  instance."). Where such a procedural default constitutes an adequate and independent

9  state ground for denial of habeas corpus, the default may be excused only if "a

10  constitutional violation has probably resulted in the conviction of one who is actually

11  innocent," or if the prisoner demonstrates cause for the default and prejudice resulting

12  from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

13    To demonstrate cause for a procedural default, the petitioner must "show that

14  some objective factor external to the defense impeded" his efforts to comply with the

15  state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external

16  impediment must have prevented the petitioner from raising the claim. *See McCleskey*

17  *v. Zant*, 499 U.S. 467, 497 (1991). With respect to the question of prejudice, the

18  petitioner bears "the burden of showing not merely that the errors [complained of]

19  constituted a possibility of prejudice, but that they worked to his actual and substantial

20  disadvantage, infecting his entire [proceeding] with errors of constitutional dimension."

21  *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456

22  U.S. 152, 170 (1982).

23    In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective

24  assistance of post-conviction counsel may serve as cause, to overcome the procedural

25  default of a claim of ineffective assistance of trial counsel. In *Martinez*, the Supreme

26  Court noted that it had previously held, in *Coleman*, 501 U.S. at 746–47, that "an

27  attorney's negligence in a postconviction proceeding does not establish cause" to

28  excuse a procedural default. *Martinez*, 566 U.S. at 15. The *Martinez* Court, however,

1   "qualif[ied] Coleman by recognizing a narrow exception: inadequate assistance of

2   counsel at initial-review collateral proceedings may establish cause for a prisoner's

3   procedural default of a claim of ineffective assistance at trial." *Id.* at 9. The Court

4   described "initial-review collateral proceedings" as "collateral proceedings which provide

5   the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 8.

6   Claim 30

7        In Claim 30, Hernandez claims that his federal constitutional rights were violated

8   because his trial counsel were ineffective for conceding his guilt without his consent.

9   *See* Fifth Amended Petition (ECF No. 221), pp. 229–40.

10       Respondents contend that Claim 30 is, in part, unexhausted and procedurally

11  defaulted. *See* Motion to Dismiss (ECF No. 224), pp. 7–8. Respondents argue that, in

12  the introduction to Claim 30, Hernandez states that his counsel's concession of guilt

13  violated his "federal constitutional guarantees of due process, equal protection, the

14  effective assistance of counsel, a fair and impartial jury, and a reliable sentence," and

15  he cites "U.S. Const. Amends. V, VI, VIII & XIV," but in state court he based his claim

16  solely on his right to effective assistance of counsel. *See id.*; *see also* Fifth Amended

17  Petition (ECF No. 221), p. 229.

18       The Court agrees that, to the extent that in federal court Hernandez adds

19  theories to his claim, his claim is unexhausted, and because there is no indication that

20  Hernandez could overcome the procedural bars that would now exist in state court—

21  procedural bars based on the statute of limitations and laches, and the procedural bar

22  applicable to successive petitions—the claim is, to the extent of the new theories,

23  procedurally defaulted. However, it is possible that, under *Martinez*, Hernandez could

24  overcome the procedural default by showing that his first state post-conviction counsel

25  was ineffective for not asserting the additional theories. *See Martinez*, 566 U.S. at 9

26  (inadequate assistance of counsel in a first state habeas action may establish cause for

27  procedural default of a claim of ineffective assistance of trial counsel). This issue,

28  though, is intertwined with the merits of Hernandez's claims, such that it will be better

1   addressed in conjunction with the merits of the claims. The Court will, therefore, deny

2   Respondents' motion to dismiss with respect to Claim 30, without prejudice to

3   Respondents asserting the procedural default defense to that claim in their answer.

4   Claim 31

5         In Claim 31, Hernandez claims that his federal constitutional rights were violated

6   because his trial counsel were ineffective for failing to adequately challenge the State's

7   blood and DNA evidence. *See* Fifth Amended Petition (ECF No. 221), pp. 241–48. More

8   specifically, Hernandez claims that his trial counsel sought and obtained appointment

9   of, and funding for, a DNA analyst, but did not use that expert either to independently

10  test blood evidence or to prepare for cross-examination of the State's DNA expert. *See*

11  *id.*

12        Respondents argue in their motion to dismiss that Claim 31 is barred by the

13  AEDPA statute of limitations because it does not relate back to any claim in

14  Hernandez's timely original petition or first amended petition. *See* Motion to Dismiss

15  (ECF No. 224), pp. 5–7. However, in his original petition, Hernandez claimed:

16            Trial Counsel Were Ineffective for Failing to Properly Challenge the
    State's Scientific Evidence.

17

18            Trial counsel never challenged the qualifications of the state's
    witnesses or the reliability of their testing. Trial counsel should have

19  challenged the state's scientific evidence and required the state to prove
    that their experts were qualified and that their testing was accurate.

20  Because they did not, constitutional procedures, standards, and protocols
    were not followed. Mr. Hernandez's rights were violated by the lack of

21  standards and trustworthiness of the evidence admitted against him.

22  Petition for Writ of Habeas Corpus (ECF No. 1), p. 18. The Court determines that this

23  claim in Hernandez's timely original petition is based on the same core of operative fact

24  that underlies Claim 31: the alleged fact that his trial counsel failed to adequately

25  challenge the State's scientific evidence. Claim 31 relates back to Hernandez's timely

26  original petition and is not barred by the statute of limitations.

27        Respondents also argue that Claim 31 is unexhausted and procedurally

28  defaulted. *See* Motion to Dismiss (ECF No. 224), pp. 8–9. In his first state habeas

1   action, in his briefing before the Nevada Supreme Court, Hernandez asserted a claim

2   that was at least in part the same as Claim 31. *See* Appellant's Amended Opening Brief,

3   Exh. 237, pp. 36–37 (ECF No. 117-10, pp. 44–45). Respondents, however, argue that,

4   in state court, Hernandez did not assert all the same theories supporting the claim and

5   did not assert the same factual bases for the claim. *See* Motion to Dismiss (ECF No.

6   224), pp. 8–9. Here again, to the extent that, in federal court, Hernandez adds theories

7   or facts to his claim, his claim may be unexhausted, and because there is no indication

8   that Hernandez could overcome the procedural bars that would now exist in state court,

9   the claim may be procedurally defaulted. However, here again, it is possible that, under

10   *Martinez*, Hernandez could overcome the procedural default by showing that his first

11   state post-conviction counsel was ineffective with respect to the presentation of the

12   claim in state court. *See Martinez*, 566 U.S. at 9. This issue, though, is intertwined with

13   the merits of Hernandez's claims, such that it will be better addressed in conjunction

14   with the merits of the claims. The Court will, therefore, deny Respondents' motion to

15   dismiss with respect to Claim 31, without prejudice to Respondents asserting the

16   procedural default defense to that claim in their answer.

17        Respondents also argue that Claim 31 is conclusory and fails to state a viable

18   claim of ineffective assistance of counsel. *See* Motion to Dismiss (ECF No. 224), pp. 9–

19   10. This argument goes to the merits of the claim, and it, too, will be better addressed in

20   conjunction with the merits of Hernandez's claims. The motion to dismiss will be denied

21   with respect to Claim 31, without prejudice to Respondents making this argument in

22   their answer.

23   Claim 32

24        In Claim 32, Hernandez claims that his federal constitutional rights were violated

25   because his trial counsel were ineffective for failing to seek suppression of Hernandez's

26   statements to the police. *See* Fifth Amended Petition (ECF No. 221), pp. 249–52.

27        Respondents argue in their motion to dismiss that Claim 32 is barred by the

28   statute of limitations because it does not relate back to any claim in Hernandez's

1   original petition or first amended petition. *See* Motion to Dismiss (ECF No. 224), p. 7.

2   Hernandez responds by pointing to pages 18 to 19 of his original petition, where, in a

3   cumulative error claim, he claimed that his trial counsel "failed to file many appropriate

4   and necessary motions," and he argues that, under *Mayle*, Claim 32 relates back to that

5   claim. *See* Opposition to Motion to Dismiss (ECF No. 234), pp. 9–10; *see also* Petition

6   for Writ of Habeas Corpus (ECF No. 1), pp. 18–19. The shortcoming of Hernandez's

7   argument is that the generic claim in his original petition that his trial counsel "failed to

8   file many appropriate and necessary motions," lacks operative facts; Hernandez did not

9   state what motions his trial counsel allegedly failed to file. The Court determines that

10  Claim 32 cannot relate back to a claim including so little factual specificity.

11          Hernandez also argues that equitable tolling is warranted because Hernandez,

12  himself, has long wanted to include a claim like Claim 32 in his petition, but his counsel

13  have disagreed and did not include such a claim in his first amended petition. *See*

14  Opposition to Motion to Dismiss (ECF No. 234), pp. 13–15. The Court disagrees that

15  this difference of opinion between Hernandez and his counsel regarding what claims to

16  assert amounted to an extraordinary circumstance that stood in the way of Hernandez

17  asserting Claim 32 within the limitations period. *See Holland*, 560 U.S. at 649. The

18  Court finds equitable tolling to be unwarranted.

19          As Claim 32 does not relate back to a timely-filed petition, and because equitable

20  tolling relative to the claim is unwarranted, Claim 32 is barred by the statute of

21  limitations. Respondents' motion to dismiss will be granted, on this ground, with respect

22  to Claim 32. Claim 32 will be dismissed.

23          Because the Court will dismiss Claim 32 on statute of limitations grounds, the

24  Court does not reach Respondents' argument that Claim 32 is unexhausted and

25  procedurally defaulted.

26  ///

27  ///

28  ///

14

1 Conclusion

2     **IT IS THEREFORE HEREBY ORDERED** that Respondents' Motion to Dismiss

3 Claims 30, 31, and 32 (ECF No. 224) is **GRANTED IN PART AND DENIED IN PART**.

4 Claim 32 is dismissed. The motion to dismiss is denied with respect to Claims 30 and

5 31.

6     **IT IS FURTHER ORDERED** that Respondents will have 120 days from the entry

7 of this order to file an answer responding to the claims remaining in Petitioner's fifth

8 amended habeas petition: 1A, 1B, 1C, 1D, 1E, 1F, the ineffective assistance of trial

9 counsel claims in Claim 2, 3, 4, 5, 6, 8, 12, 13A, 13B, 13C, 13D, 13E, 13F, 13H, 13I,

10 13J, 13K, 13L, 13M, the ineffective assistance of trial counsel claims in Claim 16, 17,

11 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31. In all other respects, the schedule

12 for further proceedings set forth in the order entered February 20, 2015 (ECF No. 94)

13 will remain in effect.

14

15     DATED this 10th day of September, 2020.

16

17                _____

18                LARRY R. HICKS
               UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28