1

2

3                           UNITED STATES DISTRICT COURT

4                                DISTRICT OF NEVADA

                                       * * *

5

6    FERNANDO NAVARRO HERNANDEZ,              Case No. 3:09-cv-00545-MMD-CSD

                              Petitioner,     MERITS ORDER
7         v.

8
     JOHN HENLEY, et al.,
9
                              Respondents.
10

11   **I.      SUMMARY**

12           Petitioner Fernando Navarro Hernandez was sentenced in Nevada state court to

13   death after a jury found him guilty of burglary while in possession of a weapon, first-degree

14   murder with the use of a deadly weapon, second-degree kidnapping, and unlawful sexual

15   penetration of a dead body. (ECF No. 53-3.) This matter is before the Court for

16   adjudication of the merits of Hernandez's Fifth-Amended Petition for Writ of Habeas

17   Corpus under 28 U.S.C. § 2254, in which Hernandez alleges that his trial counsel—David

18   Schieck and Christopher Oram—were ineffective, the jury was biased, there were voir

19   dire errors, improper jury instructions were given, the prosecution committed misconduct,

20   there was insufficient evidence to sustain his convictions, his appellate counsel was

21   ineffective, the bench conferences during the trial were unrecorded, the defense should

22   have been allowed to argue last, lethal injection is unconstitutional, Nevada's death

23   penalty scheme is cruel and unusual, the Nevada Supreme Court improperly reweighed

24   the jury's death sentence after striking an aggravating factor, and there were cumulative

25   errors. (ECF No. 221 ("Fifth-Amended Petition").) This matter is also before the Court for

26   adjudication of Hernandez's motion for leave to conduct discovery and motion for

27   evidentiary hearing. (ECF Nos. 324, 325 ("Motions").) For the reasons discussed below,

28

the Court denies the Fifth-Amended Petition, denies the Motions, and grants a Certificate of Appealability for grounds 1a, 1b, 1e, 1f, 4, and 29.

## II.    BACKGROUND

### A.    Factual Background[1]

#### 1.    Guilt phase of the trial

Sergeant David Swoboda with the Las Vegas Metropolitan Police Department ("LVMPD") testified that he was driving from Las Vegas, Nevada to Laughlin, Nevada on October 6, 1999, at around 7:00 a.m., when he saw a black Ford Probe traveling above the speed limit. (ECF No. 255-1 at 40–43.) After the car passed Sergeant Swoboda, it sped up, traveling at upwards of 96 miles per hour. (*Id*. at 44.) Sergeant Swoboda caught up with the car, and once the car finally stopped, Hernandez, the driver of the car, "placed his hands in the air" and said, "just shoot me, just shoot me, just kill me." (*Id*. at 46–47.) Hernandez then walked to the passenger side the car, "leaned up against the glass . . . , and said I'm sorry, baby." (*Id*. at 48.) Hernandez's three-year-old daughter, A.H.,[2] was in the car and "crying heavily." (*Id*. at 49.)

Sergeant Swoboda handcuffed Hernandez, who smelled like alcohol, and then attempted to calm A.H. (*Id*. at 49, 52.) Sergeant Swoboda asked Hernandez for identification and "noticed there [were] some superficial cuts about his face and a little cut on his hand." (*Id*. at 50.) Hernandez told Sergeant Swoboda that he had gotten into a fight with his ex-wife. (*Id*.) Sergeant Swoboda ran Hernandez's name and found that "there was an active protective order and stalking order against him that was filed by his ex-wife," Donna Hernandez (hereinafter "Donna"). (*Id*. at 51.) Sergeant Swoboda "advised dispatch of the situation," requesting that someone go to Donna's house to check on her. (*Id*. at 52.) Sergeant Swoboda then checked on A.H. again and noticed "a blood stain on

---

[1]The Court makes no credibility or other factual findings regarding the truth or falsity of this evidence from the state court. The Court's summary is merely a backdrop to its consideration of the issues presented in the Fifth-Amended Petition.

[2]The Court refers only to the minor child by her initials.

the back seat." (*Id*. at 55.) At that time, A.H. told Sergeant Swoboda that "daddy hurt mommy real bad." (*Id*.)

A horizontal gaze nystagmus test was performed on Hernandez, and because Hernandez "failed all six points" of the test, he was arrested for DUI. (*Id*. at 56–57, 76.) After Sergeant Swoboda allowed Hernandez to give A.H. a kiss, Hernandez stated, "I killed them. I killed her." (*Id*. at 58.) Sergeant Swoboda informed Hernandez of his *Miranda* rights, and during the drive to the police substation in Laughlin, Hernandez repeatedly told Sergeant Swoboda "to kill him" and acted in a bizarre manner. (*Id*. at 59, 64, 67.)

LVMPD Detective Thomas Allen, who assisted Sergeant Swoboda during Hernandez's traffic stop, testified that Hernandez had scratches on his face and a cut on his right hand, and Hernandez explained that the scratches were from A.H. and the cut happened at work. (ECF No. 255-1 at 77, 80–81.) A.H., who "had some blood stains on the back of her pajamas . . . and a few on the front," told Detective Allen that she and Hernandez were on their way to Mexico and that Hernandez "hurt mommy real bad" and "beat up mommy on the stairs." (*Id*. at 88, 94–95.)

LVMPD Officer Steven Leyba, who conducted Hernandez's sobriety tests at the police substation in Laughlin, testified that Hernandez told him that "he had two to three beers, and he had begun drinking at . . . 11 p.m. the night before and had stopped drinking at 1:00 a.m. that morning." (ECF No. 255-1 at 125, 129.) Hernandez "had blood shot watery eyes," slurred speech, and smelled of alcohol. (*Id*. at 129–30.) Hernandez did not pass the walk-and-turn test, one-legged-stand test, or a second horizontal gaze nystagmus test. (*Id*. at 132–35.) Two breathalyzer tests were then performed at around 9:00 a.m., indicating that Hernandez had a .15 and .16 blood alcohol content. (*Id*. at 137.)

LVMPD Officer Bernard Whalen III, who transported Hernandez from the police substation in Laughlin to the Clark County Detention Center, testified that, during that drive, Hernandez asked him "to let him out of the vehicle so that he could attempt to run away and for [Officer Whalen] to shoot him." (ECF No. 255-1 at 156, 160.) Hernandez

also "kept commenting his life was over." (*Id*.) After getting to the Clark County Detention Center booking area, Hernandez "beg[a]n to bash the back of his head against the concrete wall." (*Id*. at 162.)

LVMPD Detective Thomas Thowsen interviewed Hernandez, and Hernandez told him that "he was at his ex-wife's house the night before, and her boyfriend Francisco showed up. They got into a fight so he took his daughter and left." (ECF No. 256-1 at 21–22.) Detective Thowsen later met with Francisco Landeros, who explained that he was not Donna's boyfriend but, rather, her roommate, following Donna and Hernandez's recent divorce. (*Id*. at 27–28.)

LVMPD crime scene analyst Kelly Neil took photographs of Hernandez at the Clark County Detention Center, showing a laceration on his right hand, "some scratches primarily located on the left side of his face and neck and some red marks and abrasions on his arms and on his back or on his torso." (ECF No. 255-1 at 176.) Hernandez also had blood stains on the right side of his shirt and the front side of his pants. (*Id*. at 178.)

LVMPD Officer James Churches responded to a welfare check on Donna's house following Hernandez's arrest for a DUI. (ECF No. 255-1 at 107, 109.) After nobody answered the door, Officer Churches looked through a window and saw a woman lying unconscious on the stairwell landing. (*Id*. at 111.) The woman had "a large amount of blood on her body," "[s]he was not completely dressed," and "she was laying in a very unnatural looking position." (*Id*.) LVMPD Officer Kerry Reusch, who was at Donna's house with Officer Churches, testified that, following Officer Churches' observations, he kicked in the door to Donna's house and saw Donna "on the stairway leading to the second floor." (*Id*. 117.) Donna "was partially clothed and . . . there was a knife which appeared to be broken in half laying next to her." (*Id*. at 119.) Donna did not have a pulse. (*Id*. at 120.)

Dr. Lary Simms, Clark County's Chief Medical Examiner, performed Donna's autopsy and testified that Donna's "cause of death was strangulation" and that she also suffered from "significant contributing conditions including multiple stab and incised wounds and blunt head trauma." (ECF No. 257-1 at 69, 72, 76.) One "stab wound went

into [her] chest into the central portion of the lung," causing Donna's left lung to collapse. (*Id*. at 87–88.) According to Dr. Simms, "this wound [was] a very directed wound toward the heart," and "[t]he only way that can come about is if [Donna] has ceased to struggle, so the assailant [could] aim the weapon where he want[ed] it to go." (*Id*. at 89–90.) Donna also suffered stab wounds to the left and right sides of her neck. (*Id*. at 88.) Further, a knife "was retrieved from [Donna's] vagina" that "went to the left side of [Donna's] cervix and coursed up into the area of the left ovary," perforating the vagina wall and ending up partially in her abdominal cavity. (*Id*. at 93–94.) Dr. Simms testified that this final stabbing "more likely" occurred after Donna had already died. (I*d*. at 94.)

Annie Griego, Donna's mother, testified that Donna and Hernandez were married in October of 1991 and divorced in October 1998. (ECF No. 256-1 at 144–45, 147.) Following their divorce, regarding custody of A.H., Hernandez would pick up A.H. "at day care on Wednesdays at noon and bring her back to [Griego's] home on Friday[s] at five o'clock" in the evening. (*Id*. at 149.) Approximately six months before the murder, on March 24, 1999, Hernandez called Griego at 11:20 p.m. and "told [her] that he had seen [Donna] and [Landeros] together . . . and that the was going to kill [Donna]." (*Id*. at 153.) Hernandez called Griego again 5 to 10 minutes later and "told [her] that he had a lot of money in Mexico and he was going to take [A.H.] to Mexico and raise her there because her mom was an unfit mother." (*Id*. at 153–54.) Hernandez called Griego a third time and "asked [her] what kind of school [she] had sent [her] daughter to for her to be doing all these bad things." (*Id*. at 154.) Following these phone calls, on March 26, 1999, Donna got a protective order against Hernandez. (*Id*. at 157.) That protective order was extended and set to expire in April 2000. (*Id*. at 160.) When Griego picked up A.H. from child protective services following Hernandez's arrest, A.H. told Griego "that her daddy dead [sic] her mommy." (*Id*. at 166.)

Landeros, whose sister was married to Hernandez's brother, testified that there was no romantic relationship between he and Donna and that he had only rented a room from her for about four months. (ECF No. 256-1 at 182–183.) From October to December

1998, the time that he lived with Donna, Landeros heard messages left by Hernandez on Donna's answering machine saying that Donna "was a common woman, a whore. She was a fool, that she didn't know what she was doing." (*Id*. at 184–86.) Hernandez also stated on a couple of messages that "he was going to kill her." (*Id*. at 187.) On March 24, 1999, after he had moved out of Donna's house, Landeros was driving Donna home from work when they saw Hernandez's car outside of Donna's home. (*Id*. at 187–89.) Hernandez drove away upon seeing them, and Landeros drove his truck into Donna's garage. (*Id*. at 190.) Donna attempted to close the garage door, but Hernandez drove his car under the door, causing it to reopen. (*Id*. at 191.) Hernandez then exited his car and tried to hit Landeros. (*Id*. at 192.) Landeros subdued Hernandez and then let him go, and Hernandez said, "you're going to die dogs." (*Id*. at 194.)

Rafael Meza, a friend of Hernandez, testified that Hernandez, who was intoxicated at the time, visited his home a couple of weeks before Donna's death. (ECF No. 256-1 at 126–27, 135.) At this visit, Hernandez was sad and upset and "said that he had been thinking of killing himself because he [could] no longer put up with the situation of his child being molested and somebody living with the ex-wife, and he wanted to end it." (*Id*. at 128, 143.) Hernandez also told Meza that "[h]e wanted to kill himself. He wanted to kill the baby. He wanted to kill Donna." (*Id*. at 129.)

Sandra Buterbaugh testified she had spoken with Donna about Hernandez before Donna's death and that Donna told her that Hernandez had said "he was going to make [Donna's] life very sorry. He wanted the child. He was going to take the child and leave the country and go to Mexico, and she was very afraid that was going to happen." (ECF No. 257-1 at 8.)

LVMPD criminalist David Welch testified that he obtained DNA profiles for Donna, Hernandez, and Landeros. (ECF No. 257-1 at 47.) According to Welch, Donna's blood was found on a ring Hernandez had been wearing at the time of his arrest; both Donna's and Hernandez's blood was found on the blade of the kitchen knife at the crime scene; Hernandez's blood was found on the entryway floor, north hallway wall, and kitchen floor

in Donna's house; and both Donna's and Hernandez's blood was found on A.H.'s pajamas. (*Id*. at 51–54.) Landeros's blood was not found on any of these items. (*Id*. at 53.) LVMPD print examiner Steven Scarborough testified that he was "absolutely certain" that "Hernandez's palm print was left on the knife handle" found on the stairway of Donna's house. (ECF No. 157-1 at 10, 27.) Ramon Paz, Donna's neighbor, testified that on October 6, 1999, at "[a]bout 5:30, 5:45" the morning of the murder, he saw Hernandez's car parked "sideways" in Donna's driveway. (ECF No. 255-1 at 31–32.)

Hernandez's defense at trial was to concede that he killed Donna but to argue that he was not guilty of first-degree murder. The defense called witnesses to demonstrate that he was guilty, at most, of second-degree murder, including witnesses to show that he still loved Donna, Donna had been seeing him voluntarily in violation of her restraining order, he and Donna were contemplated getting back together, and he did not premediate the murder given that he had not made any plans to escape to Mexico with A.H.

Sylvia Hernandez, the director of A.H.'s preschool, testified that she saw Hernandez and Donna together a few days before Donna's death and that Hernandez appeared "[n]ormal." (ECF No. 284-1 at 9, 12–14.) Juan Trillo testified that, in the month before Donna's death, he had seen Hernandez and Donna together in Hernandez's car "a couple times," and Hernandez had "told [him] that he was trying to get [Donna] back." (*Id*. at 41, 43.) Armando Martinez, Hernandez's neighbor, testified that he had seen Donna at Hernandez's house. (ECF No. 257-3 at 22–23.) Nellie Hernandez (hereinafter "Nellie"), Hernandez's coworker, testified that Hernandez "was pretty upset about" his divorce to Donna and "wanted to be with his family." (ECF No. 284-1 at 20–21.) Nellie also testified that she packed up some of Hernandez's belongings after he was arrested, and Hernandez's passport and A.H.'s birth certificate were still at his house. (*Id*. at 27.) Defense counsel also read the following stipulation to the jury: "the caller ID on Donna's home telephone showed that [Hernandez's] home phone number called at 9:32 p.m. on October 5, 1999." (ECF No. 257-3 at 25.)

The defense also attempted to show that Hernandez was delusional. William Sheldon, an investigator for Child Protective Services, testified that Hernandez called Child Protective Services' hot line on April 28, 1999, and made allegations against Landeros regarding A.H. (ECF No. 284-1 at 56, 58.) However, Sheldon spoke with Hernandez, Donna, Landeros, Griego, and A.H., and he did not find evidence to substantiate Hernandez's allegations against Landeros. (*Id*. at 57.) Sheldon admonished Hernandez "concerning his questioning of the child incessantly to the point where [she] was confused," because he was concerned that Hernandez "was perhaps planting things in her mind." (*Id*. at 60.)

Finally, regarding not disputing the protective order Donna had against Hernandez, the defense called Paul Gaudet who testified that he represented Hernandez in that protective order case. (ECF No. 284-1 at 30–31.) Gaudet testified that he "thought that it was in everybody's best interest to just go ahead and leave this protective order in place" and keep Hernandez and Donna away from each other because, "from a practical standpoint, [he] thought everyone involved was better served by not requesting a hearing in an attempt to validate any allegations that would be made." (*Id*. at 34.)

On rebuttal, the State played a videotape of a family court proceeding involving Hernandez and Donna from November 4, 1998. (ECF No. 257-3 at 25–26.)

The jury found Hernandez guilty of burglary while in possession of a weapon, first-degree murder with the use of a deadly weapon, second-degree kidnapping, and unlawful penetration of a dead body. (ECF No. 257-2.)

### 2.    Penalty phase of the trial

The State presented various witnesses to show the effect the murder had on A.H. First, Toby Griego, Jr. ("Toby"), Donna's brother, testified that he currently lived with his parents and A.H. (ECF No. 258-2 at 18.) Toby testified that A.H. "doesn't want to be alone" and "doesn't want to be in the dark." (*Id*. at 19.) Toby also testified that Donna's murder had "just torn [his] life apart." (*Id*. at 21.)

Second, Griego, Donna's mother who had also testified at the guilt phase of the trial, testified that she was now raising A.H. (ECF No. 258-2 at 23.) Griego described A.H.'s current behavior as "withdraw," explaining that A.H. "cried a lot[,] . . . wanted her mommy, especially at nighttime, and . . . won't sleep alone." (*Id*. at 31.) According to Griego, A.H. drew "pictures of houses without windows and doors" because "[s]he doesn't want . . . anybody to come in and definitely doesn't want her daddy to come in." (*Id*. at 32.) A.H. had also acted out the murder with Barbie dolls: "She would get sticks and try to stab the dolls. She tried to choke the doll, and she would shake the dolls." (*Id*. at 33.)

And third, Linda Cavazos, A.H.'s therapist, testified that at A.H.'s first appointment following the murder, A.H. "was extremely emotional, very tearful. She could not speak of her mother without crying, showing great emotion. She expressed great fearfulness. She was afraid of any closed room or area that had a door or window adjacent to it." (ECF No. 258-2 at 43.) At therapy, A.H. "would do stabbing motions on various parts of the doll's body." (*Id*. at 44.) Cavazos diagnosed A.H. with post-traumatic stress disorder. (*Id*. at 47.)

Next, during Hernandez's presentation of evidence, he called various witnesses to testify to his good character. Anibal Sabate, Hernandez's employer at a restaurant, testified that she never had any problems with him and believed him to be an honest person. (ECF No. 258-3 at 11–12.) Rafael Hernandez, Hernandez's brother, testified that Hernandez never got into any trouble in Mexico, and, after moving to the United States, he had not been in any trouble either. (*Id*. at 14, 18.) Rafael Meza testified that he and Hernandez had known each other since they were children in Mexico. (*Id*. at 20.) According to Meza, Hernandez had been employed the entire time he was in the United States, Hernandez was a "devoted father" who wanted A.H. to have "a better future," Hernandez wanted to get back together with Donna, Hernandez's family "were good, caring people," and Hernandez had drinking problems, which caused him to act stupidly and then forget what he had done. (*Id*. at 22–23, 25–29.) Trillo, who testified during the guilt phase of the trial and was an coworker and family friend of Hernandez, testified that A.H. "looked happy all the time," Hernandez would get A.H. whatever she needed,

Hernandez wanted to get back together with Donna, and Hernandez had told him that he and Donna "were having a good relationship again." (*Id*. at 33–35.) Nellie, who also testified at the guilt phase of the trial, testified that "[t]here was a lot of love" between Hernandez and A.H., A.H. "loved her father to death," Hernandez had been employee of the month at the casino where he worked, Hernandez wanted to get back together with Donna, and Hernandez was never in trouble with the law or disciplined at work. (*Id*. 258-3 at 37–44.) Lisa Souders, Hernandez's coworker at the casino, testified that Hernandez was "[w]onderful," "great," "very helpful," and "very loyal." (*Id*. at 45–46, 48.) Armando Salas, another coworker of Hernandez from the casino, testified that Hernandez was "very kind" and "loved [his daughter] a lot." (*Id*. at 52–53.) Alberta Flores, another coworker, testified that Hernandez "was living for his daughter." (*Id*. at 56, 58.) And Frank Coco, another coworker, testified that Hernandez was a happy and nice guy and had offered to clean his carpets for free. (*Id*. at 59–61.)

Hernandez allocated. (ECF No. 258-3 at 65–68.)

The jury found the following aggravating circumstances during the penalty phase of the trial: (1) Hernandez subjected or attempted to subject the victim to non-consensual sexual penetration immediately before, during, or after the commission of the murder, (2) the murder was committed while Hernandez was engaged in the commission of or an attempt to commit a burglary, and (3) the murder involved the torture or mutilation of the victim. (ECF No. 258-6 at 11.) The jury then found the following mitigating circumstances: (1) Hernandez had no significant history of prior criminal activity, (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, (3) the defendant had accepted responsibility for the crime, (4) the defendant had expressed remorse for the crime, (5) the defendant was intoxicated at the time of the crime, (6) the defendant had been gainfully employed throughout his adult life, and (7) Hernandez spared the life of A.H. even though he had threatened to kill her. (*Id*. at 12.) The jury then "found that the aggravating circumstance or circumstances outweigh any

mitigating circumstance or circumstances" and imposed a sentence of death. (ECF No. 258-5 at 2.)

> **B.    Procedural Background**

Hernandez's judgment of conviction was filed on September 28, 2000. (ECF No. 53-3.) Hernandez appealed, and the Nevada Supreme Court affirmed the judgment of conviction on August 2, 2002. (ECF No. 1-2 at 12–43.) Hernandez filed a petition for writ of habeas corpus in state court on March 12, 2003. (ECF No. 117-5.) After holding an evidentiary hearing, the state court denied Hernandez's petition. (ECF No. 14-2 at 42–50.) Hernandez appealed, and the Nevada Supreme Court affirmed the denial on October 30, 2008. (ECF No. 14-2 at 51–79.) The Nevada Supreme Court denied rehearing. (ECF No. 117-9.) Remittitur issued on February 3, 2009. (ECF No. 53-9.)

Hernandez initiated this federal habeas corpus action on September 18, 2009. (ECF No. 1.) The Court appointed counsel for Hernandez, and, with counsel, Hernandez filed a first-amended habeas petition on December 21, 2009. (ECF No. 13.) Respondents filed a motion to dismiss, arguing that several of the claims in the amended petition were not exhausted in state court. (ECF No. 52.) In response, Hernandez moved for leave to further amend his petition and for a stay to allow him to return to state court to exhaust his unexhausted claims. (ECF Nos. 59, 61.) On May 21, 2010, the Court granted Hernandez leave to file his second-amended petition and granted his motion for a stay. (ECF No. 71.) Hernandez filed his second amended habeas petition, and the action was stayed pending completion of Hernandez's second state habeas action. (ECF No. 72.)

In Hernandez's second state habeas action, the state court denied relief on procedural grounds. (ECF No. 98.) Hernandez appealed, and the Nevada Supreme Court affirmed on September 24, 2014, ruling that Hernandez's second state action was untimely, and that he did not show cause and prejudice to overcome the procedural bar. (ECF No. 98-7.) The Nevada Supreme Court denied rehearing on November 25, 2014. (ECF No. 98-9.)

The stay of this action was lifted on February 20, 2015. (ECF No. 94.) Hernandez filed a third-amended petition on June 22, 2015, and then a fourth-amended petition on March 6, 2017. (ECF Nos. 97, 147.) Respondents filed a motion to dismiss Hernandez's fourth-amended petition on March 5, 2018. (ECF No. 161.) Respondents argued that several claims in the fourth-amended petition were barred, in whole or in part, by the procedural default doctrine. (*Id*.) Respondents also argued that ground 21 was not ripe for review, and that grounds 28 and 29 were without merit. (*Id*.) On February 4, 2019, the Court granted that motion to dismiss in part and denied it in part, dismissing ground 2 except the ineffective assistance of trial counsel portion of that claim, ground 16 except the ineffective assistance of trial counsel portion of that claim, and grounds 7, 9, 10, 11, 13g, 14, 15 and 19. (ECF No. 184.) Hernandez filed a motion for reconsideration, which the Court denied. (ECF No. 218.)

On July 2, 2019, Hernandez filed a motion to amend, requesting leave to file a fifth-amended habeas petition to add three grounds—grounds 30, 31 and 32—to his petition. (ECF No. 204.) The Court granted the motion. (ECF No. 218.) Hernandez filed his instant Fifth-Amended Petition on October 11, 2019. (ECF No. 221.) On December 24, 2019, Respondents filed a motion to dismiss, arguing that these three new grounds should be dismissed. (ECF No. 224.) The Court granted the motion, in part, dismissing ground 32. (ECF No. 242.)

Respondents filed their answer to the Fifth-Amended Petition, and Hernandez filed his reply. (ECF No. 285, 301.) Based on the United States Supreme Court decision in *Shinn v. Ramirez*[3], the Court instructed the parties to file an amended answer and amended reply, respectively. (ECF No. 307.) Respondents filed their amended answer, Hernandez filed his amended reply, and Respondents filed their surreply. (ECF No. 317, 322, 345.)

///

///

_____

[3]596 U.S. 366 (2022).

1    Hernandez moved for leave to conduct discovery and for an evidentiary hearing.

2    (ECF Nos. 324, 325.) Respondents responded to the motions. (ECF Nos. 340, 342.)

3    Hernandez replied. (ECF Nos. 346, 347.)

4    **III.    GOVERNING STANDARD OF REVIEW**

5        28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in

6    habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an
>     unreasonable application of, clearly established Federal law, as
>     determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
>     determination of the facts in light of the evidence presented in the
>     State court proceeding.

15   A state court decision is contrary to clearly established Supreme Court precedent, within

16   the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the

17   governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a

18   set of facts that are materially indistinguishable from a decision of [the Supreme] Court."

19   *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362,

20   405–06 (2000)). A state court decision is an unreasonable application of clearly

21   established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the

22   state court identifies the correct governing legal principle from [the Supreme] Court's

23   decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

24   at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires

25   the state court decision to be more than incorrect or erroneous. The state court's

26   application of clearly established law must be objectively unreasonable." *Id.* (quoting

27   *Williams*, 529 U.S. at 409–10) (internal citation omitted).

28

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.    Ground 1: Ineffective Assistance of Counsel

In ground 1, Hernandez alleges that his convictions and death sentence are invalid under federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, a fair and impartial jury, and a reliable sentence, because trial counsel were ineffective. (ECF No. 221 at 33.)

Importantly, as is discussed further in the motion for evidentiary hearing section of this Order, *infra*, the Court does not consider any evidence beyond Hernandez's first state postconviction record[4] with regard to grounds 1 and 2 because Hernandez cannot satisfy the stringent requirements of § 2254(e)(2). *See Shinn v. Ramirez*, 596 U.S. at 385 (concluding "that, under § 2254 (e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel").

---

[4]The Court cannot consider evidence presented during Hernandez's second state postconviction proceedings—and any evidence generated thereafter—because (1) the Court is precluded from considering evidence presented in a procedurally barred state postconviction action, *see McLaughlin v. Oliver*, 95 F.4th 1239 (9th Cir. 2024), and (2) Hernandez's second state postconviction action was found to be procedurally barred by the state district court and the Nevada Supreme Court affirmed that ruling. (*See* ECF No. 98, 98-7.)

### 1. Procedural default

The Court previously found grounds 1a through 1e to be procedurally defaulted. (ECF No. 184 at 17–21.) The Court explained that it would consider whether Hernandez can demonstrate cause and prejudice to overcome these procedural defaults during its merits review. (*Id*.)

Under *Martinez v. Ryan*, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had no counsel during the state postconviction proceedings or (b) such counsel was ineffective. 566 U.S. 1, 14 (2012). To demonstrate "prejudice" under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. *Id*. A claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability. *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See generally Miller-El v. Cockrell*, 537 US. 322, 336–38 (2003).

Regarding grounds 1a through 1e, the principal issues[5] before the Court are: (1) whether Hernandez's ineffective-assistance-of-trial-counsel claim is substantial; (2) if so, whether Hernandez's state postconviction counsel was ineffective in raising the claim in the state court; and (3) if so, whether, on the merits, Hernandez was denied effective assistance of trial counsel. *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, the Court's review is de novo. *See Atwood*, 870 F.3d at 1060 n.22.

///

---

[5]It is undisputed that (1) a state postconviction proceeding in the state court was an initial-review collateral proceeding for purposes of *Martinez*, and (2) Nevada procedural law sufficiently requires a petitioner to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

### 2.    Standard for ineffective assistance of counsel claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Although irrelevant for ground 1, the Court notes, for the sake of other grounds addressed in this Order, that where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id*. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions

were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 3.    Ground 1a—failure to investigate mental health issues

In ground 1a, Hernandez alleges that his counsel failed to investigate his organic brain damage, severe delusional disorder, fetal alcohol spectrum disorder, and genetic predisposition toward alcohol-induced psychosis, which had worsened by the onset of dementia caused by his severe heart condition. (ECF No. 221 at 35.)

#### a.    Background information

Schieck and Oram hired Thomas F. Kinsora, Ph.D., to conduct a forensic psychological assessment of Hernandez. (ECF No. 24 at 42.) Dr. Kinsora examined Hernandez on three occasions before trial and once just before his penalty hearing "to investigate Mr. Hernandez's current personality functioning and to assess his ability to understand the charges against him, his awareness of the implications of going to trial versus taking a plea bargain offered to him, and his ability to assist counsel." (*Id*.) Regarding Hernandez's results from the Minnesota Multiphasic Personality Inventory-2 test, Dr. Kinsora reported the following:

> The validity scales indicated that he responded in a highly defensive manner, attempting to appear without flaws or personal shortcomings. He likely purposefully denied any item that would make him appear to have emotional problems, problems with anger, or problems with depression. The profile is, unfortunately invalid for interpretation.
>
> My own clinical impression is that Mr. Hernandez is extremely guarded and resistant to the idea that he played a role in this murder. He worked hard to paint a picture for this examiner of a high functioning, well-adjusted man who never had any problems with anger or jealousy. When confronted with strong evidence to the contrary, he provided explanations and rationalizations that were often weak and self-contradictory.

(*Id*. at 46.) And regarding his recommendations, Dr. Kinsora reported the following:

> Formal measures of intelligence were not administered due to his less than ideal comprehension of the English language. He does not appear to possess any neurological problems and it is unlikely that full neuropsychological assessment would be of any benefit. His present and past level of functioning suggests a gentleman of average intellectual skills who is self motivated and driven. His reluctance to discuss any negative psychological qualities makes any comment related to his current state of mind difficult. My own assessment of Mr. Hernandez suggest that he is not currently suffering from any formal thought disorder or severe level of

17

depression. He seems to be able to assist counsel in his defense, although he may need an interpreter when English passages are very complex or rapidly presented. He does understand the implications of going to trial versus taking a plea bargain, and he does understand the charges brought against him.

I have reached two important conclusions related to the incident itself:

It is my opinion, with a reasonable degree of certainty, that Mr. Hernandez was unable to reason properly at the time he attacked Donna Hernandez. His state of mind around the time of his arrest does suggest that he was under profound duress and emotional turmoil. He likely lost at least some aspects of reality testing as indicated by the apparent belief that he had actually killed both Donna and Francisco (Donna's former room-mate and possibly her former lover). It is my opinion that if he was this distraught and mentally unbalanced several hours after the murder, he must have been completely unable to reason or judge right from wrong at the time of the murder. Any speculation would be difficult to prove, however, anyone reading the reports of Mr. Hernandez' behavior just after being pulled over would conclude that he was severely disturbed, emotionally distraught, and was admitting to two killings when in fact only one occurred. He was likely suicidal and seemed to want the officers to kill him for what he had done. His belief that he killed both Donna and Francisco was likely based on his fantasies of what he wished had happened. At the time of his arrest he clearly could not tell fantasy from reality. Furthermore, the manner in which Donna was murdered suggests that Mr. Hernandez displayed a level of rage that is profound and directed from a place that is beyond reasoning and judgment, at least for Mr. Hernandez. This act was directed from a heated level of passion that was likely uncontrollable for him when it surfaced.

(*Id*. at 46–47.) The defense did not call Dr. Kinsora to testify at the guilt or penalty phases of Hernandez's trial. (*See* ECF No. 27 at 10.)

When questioned why the defense did not call Dr. Kinsora to testify, Schieck testified at the postconviction evidentiary hearing that he did not "want the jury to find out" that Hernandez was "being deceptive to his own doctor." (*Id*. at 14.) Schieck elaborated: "[c]ertainly there are some things in the report that if you read them in a vacuum appear to be helpful, but when you take in the entire range of the report I think it does more harm than good," including "[t]he deception, the continual denial of culpability, [and] the continuing to blame others when clearly the evidence showed it was not someone else." (*Id*.) Similarly, Oram testified that the defense decided not to call Dr. Kinsora because "the doctor had said that Mr. Hernandez had denied the crime [but they] had conceded guilt and gotten [Hernandez's] permission" to do so. (*Id*. at 25.) According to Oram, the defense was "concerned that the jury would be disturbed that Mr. Hernandez had not

been forthcoming with Dr. Kinsora" and that presenting a penalty-phrase theme of "acceptance or responsibility" was the better way to proceed. (*Id.*)

### b.    Standard

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. This investigatory duty includes investigating the defendant's "most important defense." *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). It also includes investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). In assessing an attorney's investigation, the Court must conduct an objective review of that attorney's performance, measured for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. This includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Id*. at 689*; see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### c.    Analysis

For the reasons discussed in the remainder of this ground and the certificate of appealability section of this Order, *infra*, the Court finds that (1) ground 1a is substantial and (2) Hernandez has demonstrated cause and prejudice to overcome the procedural default of ground 1a. *See Ramirez v. Ryan*, 937 F.3d at 1241 (explaining that a claim is "substantial" for purposes of Martinez if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability). The Court now reviews the merits of ground 1a.

Hernandez argues that counsel failed to perform basic interviews of his family and failed to retain necessary experts to explain that his behavior on the day of the crime amounted to second-degree rather than first-degree murder and to provide mitigation evidence against a sentence of death.[6] (ECF No. 221 at 39.)

Hernandez's counsel hired Dr. Kinsora to perform a psychological evaluation of Hernandez, and, importantly, as reasonably explained by Schieck and Oram at the postconviction evidentiary hearing, Schieck and Oram purposefully declined to have Dr. Kinsora testify because they determined it would have caused more harm than good. *See Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."). This strategy was sound and is entitled to deference. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Richter*, 562 U.S. at 105 ("The standard for judging counsel's representation is a most deferential one."); *Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions.").

However, it is less clear that Hernandez's counsels' decision to not seek out other experts to further explore Hernandez's psychological issues was objectively reasonable. Hernandez's defense was to concede that he killed Donna but lacked the culpability for first-degree murder during the guilt phase of the trial and should be spared from death during the penalty phase of the trial. As such, Hernandez's potential mental health issues should have been at the forefront of counsels' investigations and, if fruitful, should have been the focal point of the defense during both phases of the trial. Indeed, Hernandez's mental health issues could have been compelling evidence that he lacked the *mens rea*

---

[6]Importantly, in this ground, Hernandez relies almost exclusively on evidence that the Court is unable to consider. Notably, Hernandez concedes that he did not present many exhibits, including a neuropsychiatric evaluation by Dr. Antonin Llorente, until his second state habeas proceedings and has never presented exhibits, including a report by neuroradiologist Dr. Anne Hayman, to the state courts. (*See* ECF No. 322 at 66 n.10, 70 n.13.)

for first-degree murder during the guilt phase of the trial and could have persuaded the jury against a death sentence during the penalty phase of the trial. That being said, the Court notes various issues with Hernandez's mental health arguments.

First, some of Hernandez's mental health evidence seems speculative and lacks certainty, supporting a finding that counsels' assessment of the lack of need for further investigation was reasonable under the circumstances here. Hernandez bases his argument about his prenatal exposure to alcohol entirely on his uncle's recollection, not on any medical evidence. (*See* ECF No. 221 at 36.) Hernandez only alleges that he "*may* have sustained a traumatic brain injury*" when he fell from a ladder at a young age. (*Id*. at 38 (emphasis added).) And Hernandez only alleges that his severe heart disease "made it *quite possible* that his decline in intellect" is a sign of the onset of dementia. (*Id*. at 40 (internal quotation marks omitted) (emphasis added).)

Second, some of Hernandez's mental health evidence is contradicted by his own statements, hindering counsels' knowledge of the need for investigation. Hernandez alleges that he was hospitalized for psychiatric treatment as a child, frequently ran away from home as a child, was the victim of severe parental neglect, was the victim of emotional and physical abuse, and was suffering from long-term alcohol abuse at the time of the crime. (ECF No. 221 at 41, 43, 45, 46, 48.) However, these allegations are all contradicted by his own statements to Dr. Kinsora. (*See* ECF No. 24 at 44–45 (describing his parents "in almost saintly terms," denying any childhood physical or sexual abuse, stating that his only previous psychological history was seeing a marriage counselor, reporting "[n]o problems" regarding fetal health, and admitting to only "occasional alcohol use").) Because Hernandez did not notify Dr. Kinsora—or, presumably, his counsel—of these issues, he fails to demonstrate deficiency regarding his counsels' investigation of them. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence.").

1    Nevertheless, even if Hernandez's counsel could have done a more thorough job

2    investigating these various mental issues avenues, the Court finds that Hernandez fails

3    to demonstrate prejudice. First, regarding establishing that Hernandez lacked the

4    requisite *mens rea* for first-degree murder, the apparent depth of Hernandez's alcoholism

5    could have perhaps been more thoroughly investigated and then painted for the jury, but

6    the Court is far from confident that the jury would have found that supplementary details

7    would have provided further persuasive value compared to the details they already had

8    before them. Indeed, the jury was already fully aware that Hernandez had been drinking

9    alcohol on the night Donna was killed. And the remaining mental health evidence which

10    the Court is permitted to consider is too inconclusive for it to have carried much, if any,

11    weight in the jury's assessment of Hernandez's state of mind at the time of the murder.

12    Second, regarding providing mitigation at the penalty hearing, Hernandez's mental

13    illnesses contrast sharply with the strength of the aggravating circumstances. *Thornell v.*

14    *Jones*, 602 U.S. 154, 171–72 (2024) ("When a capital defendant claims that he was

15    prejudiced at sentencing because counsel failed to present available mitigating evidence,

16    a court must decide whether it is reasonably likely that the additional evidence would have

17    avoided a death sentence. This analysis requires an evaluation of the strength of all the

18    evidence and a comparison of the weight of aggravating and mitigating factors."). Given

19    the weighty aggravating circumstances of this case, the Court cannot find that a more

20    detailed picture of Hernandez's mental illnesses would have altered Hernandez's

21    sentencing profile, meaningfully changed how the jurors viewed this case, or changed the

22    jury's assessment that Hernandez was deserving of the death penalty. This finding is

23    supported by the fact that the jury already found that Hernandez was under extreme

24    mental or emotional disturbance at the time of the offense, and it still sentenced him to

25    death. (ECF No. 258-6 at 12.) Thus, in reweighing the evidence in aggravation against

26    the totality of the mitigating evidence, including the mental illness evidence presenting in

27    this ground that the Court is allowed to consider, the Court finds the horrifyingly violent

28    evidence in aggravation decidedly overshadows the mitigation evidence.

In sum, because (1) Hernandez's counsels' actions were only conceivably deficient and (2) Hernandez fails to demonstrate prejudice, ground 1a is denied.

### 4. Ground 1b—failures regarding second-degree murder defense

In ground 1b, Hernandez alleges that his trial counsel were ineffective in their development and presentation of their second-degree murder defense. (ECF No. 221 at 55.) Hernandez breaks this argument down into three parts.

First, Hernandez alleges that his counsel failed to investigate and present available evidence regarding the tumultuous, dysfunctional, and emotionally stressful relationship that existed between he and Donna. (ECF No. 322 at 95.) In support of this argument, Hernandez presents statements from witnesses describing their relationship as dysfunctional and full of tension. (*See* ECF No. 221 at 55–66 (statements from witnesses explaining that Donna's moods would change in an instant, Donna would kick Hernandez out of the house leaving him and A.H. to sleep outside in the car, and the couple was known to have separated numerous times).) Hernandez also contends that his counsel should have investigated Donna's regular violations of her own restraining orders and emotional problems. (*Id*. at 56.)

Second, Hernandez alleges that his counsel failed to investigate and present available evidence regarding the crime scene itself. (ECF No. 322 at 95.) In support of this argument, Hernandez contends that the prosecution argued that he first strangled Donna, thereby immobilizing her, and then repeatedly stabbed her as she lay defenseless; however, defense experts could have presented evidence that this was a heat of passion killing. (ECF No. 322 at 95.)

Third, Hernandez alleges that his counsel failed to investigate and present available evidence regarding his heavy drinking before the offense. (ECF No. 322 at 96.) In support of this argument, Hernandez contends that his counsel failed to retain a neuropharmacologist to calculate his likely blood-alcohol concentration level at the estimated time of the murder and to provide testimony regarding the expected neurobehavioral effect of his blood alcohol concentration levels. (*Id*. at 97.) Hernandez

1 also contends that witnesses could have provided information about his drinking on the

2 night leading up to the offense.[7] (*Id*. at 99.)

3      For the reasons discussed in the remainder of this ground and the certificate of

4 appealability section of this Order, *infra*, the Court finds that (1) ground 1b is substantial

5 and (2) Hernandez has demonstrated cause and prejudice to overcome the procedural

6 default of ground 1b. The Court now reviews the merits of ground 1b.

7      In support of their second-degree murder defense, the defense called witnesses

8 to show that Hernandez and Donna had been seen together and were contemplating

9 getting back together at the time of her murder, Hernandez had not planned the murder

10 based on his failure to conceal his whereabouts at the time of the murder and his failure

11 to pack passports and other essentials to effectuate escaping to Mexico, and Hernandez

12 was delusional. Given the gravity of the charges and potential death sentence facing their

13 client, Hernandez's counsel should have supplemented this evidence with evidence of

14 his dysfunctional relationship with Donna, Donna's emotional problems, crime scene

15 experts, witnesses to describe his drinking on the night of the murder, and experts to

16 explain the effects of his drinking.[8] Indeed, given that the prosecution's evidence of

17 premeditation came from Hernandez's previous death threats to Donna, it should have

18 been self-evident to Hernandez's counsel that presenting Donna's previous turbulent

19      [7]During "the guilt phase, a defendant's mental state is directly relevant for limited

20 purposes—principally, . . . legal insanity or actual failure to form the requisite intent at the

21 time of the offense." *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015). Nevada

law allows a defendant to argue that their insanity or intoxication made them incapable of

21 forming the intent to the commit the crime. *See* NRS § 193.220 ("No act committed by a

22 person while in a state of insanity or voluntary intoxication shall be deemed less criminal

by reason of his condition, but whenever the actual existence of any particular purpose,

23 motive, or intent is a necessary element to constitute a particular species or degree of

24 crime, the fact of his insanity or intoxication may be taken into consideration in

determining the purpose, motive or intent.").

25

26      [8]The bulk of Hernandez's factual support for this ground comes from evidence that

the Court is unable to consider, including a declaration by Gregory Reiber, M.D. (ECF No.

27 22 at 106–112); a declaration by criminalist William Jerry Chisum (ECF No. 22 at 119–

124); and a report by Jonathan J. Lipman, PhD. (ECF No. 302-3). Notably, Hernandez

28 concedes that he only "presented every cited exhibit [for this ground] to the state courts

during his 2010 state habeas proceedings." (ECF No. 322 at 94 n.17.)

behavior towards Hernandez would have supported the defense that Hernandez acted in a heat of passion on the night of the murder. Similarly, given that the defense attempted to show that Hernandez suffered from delusions, it would have been practicable for Hernandez's counsel to have also attempted to show that Hernandez's heavy alcohol consumption resulted in him potentially experiencing an alcohol-induced psychosis at the time of the murder, as was raised as a possibility by Hernandez in ground 1a. Accordingly, the Court finds that Hernandez's trial counsels' failures in this regard fell below an objective standard of reasonableness.

However, moving to the second *Strickland* prong, the Court finds that Hernandez fails to demonstrate sufficient prejudice because it is mere speculation that this supplemental evidence would have persuaded the jury away from convicting Hernandez of first-degree murder. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). First, although evidence of Donna's past behavior towards Hernandez would have provided general context to their relationship, there is no evidence of Donna's conduct on the night of the murder to support a finding that she provoked Hernandez on this specific occasion. Second, based on the evidence the Court is permitted to consider, it is not clear how a defense crime scene expert would have challenged the prosecution's expert. And third, regarding further evidence of Hernandez's intoxication on the night of the murder and explanation of effects of alcohol on a person's ability to make reasoned decisions, the jury already had evidence of Hernandez's intoxication on that night, and it is unclear whether presenting further evidence of that intoxication would have made a favorable difference on Hernandez's behalf or, rather, would have had the opposite effect resulting in the jury finding Hernandez less sympathetic. *See King v. State*, 392 P.2d 310, 311 (Nev. 1964) ("Whether one's intoxication is so gross as to preclude a capacity intentionally to kill is normally a fact issue for the jury to resolve.").

///

///

1    In sum, although Hernandez's counsels' actions in presenting a second-degree

2    murder defense fell below an objective standard of reasonableness, Hernandez fails to

3    demonstrate prejudice, so ground 1b is denied.

4         **5.    Ground 1c—failure to move for questioning of jurors**

5    In ground 1c, Hernandez alleges that his trial counsel were ineffective for failing to

6    move the trial court to question all of the jurors regarding any conversations concerning

7    the purchase of a gift for A.H. (ECF No. 221 at 66.)

8              **a.    Background information**

9    While the jury was deliberating during the penalty phase of the trial, the court

10   explained that "the bailiff had informed [it] that three of the jurors had purchased a present

11   for [A.H.]." (ECF No. 258-6 at 5.) The court "instructed the bailiff simply to tell them to set

12   the present aside." (*Id.*) The following day, outside the presence of the jurors, the trial

13   court discussed this issue with counsel, proposing that, after the jury finished deliberating,

14   it would have "the bailiff identify the three jurors who purchased the present" and then,

15   after excusing the rest of the jury, allow "counsel [to] question them whether they

16   discussed the case or any facts of the case or discussed potential punishment or anything

17   that jurors are precluded from discussing, when they made the decision to purchase [the]

18   present for the child." (*Id.* at 5–6.) Hernandez's counsel explained that they would be

19   moving for a mistrial depending "upon what we may or may not find out from the jurors."

20   (*Id.* at 6.) The trial court explained that it believed "the appropriate time to question them

21   would be after they have reached a decision." (*Id.*)

22   After the jury returned Hernandez's death sentence and the rest of the jurors had

23   been excused, the court questioned Michelle Lorren and Traci Almond. (*Id.* at 16.) The

24   following discussion took place:

25   THE COURT:          Thank you. Miss Lorren and Miss Almond, I understand
                         that the two of you along with [Amber Lacosse, an
26                       alternate juror who had already been excused],
                         purchased a gift for the minor child, [A.H.], and if you
27                       have that, you may certainly give that either to the
                         grandmother or to the district attorney to transfer to the
28                       grandmother. However, we do have to know, because

| | | |
|---|---|---|
| | | we give you this admonishment that you can't talk to each other, you can't discuss the trial or any of the facts, et cetera, et cetera, I do have to ask you how it was that you decided, three of you decided to go together to purchase a present for the child. |
| JUROR LORREN: | | The day that we were here all day on Friday, we were walking out, and I think it was Amber that said I wish we can get something for [A.H.]. I said, why don't we do that, and we took Traci because she has a little girl too about the same age. We just got the sizes of clothes. We didn't talk about the trial at all. |
| THE COURT: | | And, Miss Almond, . . . [i]s that you recollection of how that happened, and you tell us that you did not discuss the trial at all? |
| JUROR LORREN: | | No. We basically discussed what would fit her and what we thought was cute. |
| THE COURT: | | Counsel, do you have any questions you would like to ask Miss Lorren or Miss Traci. |
| MR. SCHIECK: | | Just a few, judge. That was Tuesday the day we quit early after the State presented the counselor and - - |
| JUOR ALMOND: | | We quit about two. |
| MR. SCHIECK: | | Was it after you heard the State's case in the penalty hearing that you went out? |
| JUROR LORREN: | | It was this week. I think we all had been, at least I had wished I could do something for [A.H.], and I heard Amber say that, and I thought, well, let's get it, [A.H.] something. |
| JUROR ALMOND: | | We were walking downtown. We saw something down there the other day. We went down afterwards because we got out early. |
| . . . . | | |
| THE COURT: | | If you have the present here, you can certainly give it to the district attorney, and he will transfer it to the family, and you're excused. |

(*Id*. at 16–18.)

The trial court denied a mistrial, explaining that "[t]he jurors testified as to how it is that three of them went shopping and bought some clothing for [A.H.]. They did not discuss the case." (ECF No. 259-5 at 27.)

### b.    Analysis

Hernandez argues that his counsel should have insisted that the entire jury be questioned to determine if anyone could confirm or contradict the jurors' statements that they did not discuss the case when making the decision to purchase the gift and about the impact the gift had during deliberations given that it was placed in the deliberation room. (ECF No. 221 at 66–67.) Although Hernandez's counsel could certainly have taken these extra steps to attempt to acquire more evidentiary support for their motion for a

mistrial, Hernandez fails to demonstrate that failure to take these extra steps resulted in his counsels' performances falling below an objective standard of reasonableness. As the Court discusses further in ground 3, *infra*, the buying of the gift was a symbol of a few of the jurors' sympathies for A.H. While acting on this sympathy may have amounted to juror misconduct, in light of Lorren's and Almond's answers to the trial court's questions— including the fact that they did not discuss the case either before or during their shopping trip—Hernandez's trial counsel could have reasonably determined that the jurors' buying of the gift did not warrant a mistrial, negating a futile further investigation into the issue.

Because Hernandez fails to demonstrate any deficiency, ground 1c is not substantial, so Hernandez fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 1c. Ground 1c is dismissed.

### 6.    Ground 1d—failures to object to prosecutorial misconduct

In ground 1d, Hernandez alleges that his trial counsel were ineffective for failing to object to the alleged instances of prosecutorial misconduct identified in ground 8a. (ECF No. 221 at 67.) For the reasons discussed in ground 8a, Hernandez fails to demonstrate that his counsel acted deficiently or resulting prejudice, so ground 1d is not substantial. Because Hernandez fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 1d, ground 1d is dismissed.

### 7.    Ground 1e—failures during the penalty phase

In ground 1e, Hernandez alleges that trial counsel were ineffective during the penalty phase of the trial. (ECF No. 221 at 67.) Ground 1e essentially combines counsels' alleged failures in ground 1a, which discusses Hernandez alleged mental illnesses, with the following alleged failures to show his lessened moral culpability: (1) interviewing his family and friends and obtaining education, health, employment, and mental health records to obtain a complete life history, (2) retaining an expert to determine whether there were any cultural influences that might have helped to explain his actions, (3) retaining a psychopharmacologist to explain the effects of alcohol on a person's ability to make reasoned decisions, and (4) retaining an institutionalization expert to explain that

28

the probability of him committing acts of violence against other inmates or correctional staff was extremely low.[9] (*Id*. at 70–71.)

For the reasons discussed in the remainder of this ground and the certificate of appealability section of this Order, *infra*, the Court finds that (1) ground 1e is substantial and (2) Hernandez has demonstrated cause and prejudice to overcome the procedural default of ground 1e. The Court now reviews the merits of ground 1e.

"To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (alternations in original) (quoting *Williams*, 529 U.S. at 393). During the penalty phase, the jury has wide "latitude to consider amorphous human factors," so "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Bemore*, 788 F.3d at 1171 (quoting *Wharton v. Chappell*, 765 F.3d 953, 970 (9th Cir. 2014)). "To that end, trial counsel must inquire into a defendant's social background, family abuse, mental impairment, physical health history, and substance abuse history; obtain and examine mental and physical health records, school records, and criminal records; consult with appropriate medical experts; and pursue relevant leads." *Id*. (internal quotation marks omitted).

Even scrutinizing Hernandez's counsels' performances under a highly deferential lens, it is apparent that Hernandez's counsels' mitigation presentation as a whole was vague and lifeless. Hernandez's penalty-phase witnesses testified about only superficial observations regarding his work ethic, positive qualities, and love for his family. *See Noguera v. Davis*, 5 F.4th 1020, 1041 (9th Cir. 2021) ("Viewed from their penalty-phase

---

[9]Hernandez's factual support for this ground comes entirely from evidence that the Court is unable to consider, including a declaration from Foreman Richard McCann, interview with juror George Minor, declarations from Schieck and Oram, and a report from Mark D. Cunningham, Ph.D. Hernandez concedes that "each of the[se] exhibits was presented [only] to the state courts in connection with [his] 2010 state petition." (ECF No. 322 at 118 n.28.)

perspective, counsel's decision to investigate only the positive aspects of Noguera's life fell well below the prevailing professional norms."); *Jones v. Ryan*, 52 F.4th 1104, 1117 (9th Cir. 2022) ("Classic mitigation evidence includes mental disorders, mental impairments, family history, abuse, physical impairments, and substance abuse."); *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) ("The defendant's history of drug and alcohol abuse should also be investigated."). Although Hernandez's mental illness evidence was too inconclusive for it to have carried much weight, as the Court discussed in ground 1a, *supra*, Hernandez's mental illness evidence in combination with evidence showing a more complete life history, cultural influences, effects of alcohol, and that he would not pose a danger should he have been given a life sentence may have brought the jury's penalty determination to a tipping point. *See Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing because the Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy." (Internal quotation marks and alteration omitted).) Consequently, the Court finds that Hernandez's trial counsels' generic mitigation presentation at the penalty hearing provided potentially inadequate and incomprehensive information, resulting in the depiction of Hernandez being potentially incomplete and unfairly skewed in the favor of a death verdict. As such, Hernandez demonstrates that his counsels' representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688; *see also Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002) (concluding that the petitioner's counsel's "abandonment of the investigation into Silva's background—including his family, criminal, substance abuse, and mental health history—was unreasonable").

However, the prejudice stemming from this potential mitigation evidence is lacking, especially given that the Court is prevented from considering various pieces of information due to *Ramirez*. The evidence that the Court is permitted to consider is unexceptional, indefinite, and only demonstrates an ability to *conceivably* influence the jury's verdict. Because the supplemental mitigation evidence that the Court is permitted to consider

does not come close to even counterbalancing the unmistakably horrific evidence in aggravation to support a finding that it would have changed the jury's assessment that Hernandez was deserving of the death penalty, the Court is unable to find that Hernandez has demonstrated prejudice under *Strickland*. *See Wiggins*, 539 U.S. at 534. Ground 1e is denied.

### 8.    Ground 1f—cumulative ineffectiveness

In ground 1f, Hernandez alleges that the cumulative effect of his counsels' ineffectiveness warrants relief. (ECF No. 221 at 72.) The Court previously determined that, to the extent that there are claims of ineffective assistance of trial counsel in grounds 1a through 1e that are not barred by the procedural default doctrine, this claim is not subject to dismissal. (ECF No. 184 at 21.)

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the Court must assess whether the aggregated errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process") (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The Court has identified deficiencies on the part of Hernandez's counsel in grounds 1b and 1e and potential deficiencies on the part of Hernandez's counsel in ground 1a. However, for the combined reasons identified in the prejudice discussions of these grounds, even cumulating these definite and potential errors does not result in a finding of prejudice warranting the granting of relief. Ground 1f is denied.

### B.    Ground 2—Counsels' Failure Regarding Expert Witnesses

In ground 2, Hernandez alleges that his trial counsel were ineffective in failing to obtain (1) a Spanish-speaking neuropsychologist, (2) an expert who could explain that the crime scene evidence was consistent with an offense that occurred during the "heat of passion," and (3) an institutionalization expert who could explain that he would not

present a danger to the guards and inmates if given a life sentence. (ECF No. 221 at 74–99.) The Court previously found ground 2 to be procedurally defaulted but explained that it would consider cause and prejudice arguments to overcome the procedural default during its merits review. (ECF No. 184 at 22.) The Court now considers: (1) whether ground 2 is substantial; (2) if so, whether Hernandez's state postconviction counsel was ineffective in raising ground 2; and (3) if so, whether, on the merits, Hernandez was denied the effective assistance of trial counsel.

Hernandez's support for ground 2 comes entirely from evidence the Court is not allowed to consider under *Ramirez*, including Dr. Antonin Llorente's declaration, Dr. Kinsora's 2009 declaration, Schieck and Oram's declaration, Dr. Natalie Novick Brown's declaration, Dr. Jonathan Lipman's report, and Dr. Mark Cunningham's report. Lacking any evidentiary support, this ground is supported only by conclusory arguments.

First, regarding obtaining a Spanish-speaking neuropsychologist's evaluation, Hernandez contends that (1) his first language is Spanish, so a Spanish-speaking evaluation would have produced more accurate results, and (2) Schieck's and Oram's retention of Dr. Kinsora was deficient because Dr. Kinsora was hired for only the limited purpose of gaining a preliminary understanding of his mental state and because Dr. Kinsora was not given necessary information to conduct an adequate assessment. While Schieck and Oram certainly could have sought out a Spanish-speaking neuropsychologist to more broadly assess Hernandez's brain conditions, Hernandez fails to demonstrate deficiency. As the Court discussed in ground 1a, Schieck and Oram hired Dr. Kinsora, a "formally trained neuropsychologist," to perform a "forensic psychological assessment" of Hernandez before trial, and Dr. Kinsora determined that Hernandez did "not appear to possess any neurological problems and it is unlikely that full neuropsychological assessment would be of any benefit." (ECF No. 24 at 42, 46.) And regarding Hernandez's comprehension, Dr. Kinsora reported that Hernandez "[d]enied any difficulty understanding the examiner, particularly after the information was restated." (*Id*. at 24.)

1    Second, regarding obtaining an expert who could explain that the crime scene

2    evidence was consistent with an offense that occurred during the "heat of passion," the

3    Court already addressed—and denied—this argument in ground 1b, finding that

4    Hernandez fails to demonstrate prejudice.

5    Third, regarding obtaining an institutionalization expert who could explain that he

6    would not present a danger to the guards and inmates if given a life sentence, Hernandez

7    fails to demonstrate ineffectiveness. During penalty-phase closing arguments,

8    Hernandez's counsel invited the jury to ask whether Hernandez would be "a future danger

9    [so] that we have to put him to death to remove him from this planet before his time."

10   (ECF No. 258-4 at 6.) Hernandez's counsel then answered his own question: "I would

11   submit that evidence does not support that he is a future danger, that he needs to be

12   killed to protect. The state presented no evidence to support that." (*Id*.) Hernandez's trial

13   counsel then subsequently noted that the jury could "look at the fact as another mitigator

14   that [the State] have produced not a shred of evidence that [Hernandez] is any threat to

15   any correctional officer [or] to any other prisoner." (*Id*. at 21.) Although Hernandez's trial

16   counsel could have obtained an expert to strengthen this argument in support of a life

17   sentence over a death sentence, Hernandez fails to demonstrate the need for his counsel

18   to have done so. As Hernandez's counsel states, the State presented no evidence to the

19   contrary, so there was nothing to rebut. And given Hernandez's lack of previous criminal

20   history and the fact that his killing in this matter involved a domestic dispute with a former

21   partner, it was sufficiently discernable that Hernandez would not necessarily be a danger

22   to remote persons whom he shared no attachment.

23   Hernandez fails to demonstrate counsel ineffectiveness, so ground 2 is not

24   substantial. Because Hernandez fails to demonstrate requisite prejudice necessary to

25   overcome the procedural default of ground 2, ground 2 is dismissed.

26   **C.    Ground 3—Jurors**

27   In ground 3, Hernandez alleges that his convictions and death sentence are invalid

28   under federal constitutional guarantees of due process, the effective assistance of

counsel, and a fair and impartial jury because a biased and improperly impassioned jury determined his sentence. (ECF No. 221 at 100.) Specifically, Hernandez alleges that the jurors were biased against him due to the gift bought for A.H., the trial court erred in refusing to declare a mistrial based on this conduct and the presence of the gift in the deliberation room, and this bias constituted structural error. (*Id*. at 100–04.)

### 1.    State court determination

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez contends that a mistrial should have been granted because of juror misconduct. The following facts are pertinent.
>
> The jurors returned guilty verdicts on a Friday, and the district court excused the jurors until the next Tuesday, when the penalty phase was to begin. As required by NRS 175.401, the court admonished them in the meantime not to talk among themselves or with anyone else on any subject related to the trial; not to read, watch, or listen to any report or commentary pertaining to the trial; and not to form or express any opinion on any subject connected with the trial.
>
> Penalty deliberations began on Wednesday afternoon. At that time the district court informed the parties that the bailiff had learned that three jurors had bought a present for [A.H.] and the court had instructed the bailiff to tell the jurors to set the present aside to be dealt with later. The court decided to wait until after a verdict was returned before it questioned the three jurors "whether they discussed the case or any facts of the case or discussed potential punishment or anything that jurors are precluded from discussing, when they made the decision to purchase a present for the child." After the jury returned a death sentence on Thursday, the court excused all but two jurors, and the following colloquy occurred:
>
> The Court: Thank you. Miss Lorren and Miss Almond, I understand that the two of you along with one of the alternates who is not with . . . us anymore, purchased a gift for the minor child, [A.H.], and if you have that, you may certainly give that either to the grandmother or to the district attorney to transfer to the grandmother. However, we do have to know, because we give you this admonishment that you can't talk to each other, you can't discuss the trial or any of the facts, etc., etc., I do have to ask you how it was that you decided . . . to go together to purchase a present for the child.
>
> Juror Lorren: The day that we were here all day on Friday, we were walking out, and I think it was Amber that said I wish we can get something for [A.H.]. I said, why don't we do that, and we took Traci [Almond] because she has a little girl too about the same age. We just go the sizes of clothes. We didn't talk about the trial at all.
>
> . . . .
>
> The Court: [Miss Almond, is] that your recollection of how that happened, and you tell us that you did not discuss the trial at all?

Juror [Almond]: No. We basically discussed what
would fit her and what we thought was cute.
Defense counsel also questioned the two jurors and then moved for a
mistral, which the court denied.

Hernandez contends that the jurors violated the admonition not to
talk about the case. He also contends that the presence of the gift in the
jury room during deliberations was prejudicial error.

"It is generally accepted principle of trial administration that jurors
must not engage in discussions of a case before they have heard both the
evidence and the court's legal instructions and have begun formally
deliberating as a collective body." [*U.S. v. Resko*, 3 F.3d 684, 688 (3d Cir.
1993).] The record does not support appellant's claim that the jurors
discussed the case prematurely. Hernandez asserts that discussing the
child of the victim necessarily constituted a discussion about the case, but
based on the jurors' testimony, we do not agree.

Even if the jurors' behavior was misconduct, not every incidence of
juror misconduct requires a new trial. [*Tanksley v. State*, 113 Nev. 997,
1003, 946 P.2d 148, 151 (1997).] If it appears beyond a reasonable doubt
that no prejudice occurred, a new trial is unnecessary. [*Id.*] The question of
prejudice is a factual one for the district court, and this court will not reverse
absent an abuse of discretion. [*Id.*] Intra-jury discussions are far less of a
threat to a defendant's right to trial by an impartial jury than are extra-jury
influences. [*Resko*, 3 F.3d at 690.] Here, the facts do not establish prejudice
but merely demonstrate that the jury was sympathetic to an innocent child,
who was a collateral victim of the murder. We conclude that the district court
did not abuse its discretion and that the record indicates beyond a
reasonable doubt that no prejudice occurred. [*Cf. Lewis v. State*, 94 Nev.
727, 729, 588 P.2d 541, 542 (1978).] Further, we conclude that Hernandez
fails to show that the presence of the gift constituted plain error or affected
his substantial rights. [*See* NRS 178.602 ("Plain errors or defects affecting
substantial rights may be noticed although they are not brought to the
attention of the court.").]

(ECF No. 1-2 at 19–22.)

## 2.    Appropriateness of de novo review

Hernandez argues that the Court should review this ground de novo because the

Nevada Supreme Court did not adjudicate his federal claim on the merits. (ECF No. 322

at 178.) Hernandez fails to rebut the presumption that the Nevada Supreme Court

adjudicated the federal portion of ground 3 on the merits. *See Johnson v. Williams*, 568

U.S. 289, 293 (2013) ("[W]hen a state court issues an order that summarily rejects without

discussion *all* the claims raised by a defendant, including a federal claim that the

defendant subsequently presses in a federal habeas proceeding, the federal habeas court

must presume (subject to rebuttal) that the federal claim was adjudicated on the merits."

(Emphasis in original)). Because the Court does not review ground 3 de novo, it is

precluded from considering the declaration of Michelle Lorren (ECF No. 23 at 2–4) and

1   the declaration of Foreperson Richard McCann (ECF No. 23 at 48–50) because they were

2   not before the Nevada Supreme Court at the time it considered Hernandez's direct

3   appeal. *See Pinholster*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited

4   to the record that was before the state court that adjudicated the claim on the merits").

5           **3.    Standard**

6           Under the Sixth Amendment, a defendant has a federal constitutional right to an

7   impartial jury. *See Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). This "means a jury

8   capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*,

9   455 U.S. 209, 217 (1982). "[D]ue process is denied by circumstances that create the

10  likelihood or the appearance of bias." *Peters v. Kiff*, 407 U.S. 493, 502 (1972). In this

11  situation, "the remedy for allegations of juror partiality is a hearing in which the defendant

12  has the opportunity to prove actual bias." *Smith*, 455 U.S. at 215; *see also Tanner v.*

13  *United States*, 483 U.S. 107, 120 (1987) (explaining that "evidentiary hearing[s]" are

14  required "where extrinsic influence or relationships have tainted the deliberations"). The

15  trial court "should determine the circumstances, the impact thereof upon the juror, and

16  whether or not it was prejudicial, in a hearing with all interested parties permitted to

17  participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954).

18          **4.    Analysis**

19          Under Nevada law, jurors are admonished "that it is their duty not to . . . [c]onverse

20  among themselves or with anyone else on any subject connected with the trial." NRS §

21  175.401. Hernandez interprets this admonishment broadly to include the jurors'

22  discussion about getting a gift for A.H., as was discussed in further detail in ground 1c.

23  However, it was not objectively unreasonable for the Nevada Supreme Court to have

24  more narrowly construed the admonishment and to have come to an opposite conclusion.

25  The underlying issue, which resulted in the discussion, purchase, and giving of the gift,

26  was the jurors' sympathy for A.H. Although tangentially related to the case in general, the

27  jurors having mutual sympathy for A.H. does not mean that they necessarily discussed

28  the basis of their sympathy or any other facts surrounding the case. Further, even if the

36

giving of the gift to a collateral witness amounted to juror misconduct, it fails to rise to the level of showing bias or any impartiality against Hernandez given that the correlation between having sympathy for A.H.[10] and treating Hernandez unfairly is tenuous at best.

Turning to the trial court's refusal to declare a mistrial, Hernandez fails to demonstrate error. The trial court's remedy regarding the purchasing of a gift for A.H. was to hold a hearing and question Lorren and Almond in open court in the presence of defense counsel and the prosecution. The trial court allowed the parties to ask questions of their own to these jurors. (*See* ECF No. 258-6 at 18.) Although the trial court did not question Lacosse—the alternate who was no longer present—or the other jurors about the gift, Hernandez fails to demonstrate that the trial court's inquiry into the matter was insufficient to fully understand the circumstances, impact, and prejudicialness of the issue. *See Remmer*, 347 U.S. at 230.

Finally, as the Nevada Supreme Court reasonably concluded, any error here does not dictate that Hernandez receive a new trial. Hernandez contends that the jurors' misconduct amounted to structural error. (ECF No. 221 at 104.) "[T]he defining feature of a structural error is that it affect[s] the framework within the trial proceedings, rather than being simply an error in the trial process itself." *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (internal quotation marks omitted). A biased juror may amount to a structural error because it would infect the entire trial process. However, as discussed previously, the jurors' actions in buying the gift here amounted to—at most—misconduct, not bias. *See Thompson v. Borg*, 74 F.3d 1571, 1574 (9th Cir. 1996) (explaining that jury misconduct "would support a writ only if prejudicial, because the error is 'trial error,' not 'structural error'").

---

[10]Indeed, given the testimony at the penalty hearing about A.H.'s trauma, which appears to have taken place right before the gift was purchased, sympathy for A.H. was a natural response, is unsurprising, and is not indicative of how the jurors viewed Hernandez or their obligations to be fair and impartial. Afterall, A.H. was 3 years old at the time of her mother's death and her father conceded to killing her mother.

Alternatively, Hernandez contends that the jurors' misconduct had a substantial and injurious effect on the jurors' verdict. (ECF No. 221 at 104.) Under *Brecht v. Abrahamson*, it must be determined whether a trial error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623 (1993). Here, the Nevada Supreme Court reasonably concluded that the facts present here do not establish prejudice. *See Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987) (explaining that there is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct). Although at least three jurors had sympathy for A.H., which the other jurors were potentially aware of given the gift's presence in the deliberation room, it is far from clear that this issue had a substantial and injurious effect on the jury's verdict. While jurors in other proceedings may not have acted on similar sympathies like the jurors in Hernandez's trial, it cannot be concluded that juror sympathy for a minor child or seeing a gift while deliberating influenced the jury's sentencing decision. In fact, given Hernandez's actions before and after killing Donna and the brutality of the crime itself, Hernandez fails to demonstrate prejudice resulted from Lorren's and Almond's actions.

The Nevada Supreme Court's denial of this ground was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Hernandez is not entitled to relief on ground 3.

**D.    Ground 4—Voir Dire Errors**

In ground 4, Hernandez alleges that his sentence of death is invalid under the federal constitutional guarantees of due process and equal protection, the right to effective assistance of counsel, the right to a fair trial and fair penalty hearing, and the right to be free from cruel and unusual punishment because of ineffective assistance of counsel during voir dire. (ECF No. 221 at 105.) Specifically, Hernandez alleges that his counsel failed to ask all the seated jurors whether they could consider a life sentence with parole for a crime involving the facts of Hernandez's case, to ask the jury about their

ability to consider mitigation evidence, and to ensure that the jury that sat on his case was composed of an ethnic and racial cross-section of the community.[11] (*Id*. at 105–108.)

### 1. Standard

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able to impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). The standard for assessing "when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1985)).

Relatedly, a defendant has a right "to a petit jury selected from a fair cross section of the community." *Duren v. Missouri*, 439 U.S. 357, 359 (1979). To demonstrate a violation of this right, the following factors must be shown: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id*. at 364.

### 2. State court determination

In affirming the denial of Hernandez's first state habeas petition, the Nevada Supreme Court held as follows:

> Hernandez asserts that the district court erred by denying his claims that counsel were ineffective for failing to file [a] motion[ ] to . . . challenge matters related to the questioning of jurors during voir dire . . . . Hernandez has not provided adequate facts or argument establishing that his counsel were deficient or, assuming any deficiency, that he was prejudiced by

---

[11]Hernandez also originally argued that the trial court erred in denying his counsels' challenge of potential juror Graham; however, Hernandez withdrew this argument in his reply brief. (ECF No. 322 at 190 n.52).

counsel's omissions. Therefore, we conclude that the district court did not err by denying th[is] claim[ ].

(ECF No. 14-2 at 73.)

The Court previously found Hernandez asserted this claim, in part, on his direct appeal and, in part, on the appeal of his first state habeas action. (ECF No. 184 at 23.) The Court then explained that, to the extent that the claim of ineffective assistance of counsel in ground 4 is more detailed than that asserted on the appeal in Hernandez's first state habeas action, Hernandez might be able to overcome the procedural default by showing inadequate assistance of counsel in his first state habeas action. (*Id.*) The Court then explained that it would consider cause and prejudice arguments to overcome the procedural default during its merits review. (*Id.*)

### 3.    Analysis

First, regarding Hernandez's allegation that his counsel failed to ask all the seated jurors whether they could consider a life sentence with parole for a crime involving the facts of Hernandez's case, Hernandez fails to demonstrate deficiency or resulting prejudice. Hernandez's counsel asked various prospective jurors if they would consider a punishment of life in prison with the possibility of parole if they found Hernandez guilty of first-degree murder. (ECF Nos. 253-23 at 116; 254-1 at 28, 103.) Although Hernandez's trial counsels' questions in this regard lacked Hernandez's desired level of specificity, Hernandez's counsel was able to sufficiently determine the jurors' general receptiveness to a sentence less than death by asking this question generically. *See*, *e.g.*, *Wainwright*, 469 U.S. at 424 (explaining that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism" because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings").

Second, regarding Hernandez's allegation that his counsel failed to ask the jury about their ability to consider mitigation evidence, Hernandez again fails to demonstrate

deficiency or resulting prejudice. Hernandez's counsel asked many prospective jurors (1) if they would consider all four forms of punishment (ECF Nos. 253-23 at 103, 108, 114, 121; 254-1 at 6, 12, 18, 23, 24, 100, 102, 104, 110, 114, 129, 136); (2) if it was important to them to consider Hernandez's background and other facts outside the crime in determining whether the death penalty should be imposed (ECF Nos. 253-23 at 107, 109, 116–117; 254-1 at 22); and (3) about what factors they were likely to consider in deciding a penalty (ECF No. 254-1 at 106–07, 110, 118, 134). These questions all go to the jurors' ability to consider mitigation evidence, and Hernandez fails to demonstrate that inquiring into the jurors' ability to consider any specific mitigation evidence amounted to ineffectiveness. *See Richter*, 562 U.S. at 106 ("Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach."); *see also Strickland*, 466 U.S. at 688–89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.").

Finally, the Court turns to Hernandez's allegation that his counsel failed to ensure the jury was composed of a fair ethnic and racial cross-section of the community. In his appeal of the denial of his first state habeas action, Hernandez merely argued to the Nevada Supreme Court that his trial counsel never filed a "motion challenging the racial composition of the jury venire." (ECF No. 17 at 36.) Because Hernandez's argument here is broader and more detailed than the argument he presented to the Nevada Supreme Court, this portion of ground 4 is procedurally defaulted, and Hernandez must show cause and prejudice to overcome the procedural default. Hernandez contends that (1) "[w]hile there were several persons of various racial and cultural backgrounds on the venire, [he] believes . . . that no minorities were seated on [his] jury," and (2) his counsel should have "ensured that the jury pool was fairly drawn." (ECF Nos. 221 at 107, 322 at 194–95.) Regarding the first contention, even if the Court accepts the fact that there were no

1  minorities who were seated as jurors[12], Hernandez fails to demonstrate a violation of his

2  rights given that he is only entitled to a jury plan and jury pool—not seated jurors—who

3  represent a fair cross section of the community. *See Duren*, 439 U.S. at 359. Regarding

4  the second contention, Hernandez is faced with the arduous task of supporting his

5  prejudice argument—that the jury pool and venire were not fairly drawn—with a lack of

6  evidence which is the result of the deficiency with which he alleges here—his counsels'

7  failures regarding the jury pool and venire. This circular argument results in Hernandez

8  failing to factually support this ground. Indeed, the Court would need significant additional

9  information to be able to determine whether Hernandez's counsel acted deficiently in not

10 challenging the venire. However, because Hernandez's counsel was the reason behind

11 this lack of additional information, it seems inequitable that those failures will forever

12 hinder Hernandez from litigating this type of claim. For this reason, the Court finds this

13 claim to be substantial, but because there is nothing in the record to show that

14 Hernandez's counsel should have taken any sort of action in response to the jury pool

15 and venire, Hernandez ultimately fails to meet his burden of demonstrating

16 ineffectiveness under *Strickland*.

17      Therefore, because (1) the Nevada Supreme Court's rejection of the first two

18 claims in this ground constituted an objectively reasonable application of *Strickland*, and

19 (2) Hernandez fails to demonstrate that he was denied the effective assistance of counsel

20 regarding his third claim in this ground, Hernandez is not entitled to federal habeas relief

21 for ground 4.

22      **E.    Ground 5—Murder by Torture Instruction**

23      In ground 5, Hernandez alleges that his sentence of death is invalid under the

24 federal constitutional guarantees of due process and equal protection, the right to a fair

25 _____

26 [12]Notably, this fact is only supported by Hernandez's own self-serving statement. *See, e.g., Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting a petitioner's claim, in part, because "[o]ther than [the petitioner]'s own self-serving

27 statement, there [was] no evidence" to support his allegations); *Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (explaining that the petitioner's "self-serving statement,

28 made years later," was insufficient to support the petitioner's claim).

1    trial and penalty hearing, and the right to be free from cruel and unusual punishment

2    because neither the guilt phase jury instruction on "murder by torture" nor the penalty

3    phase jury instruction on torture sufficiently narrowed the class of defendants eligible for

4    the death penalty. (ECF No. 221 at 109.)

5                        **1.      Background information**

6    Guilt phase Jury Instruction No. 27 provided as follows:

7            The essential elements of murder by means of torture are (1) the act
     or acts which caused the death must involve a high degree of probability of
8    death, and (2) the defendant must commit such act or acts with the
     calculated intent to cause cruel pain and suffering for the purpose of
9    revenge, persuasion or for any other sadistic purpose.
             The crime of murder by torture does not necessarily require any proof
10   that the defendant intended to kill the deceased nor does it necessarily
     require any proof that the deceased suffered pain.
11
     (ECF No. 14-2 at 109.) Similarly, penalty phase Jury Instruction No. 10 provided as
12
     follows:
13
             The essential elements of the aggravator involving murder by means of
14   torture are:
     (1) the act or acts which caused the death must involve a high degree of
15   probability of death; and
     (2) the Defendant must commit such act or acts with the calculated intent to
16   cause cruel pain and suffering for the purpose of revenge, persuasion or for
     any other sadistic purpose.
17   The aggravator involving murder by torture does not necessarily require any
     proof that the Defendant intended to kill the deceased nor does it
18   necessarily require any proof that the deceased suffered pain.

19   (ECF No. 19 at 27.)

20                       **2.      State court determination**

21          In affirming the denial of Hernandez's first state habeas petition, the Nevada

22   Supreme Court held as follows:

23           Hernandez argues that, similar to *McConnell*'s holding respecting
     felony murder, it is unconstitutional for the State to charge first-degree
24   murder based on torture and also base an aggravating circumstance on the
     same act or acts of torture unless it is clear that the jury did not rely on
25   torture murder in finding the defendant guilty. Therefore, according to
     Hernandez, because it is unclear whether the jurors relied on the torture-
26   murder theory to find him guilty of first-degree murder, the torture
     aggravating circumstance must be stricken. We disagree.
27           In *McConnell*, we concluded that the United States and Nevada
     Constitutions require a capital sentencing scheme to "'genuinely narrow the
28   class of persons eligible for the death penalty and must reasonably justify

the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" [120 Nev. At 1063, 102 P.3d at 620–21 (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).] Noting the United States Supreme Court decision in *Lowenfield v. Phelps*, [484 U.S. 231 (1988)] we recognized that this narrowing function may be achieved by one or two means—"'[t]he legislature may itself narrow the definition of capital offenses'" or "'the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.'" [*McConnell*, 120 Nev. at 1064, 102 P.3d at 621 (quoting *Lowenfield*, 484 U.S. at 246).] Thus, to assess whether Nevada's capital felony-murder scheme provided sufficient narrowing to pass constitutional scrutiny, we asked two questions in *McConnell*: "First, is Nevada's definition of capital felony murder narrow enough that no further narrowing of death eligibility is needed once the defendant is convicted? Second, if not, does the felony aggravator sufficiently narrow death eligibility to reasonably justify the imposition of a death sentence on the defendant?'" [*Id.* at 1065, 102 P.3d at 621–22.]

Accordingly, here, we must first determine whether Nevada's definition of torture murder is sufficiently narrow such that no further narrowing of death eligibility is needed once the defendant is convicted. We conclude that it is and that no further narrowing is required. Consequently, we need not address the second question posted in *McConnell*.

Torture murder identifies a constitutionally narrow class of murders, which only includes those defendants who act with calculated intent to inflict pain for revenge, extortion, persuasion, or for any sadistic purpose and to inflict pain beyond the killing itself. [*Domingues v. State*, 112 Nev. 683, 702 & n.6, 917 P.2d 1364, 1377 & n.6 (1996).] We conclude that the definition of torture murder assuages the risk of unconstitutional arbitrariness that the narrowing function is designed to avoid.

Moreover, the concern engendering our ruling in *McConnell* is not present here. Nothing in *McConnell* prohibits per se using the same conduct to support a murder theory and an aggravating circumstance. [We have rejected other arguments seeking to extend *McConnell*'s holding beyond the scope of felony murder. *See Blake v. State*, 121 Nev. 779, 794, 121 P.3d 567, 577 (2005) (rejecting argument that *McConnell* should apply to invalidate preventing-a-lawful-arrest aggravating circumstance because although aggravator may constitutionally narrow class of persons eligible for death penalty in theory, "the practical effect is so slight as to render the aggravator unconstitutional").] Our reasoning in *McConnell* centered on whether felony murder performed an adequate narrowing function. Specifically, we held that Nevada's felony-murder statute was too broad to provide sufficient narrowing because it did not require the defendant to have the intent to kill. [*McConnell*, 120 Nev. at 1065–66, 102 P.3d at 622.] Rather, the intent simply to commit the underlying felony is "'transferred to supply the malice necessary to characterize the death a murder.'" [*Id.* at 1066, 102 P.3d at 622 (quoting *Ford v. State*, 99 Nev. 209, 215, 660 P.2d 992, 995 (1983)).] Torture murder, on the other hand, includes an intent element because malice must still be proved. [*See Collman v. State*, 116 Nev. 687, 714–15, 7 P.3d 426, 443–44 (2000) (noting that "malice is not subsumed by willfulness, deliberation, and premeditation" and that first-degree murder by enumerated means still requires State to prove malice); *see also* NRS 200.020 ("1. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. 2. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.").

44

As the definition of torture murder performs a constitutionally satisfactory narrowing function and does not implicate the concerns expressed in *McConnell*, we conclude that *McConnell* does not render the torture aggravating circumstance invalid.

(ECF No. 14-2 at 56–59.)

### 3.    Standard

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). To this end, "[u]nder the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death." *Id*. The Court also concluded that "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Id*. at 246.

### 4.    Analysis

Here, the State prosecuted Hernandez for first-degree murder under three theories: (1) premeditation and deliberation, (2) murder during the perpetration or attempted perpetration of kidnapping and/or burglary (felony-murder), and/or (3) perpetration by means of torture. (ECF No. 253-22 at 3.) The jury's verdict did not specify which theory or theories of first-degree murder they applied in finding Hernandez guilty of first-degree murder. (*See* ECF No. 257-2 at 3.) As such, each theory must pass constitutional muster. Here, Hernandez takes issue with the third theory: perpetration by means of torture. Relatedly, Hernandez also takes issue with the torture aggravator found during the penalty phase.

Under Nevada law, murder "[p]erpetrated by means of . . . torture" is first-degree murder. NRS § 200.030(1)(a). The Nevada Supreme Court has held that to support a first-degree murder by torture conviction, the jury must find that the perpetrator tortured someone, resulting in their death, and that the perpetrator acted with malice aforethought. *Collman v. State*, 7 P.3d 426, 447 (Nev. 2000) (explaining that "[a]lthough as a practical

45

1   matter malice may almost always be factually present when there is a killing by

2   torture, . . . it is conceivable that torture . . . can be done without legal malice"). Under

3   Nevada law, first-degree murder may be aggravated if it "involved torture or the mutilation

4   of the victim." NRS § 200.033(8). "Torture involves a calculated intent to inflict pain for

5   revenge, extortion, persuasion or for any sadistic purpose." *Domingues v. State*, 917 P.2d

6   1365, 1377 n.6 (Nev. 1996). The torture aggravator "requires that the murderer must have

7   intended to inflict pain beyond the killing itself." *Id*. at 1377.

8       As the Nevada Supreme Court reasonably determined here, murder by torture

9   under NRS § 200.030(1)(a) is a very narrow class of murders because it involves unique

10  acts that would not be typical of every murder. Indeed, not every murder is based on a

11  desire "to inflict pain [beyond the killing itself] for revenge, extortion, persuasion or . . .

12  sadistic purpose." *Domingues*, 917 P.2d at 1377 n.6. For these same reasons, the torture

13  aggravator is also very narrow, so the Nevada Supreme Court reasonably concluded that

14  Nevada's torture murder scheme performs a constitutionally satisfactory narrowing

15  function as is required by *Lowenfield*. *See, e.g., McKenzie v. Risley*, 842 F.2d 1525, 1539

16  (9th Cir. 1988) ("[T]he findings required by the Montana statutes—that [the defendant]

17  tortured and caused the death of [the victim]—were adequate to place his crime within

18  the narrow class of offenses for which the death penalty may be appropriate.").[13]

19      Because the Nevada Supreme Court's denial of this ground was neither contrary

20  to, nor an unreasonable application of, clearly established federal law and was not based

21  on an unreasonable determination of the facts, Hernandez is not entitled to relief on

22  ground 5.

23  ///

24  ///

---

25

26  [13]Hernandez also argues that the torture instruction did not require that the jury find that he acted with an intent to kill. (ECF No. 221 at 111.) This argument will be addressed in ground 13c. Moreover, to the extent that Hernandez alleges that the jury instructions at issue here violated *McConnell v. State*, 102 P.3d 606, 624 (Nev. 2004), the Court declines to consider this argument, as it concerns a matter of state law. *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).

27

28

### F.    Ground 6—Kidnapping Felony Murder

In ground 6, Hernandez alleges that his convictions and death sentence are invalid under federal constitutional guarantees of due process, equal protection, and a reliable sentence because it was legally impossible for him to kidnap his own daughter. (ECF No. 221 at 115.)

#### 1.    Standard

The United States Supreme Court "has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *United States v. Batchelder*, 442 U.S. 114, 123–24 (1979) (explaining that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion"); *see also Grooms v. Keeney*, 826 F.2d 883, 888 (9th Cir. 1987) ("[T]wo statutes may provide different penalties for identical conduct without offending due process, so long as each statute provides clear notice of the forbidden conduct and the consequences of violation."). "[A] defendant has no constitutional right to elect which of two applicable . . . statutes shall be the basis of his indictment and prosecution." *Batchelder*, 442 U.S. at 125.

#### 2.    State court determination

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez asserts, as he did below, that it is impossible for him to be convicted of kidnapping his daughter. Hernandez attacks the applicability and validity of the kidnapping statute in a number of ways.
> NRS 200.359(1)(a) provides that it is a category D felony for a parent with no right of custody or a person having a limited right of custody to a child to violate a court order and remove the child from a person having lawful custody. Hernandez argues that this statute is more specific than and takes precedence over NRS 200.310, which proscribes kidnapping as either a category A or B felony, but does not explicitly address the taking of a child by a parent with limited custody. He claims that application of NRS 200.310 to his case violated his rights to due process, equal protection, and a fair trial. We conclude that this argument lacks merit.
> Hernandez has not shown that NRS 200.359 and 200.310 are in conflict, and this court has never treated such statutes as conflicting. The matter at issue here involves not conflicting statutes but prosecutorial

47

discretion in charging. We have followed the United States Supreme Court's holding "that neither due process nor equal protection were violated under federal constitutional principles of virtue of the fact that the government prescribed different penalties in two separate statutes for the same conduct." [*Sheriff v. Killman*, 100 Nev. 619, 621, 691 P.2d 434, 436 (1984) (citing *United States v. Batchelder*, 442 U.S. 114 (1979)).] "[A] defendant's rights are adequately protected in this area by the 'constitutional constraints' on a prosecutor's discretion, which prevent the prosecutor from selectively enforcing the law based on such unjustifiable criteria as race or religion." [*Id.* (quoting *Batchelder*, 442 U.S. at 125).] This court has also stated that "where conviction for multiple offenses might be redundant, accepting [a guilty plea without the State's approval] undermines prosecutorial discretion in charging and the state's interest in obtaining a conviction on the other charges, which may be the more 'serious' charges." [*State of Nevada v. Dist. Ct.*, 116 Nev. 127, 139 n.10, 994 P.2d 692, 700 n.10 (2000).] We conclude that the prosecutors acted within their reasonable discretion in charging kidnapping here.

In addition, Hernandez involves the rule of lenity. This rule calls for the liberal interpretation of criminal statutes to favor the accused in resolving ambiguities. [*State v. Stull*, 112 Nev. 18, 23, 909 P.2d 1180, 1182 (1996).] But NRS 200.310, the kidnapping statute, applies unambiguously to Hernandez's actions—he simply wants NRS 200.359 applied instead. Hernandez further argues that the State was equitably estopped from prosecuting him under NRS 200.310 rather than NRS 200.359; however, his authorities are not apposite, and his argument is meritless.

Hernandez also claims that NRS 200.310 is unconstitutionally vague. Statutes enjoy a presumption of validity, and the burden is on the party attacking them to show their unconstitutionality. [*Sheriff v. Vlasak*, 111 Nev. 59, 61–62, 888 P.2d 441, 443 (1995).] A statute violates due process if it is so vague that it fails to give persons of ordinary intelligence fair notice of what conduct is prohibited and fails to provide law enforcement officials with adequate guidelines to prevent discriminatory enforcement. [*Id.*] Where, as here, First Amendment interests are not implicated, the challenged statute must be shown to be impermissibly vague in all its applications or at least as applied to the defendant in question. [*Republic Entertainment v. Clark County*, 99 Nev. 811, 816, 672 P.2d 634, 638 (1983); *Lyons v. State*, 105 Nev. 317, 320, 775 P.2d 219, 221 (1989).] NRS 200.310(2) provides in relevant part that "[a] person who willfully and without authority of law seizes . . . another person . . . for the purpose of conveying the person out of the state without authority of law, . . . is guilty of kidnapping in the second degree." Hernandez fails to show that this language did not provide him with fair notice that his conduct in taking [A.H.] was criminal, let alone that the statute is vague in all its applications.

Finally, Hernandez argues that it was a legal impossibility for him to kidnap Ana because upon Donna's death he became [A.H.]'s sole legal custodian. Although this court did not decide this issue in *Sheriff v. Dhadda*, [115 Nev. 175, 980 P.2d 1062 (1999)] that case supports the proposition that a parent having legal custody of a child can nevertheless be convicted of kidnapping the child. In *Dhadda*, we concluded that there was sufficient evidence under NRS 200.310(1) to prosecute a mother for kidnapping her own daughter because the State "demonstrated . . . probable cause to believe that [the mother] took [the daughter] to the river for the purpose of killing her or inflicting substantial bodily harm upon her." [*Id.* at 183, 980 P.2d at 1067.] In this case, Hernandez acted without authority of law in taking [A.H.] because he violated a protective order, a custody decree, and criminal statutes when he murdered Donna and took [A.H.]. [*See* NRS

48

200.310(2) (prohibiting seizures of other persons "without authority of law").] We conclude that his status as sole surviving parent of [A.H.] once he murdered Donna did not render his seizure of [A.H.] lawful. [*Cf.* NRS 41B.250-.300 (providing that the felonious, intentional killer of a decedent forfeits any interest in the estate of the decedent).]

(ECF No. 1-2 at 22–25.)

### 3.    Analysis

As was discussed in ground 5, the State prosecuted Hernandez for first-degree murder under three theories: (1) premeditation and deliberation, (2) murder during the perpetration or attempted perpetration of kidnapping and/or burglary (felony-murder), and/or (3) perpetration by means of torture. (ECF No. 253-22 at 3.) The jury's verdict did not specify which theory or theories of first-degree murder they applied in finding Hernandez guilty of first-degree murder (*see* ECF No. 257-2 at 3), so each theory must pass constitutional muster. Additionally, as is relevant to this ground, Hernandez was charged and found guilty of second-degree kidnapping under NRS § 200.310(2). (*Id.*)

Under Nevada law, "a person who leads, takes, entices, or carries away or detains any minor with the intent to keep, imprison, or confine the minor from his or her parents, guardians, or any other person having lawful custody of the minor" is guilty of first-degree kidnapping. NRS § 200.310(1). And "[a] person who willfully and without authority of law . . . kidnaps another person . . . for the purpose of conveying the person out of the State without authority of law" is guilty of second-degree kidnapping. NRS § 200.310(2). Comparatively, a person with "a limited right of custody . . . pursuant to a[ court] order . . . who . . . [i]n violation of [that] order . . . willfully detains, conceals or removes the child from a parent . . . having lawful custody or a right of visitation" is guilty of only a category D felony. NRS § 200.359(1).

Hernandez first argues that NRS § 200.359(1) provides for a specific offense addressing cases where a parent takes a child from the physical custody of the other parent, thereby making the general offense of kidnaping—NRS § 200.310—inapplicable. (ECF No. 322 at 210.) Donna and Hernandez split physical custody of A.H. (*See* ECF No. 256-1 at 149 (testimony that Hernandez had custody of A.H. from "Wednesdays at noon

49

. . . [until] Friday[s] at five o'clock" in the evening).) Because Hernandez took A.H. while she had been in her mother's care in violation of his custody order, he was susceptible to being prosecuted under NRS § 200.359. That being said, Hernandez was also susceptible of being prosecuted under NRS § 200.310 because he kidnapped A.H. for the purpose of taking her to Mexico. Under *Batchelder*, as the Nevada Supreme Court reasonably determined here, the prosecution was free to prosecute Hernandez under either statute. Further, NRS § 200.359 and NRS § 200.310 are not identical because NRS § 200.310, unlike NRS § 200.359, contains an element of force. *See Black's Law Dictionary* (12th ed. 2024) (defining kidnapping as "forcibly abducting a person"). This additional element refutes Hernandez's claim that NRS § 200.359 more specifically covers his offense as compared to NRS § 200.310. *See, e.g., Cosby v. Duncan*, 111 F.3d 138 (9th Cir. 1997).

Hernandez next argues that at the time of Donna's death, he became the sole custodial parent of A.H., so he could not be guilty of kidnapping. (ECF No. 322 at 210.) The Nevada Supreme Court reasonably rejected this argument. As the Nevada Supreme Court reasonably noted, a legal custodian can still be convicted of kidnapping a child. It is nonsensical that Hernandez's killing of A.H.'s mother resulted in him having "authority of law," as it is used it NRS § 200.310(2), to take A.H. to Mexico.

Finally, Hernandez alleges that applying the kidnapping statute after he had been put on notice that a violation of his custody order would be deemed only a violation of NRS § 200.359 resulted in a retroactively-applied change in the law. (ECF No. 322 at 212.) This argument lacks merit. "So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." *See Batchelder*, 442 U.S. at 123 (explaining that "particular conduct may violate" two statutes but that "does not detract from the notice afforded by each" because "[a]lthough the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments"). Here,

1    NRS § 200.359 and NRS § 200.310 each provide notice of the conduct prohibited and

2    the punishment authorized.

3           The Nevada Supreme Court's denial of this ground was neither contrary to, nor an

4    unreasonable application of, clearly established federal law and was not based on an

5    unreasonable determination of the facts. Hernandez is not entitled to relief on ground 6.

6           **G.    Ground 8—Prosecutorial Misconduct**

7           In ground 8, Hernandez alleges that his convictions and death sentence are invalid

8    under federal constitutional guarantees of due process, ineffective assistance of counsel,

9    equal protection, and a reliable sentence due to the severe and pervasive prosecutorial

10   misconduct throughout various parts of his trial. (ECF No. 221 at 122.)

11                 **1.    Standard for prosecutorial misconduct**

12          "[T]he touchstone of due process analysis in cases of alleged prosecutorial

13   misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith*, 455

14   U.S. at 219. "The relevant question is whether the prosecutors' comments 'so infected

15   the trial with unfairness as to make the resulting conviction a denial of due process.'"

16   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly*, 416 U.S. at 643). In

17   making that determination, the Court looks to various factors: "the weight of the evidence,

18   the prominence of the comment in the context of the entire trial, whether the prosecution

19   misstated the evidence, whether the judge instructed the jury to disregard the comment,

20   whether the comment was invited by defense counsel in summation and whether defense

21   counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d

22   1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)).

23   "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious

24   effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113

25   (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637–38).

26                 **2.    Ground 8a—prosecutorial misconduct during guilt phase**

27          In ground 8a, Hernandez alleges that the State made several improper arguments

28   during the guilt phase of his trial, including (1) asking jurors to make personal promises

and by personalizing its arguments, (2) making highly inflammatory and prejudicial arguments, and (3) making erroneous statements concerning the law and facts. (ECF No. 221 at 122–124.)

### a.    Background information

First, regarding the prosecution allegedly making personal promises and personalizing arguments, during voir dire, the prosecution posed the following questions to prospective jurors to inquire about their ability to convict Hernandez and sentence him to death: (1) "If you are convinced the defendant is guilty beyond a reasonable doubt, can you promise you will return a verdict to reflect that guilt?"; (2) "[W]e must prove the defendant's guilt beyond a reasonable doubt. If we do that, can you promise me you will vote guilty in this case" and "promise me that if you believe that this is an appropriate case for death, you can mark the box that says I vote for death?"; (3) "If you are convinced that the defendant is guilty, and you are convinced beyond a reasonable doubt can you[ ] promise the State of Nevada you will vote guilty as reflected by that belief that he is guilty beyond a reasonable doubt?"; (4) "[I]f we convince you that the defendant is guilty beyond a reasonable doubt, can you look at him and tell him that he's guilty of these crimes" and then "if you are convinced that this case is the appropriate case where death is appropriate, where death is a proper punishment, can you look at Mr. Hernandez and tell him that he deserves to die for what he did to the victim in this case?"; (5) "[I]f you are convinced that we've [proven the defendant's guilt beyond a reasonable doubt], can you promise that you will return verdicts of guilt to reflect that belief?"; and (6) "If you are convinced of his guilt beyond a reasonable doubt, can you promise me that you will convict him of the crimes that he's charged with?" (ECF Nos. 253-23 at 59, 79, 96; 254-1 at 56, 58, 82.) Later, during closing arguments at the guilt phase of the trial, the prosecution made the following comment:

> Some four or five days ago during voir dire I asked each of you if we convinced you beyond a reasonable doubt of the defendant's guilt would you promise to convict, and each of you indicated that you would.
> On behalf of the State of Nevada, we have kept our promise to you, and I now ask you to keep your promise to us and find this man guilty of all

the counts, and, most importantly, first degree murder with the use of a deadly weapon.

(ECF No. 257-3 at 129.)

Second, regarding the prosecution allegedly making inflammatory arguments, during closing argument, the prosecutor described the offense as "brutal," "horrific," and "unspeakable." (*See* ECF No. 257-3 at 53, 55, 76.) The prosecutor also used the term "overkill" to describe the crime and argued Hernandez was motivated by "pure sadistic evil revenge." (*Id*. at 57, 69.)

Third, regarding the prosecution allegedly misstating facts and introducing improper victim-impact evidence, during closing argument, the prosecutor argued, "[w]e know he is [.]15 when he is pulled over. That is all we will ever know." (ECF No. 257-3 at 76.) The prosecutor also repeatedly told the jury that A.H. had witnessed the crime. (*Id*. at 57, 70, 77.)

Fourth, regarding the prosecution allegedly misstating the law about not needing to find premeditation or deliberation to convict Hernandez of first-degree murder, the prosecutor made the following comments: (1) "[T]here is no requirement that you find that [Hernandez] acted willfully or deliberately or with premeditation when you convict him [of] first degree murder by means of torture with a deadly weapon," and (2) "The crime of murder by torture does not require proof that he intended to kill the deceased. So when we talk about premeditation and willfulness and deliberation it is of no significance. When we talk about first degree murder by means of torture, he need not even intend to kill her so long as you find he intended to commit the acts that caused her death." (ECF No. 257-3 at 122, 123.)

### b.    State court determination

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez failed to object to most of the instances of misconduct that he now alleges. Generally, for this court to consider whether a prosecutor's remarks were improper, the defendant must have objected to them at the time, allowing the district court to rule upon the objection, admonish the prosecutor, and instruct the jury. [*Riley v. State*, 107 Nev.

1  205, 218, 808 P.2d 551, 559 (1991).] Under NRS 178.602, this court may
2  nevertheless address a claim if Hernandez can show that it was plain error that affected his substantial rights. We conclude that the unobjected-to comments either were not erroneous or did not amount to plain error.

3  (ECF No. 14-2 at 24.)

4  ### c.    Analysis

5  First, regarding the prosecution allegedly making personal promises and

6  personalizing arguments, Hernandez fails to cite any federal law disallowing the

7  prosecution's remarks here. (*See* ECF No. 221 at 122–23; ECF No. 322 at 220–24.)

8  Rather, Hernandez's only citation to federal law regards the impropriety of a prosecutor

9  expressing personal beliefs. (*See* ECF No. 322 at 223.) However, the prosecution never

10  expressed personal beliefs—it merely inquired whether the jurors were committed to

11  follow the law and then reminded them of that commitment. Because there is no decision

12  of the Supreme Court squarely addressing this issue, "it cannot be said that the state

13  court unreasonabl[y] appli[ed] clearly established federal law." *See Wright v. Van Patten*,

14  552 U.S. 120, 125-26 (2008).

15  Second, Hernandez fails to demonstrate that the prosecution's use of the terms

16  brutal, horrific, unspeakable, overkill, sadistic, and evil to describe the crime amounted to

17  prosecutorial misconduct. Although arguably inflammatory, these terms were reasonable

18  based on the evidence and cannot be said to have overly inflamed the passions and

19  prejudices of the jury. *See United States v. Sayetsitty*, 107 F.3d 1405, 1408–09 (9th Cir.

20  1997) (finding that the prosecution's references to the "brutal kicking" and "animal-like

21  attack" were reasonable inferences based on the evidence and did not amount to

22  prosecutorial misconduct); *Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled*

23  *on other grounds in Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (finding no due process

24  violation when the prosecutor referred to evidence as "gruesome, horrible, horrific" and

25  the perpetrator as a "monster of a human being"). And even if these terms were overly

26  inflammatory, they were isolated. *See Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir.

27  2000) (determining, in part, that the petitioner was not denied a fair trial due to

28  prosecutorial misconduct because "the misconduct was isolated").

Third, regarding allegedly misstating facts about his intoxication, a prosecutor may "not manipulate or misstate the evidence." *Darden*, 477 U.S. at 182. Although Hernandez's blood alcohol content was .15 at the time he was at the police substation—not at the time he was pulled over, meaning his blood alcohol content at the time he was pulled over was higher than .15 and suggests that he perhaps possessed a lesser degree of culpability due to his intoxication—Hernandez fails to demonstrate that this comment so infected his trial with unfairness, especially since the jury was instructed that the prosecutor's statements were not evidence.[14] *See Allen*, 395 F.3d at 998 (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt).

Fourth, regarding statements that A.H. saw the murder occur, this does not amount to a misstatement of the evidence or improper victim-impact evidence. It was inconclusive whether A.H. saw the murder or not; however, given that A.H. told Sergeant Swoboda that "daddy hurt mommy real bad" (ECF No. 255-1 at 55), this was a reasonable inference to have been made from the evidence. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence"). Further, the prosecution's statements that A.H. saw the murder did not delve deeper into any impact she may have suffered therefrom (*see* ECF No. 257-3 at 57, 70, 77), negating any argument that these comments amounted to victim-impact evidence.

Fifth, regarding whether the prosecution's statements about the elements of first-degree murder by means of torture were accurate or not, the Nevada Supreme Court has clarified that (1) the jury must first analyze whether the defendant acted with malice, which can be implied when all the circumstances of the killing show an abandoned and malignant heart, and (2) the jury must then determine whether the elements of torture

---

[14]Jury Instruction No. 48 provided that "[s]tatements, arguments and opinions of counsel are not evidence in the case." (ECF No. 14-2 at 130.)

have been met. *See Collman*, 7 P.3d at 447. Under Nevada law, the prosecution's comments that the jury did not need to find premeditation, willfulness, and deliberation for first-degree murder by means of torture was valid. And because the Nevada Supreme Court is the final arbiter of Nevada law, its finding that the prosecution's comments were not erroneous recitations of Nevada law is unassailable on federal habeas review.

The Nevada Supreme Court's denial of this ground was not contrary to or an unreasonable application of federal law and was not based on an unreasonable determination of the facts. Hernandez is not entitled to relief for ground 8a.

### 3.    Ground 8b—prosecutorial misconduct during penalty phase

In ground 8b, Hernandez alleges that the prosecution made several improper arguments during the penalty phase of his trial, including making "eyes of the victim" and "eyes of the victim's family" and "no more holidays" arguments, appealing to passions and prejudices, expressing personal opinions, arguing incorrect legal standards, and arguing that he failed to show remorse. (ECF No. 221 at 124–26.)

### a.    Background information

First, regarding Hernandez's failure to show remorse, which allegedly morphed into an improper "holidays" argument, the prosecution stated that Hernandez "didn't tell Sergeant Swoboda out on U.S. 95 that he apologized to the Griego family because they would never have another holiday with their daughter." (ECF No. 258-3 at 88.) Hernandez's trial counsel objected, and the trial court sustained the objection. (*Id.*)

Second, regarding appealing to the passions and prejudices of the jury, the prosecution made the following comments:

> I disagree when Mr. Oram and Mr. Schieck suggest to you that Mr. Fernando Hernandez is not the worst of worst murderers. Perhaps it depends on one's perspective, but I suggest to you that in [the] eyes of Donna Hernandez, Fernando Hernandez is the worst of the worst murderers.
> On October 6, 1999, I would imagine that as Fernando placed his hands around her throat and squeezed the life out of her, that in the eyes of Donna Hernandez, Fernando is the worst of the worst murderers, and I would imagine that as he pulled out the seven-inch serrated knife and began to stab her over and over again, that in the eyes of Donna Hernandez[,] Fernando is the worst of the worst murderers, and I would imagine that as

56

she lay on her back, covered in blood, face up in her home, the place we are all supposed to feel safe, as he pulled down her underpants and shoved a butter knife inside of her, I would image that in her eyes Fernando Hernandez is the worst of the worst murderers.

With all due respect to Mr. Oram and Mr. Schieck, Fernando Hernandez is the worst of the worst.

Ms. Kollins asked if you can imagine a worst set of facts, a worst set of circumstances in which Donna Hernandez would meet her maker, and my guess is you cannot, that this is worst possible conduct and that in the eyes of Donna Hernandez Fernando is the worst of the worst murderers.

In the eyes of her family, of Annie Griego and her husband and their son Toby, Donna's brother, I am certain that Fernando is the worst of the worst murderers as they are now faced with raising little [A.H.] and faced with explaining to her why she has no mother. I'm sure to the Greigo family Fernando is the worst of the worst murderers.

And I guess even to little [A.H.] that on October 6, 1999 as she watched as her daddy, to use her words, dead her mommy that on that night or that morning Fernando Hernandez was the worst of the worst murderers even in her eyes.

(ECF No. 258-4 at 27–29.) The prosecutor also characterized the crime as "overkill," "unspeakable," "demeaning and desecrating," and "horrific." (ECF Nos. 258-3 at 83, 86; 258-4 at 17, 26.)

Third, regarding expressing a personal opinion, the prosecution commented: "You hea[r]d from . . . Lisa Souders[ that Hernandez was] helpful to guests, not disrespectful to anyone. Well, Miss Souders, I disagree with you." (ECF No. 258-3 at 92.) Hernandez's trial counsel objected, and the trial court sustained the objection. (*Id.*)

Finally, regarding allegedly misstating the law, the prosecution argued:

And you know what, this defendant does not have a formal criminal history. He's never been brought before a court or a jury of his peers before this case.

But, you know what, he has a history. He has a history with Donna Hernandez. He has a cycle of violence with Donna Hernandez. And while he may not have been before a tribunal and held responsible, I submit to you that his conduct was no less criminal. He just never got caught.

His history defines him as a domestic abuser. That's the defendant's history, and I submit to you that is criminal.

(ECF No. 258-3 at 85.) Hernandez's counsel objected, and the trial court sustained the objection. (*Id.* at 85–86.)

### b.    State court determination

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

During the penalty phase, the prosecutor told the jury that she "disagree[d] with" a witness called by the defense. Hernandez says that this was an improper statement of opinion. Because defense counsel immediately objected to the comment and the district court sustained the objection, we conclude that no reversible error occurred. [*See, e.g., Manley v. State*, 115 Nev. 114, 124, 979 P.2d 703, 709 (1999) (concluding reversal not warranted where appellant objected immediately to improper question and district court sustained the objection and struck the question).]

Also in the penalty phase, the prosecutor argued that evidence of uncharged domestic abuse by Hernandez was relevant in considering the alleged mitigating circumstances of no significant criminal history. Defense counsel objected that such bad acts could not enter into the jury's weighing of aggravating and mitigating circumstances, and the district court sustained the objection. Hernandez claims that the prosecutor misstated the law and purposefully misled the jury on the use of this evidence.

During a penalty phase, the State may properly present evidence for just three purposes: "to prove an enumerated aggravator, to rebut specific mitigating evidence, or to aid the jury in determining the appropriate sentence after any enumerated aggravating circumstances have been weighed against any mitigating circumstances." [*Hollaway v. State*, 116 Nev. 732, 746, P.3d 987, 997 (2000).] We conclude that the prosecutor's argument was an appropriate attempt to employ the evidence of domestic abuse to rebut the specific mitigating circumstance of no significant criminal history asserted by the defense.

Finally, the prosecutor argued during the penalty phase that Hernandez "didn't tell Sergeant Swoboda out on U.S. 95 that he was sorry to Ana for taking her mother away . . . [or] that he apologized to the Greigo family because they would never have another holiday with their daughter." Defense counsel objected, and the district court sustained the objection. Hernandez challenges this argument on two grounds. First, he contends that it is improper to argue that a defendant is worthy of death because he has not shown remorse. In this case there was no error because the prosecutor was fairly responding to an earlier contention by defense counsel that Hernandez expressed remorse after he was first stopped. [*See Sherman v. State*, 114 Nev. 998, 1016, 965 P.2d 903, 915 (1998).] Second, Hernandez is correct that arguments that a family will have no more holidays with the murder victim are improper because they are aimed only at the jury's emotions and encourage it to impose a sentence under the influence of passion. [*Hollaway*, 116 Nev. at 742–43, 6 P.3d at 994.] Therefore, the last part of the prosecutor's argument was improper, but objection was immediate and sustained by the court, and we conclude that no prejudice resulted.

(ECF No. 14-2 at 24–26.)

### c.    Analysis

First, regarding the prosecution's argument about Hernandez's failure to show remorse, the Nevada Supreme Court reasonably concluded that the prosecution's statement was in response to the defense's closing argument. Hernandez's trial counsel had previously argued that Hernandez had "accept[ed] accountability . . . out there on the

highway" (ECF No. 258-4 at 15), so the prosecution's lack-of-remorse comment did not amount to misconduct. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel."). However, as the Nevada Supreme Court also reasonably concluded, the prosecution's related no-more-holidays argument was improper. That being said, the Nevada Supreme Court reasonably determined that relief was not warranted for this misconduct given that the trial court sustained the defense's objection. Additionally, this comment was not pervasive, negating a finding that it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638.

Relatedly, Hernandez argues that the prosecutor's statement concerning his failure to express remorse amounted to a comment on his failure to take the stand. (ECF No. 322 at 236 (citing *Griffin v. California*, 380 U.S. 609, 614 (1965)).) This argument lacks merit. Viewed in context, the prosecution's comment was not manifestly intended to call attention to Hernandez's failure to testify and was not of such a character that the jury would have taken the comment as referring to Hernandez's failure to testify. *See Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) ("While a direct comment about the defendant's failure to testify always violates *Griffin*, a prosecutor's indirect comment violates *Griffin* only if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." (Internal quotation marks omitted)).

Second, regarding appealing to the passions and prejudices of the jury, prosecutors are "cautioned against . . . [making] statements designed to appeal to the passions, fears and vulnerabilities of the jury." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005). The prosecution's argument that Hernandez was the "worst of the worst" as seen "in the eyes of" Donna, Donna's family, and A.H. may have bordered on being an improper argument, but, again, it was merely made in response to defense counsels' argument that Hernandez was not the "worst of the worst." (*See* ECF No. 258-

4 at 18 ("Is he the worst of the worst murderers? No.").) And as was discussed in ground 8a, although the adjectives "overkill," "unspeakable," "demeaning," "desecrating," and "horrific" were arguably inflammatory, they were not overly so given the facts of the case.

Third, regarding expressing a personal opinion, the Nevada Supreme Court reasonably found that there was no reversible error due to the prosecution's statement that it did not agree with a defense character witness that Hernandez was respectful. "[P]rosecutor[s] must refrain from interjecting personal beliefs into the presentation of [the] case." *United States v. Young*, 470 U.S. 1, 8-9 (1985). Even if the prosecution's comment here crossed into improper-opinion territory, it cannot be found to have had a substantial and injurious effect or influence in determining the jury's verdict given its limited nature and sustained objection.

Fourth, regarding the prosecution's argument about Hernandez having a history of being a domestic abuser, the Nevada Supreme Court reasonably concluded that the argument appropriately rebutted the mitigating circumstance asserted by Hernandez that he did not have a significant criminal history. Because Hernandez's counsel highlighted his lack of a prior criminal history (ECF No. 258-4 at 18–19), it was proper for the prosecution to remind the jury of Hernandez's abuse of Donna—even if it was not in the form of a formal conviction. Moreover, the jury was adequately informed about how they were able to use this evidence: penalty-phase Jury Instruction No. 12 provided that "conduct or bad acts, if any, committed by the Defendant are to be considered for character only and not as aggravating circumstances." (ECF No. 19 at 29.)

The Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law and was not based on an unreasonable determination of the facts. Hernandez is not entitled to relief for ground 8b.

### H.    Ground 12—Counsels' Failures Regarding Venue

In ground 12, Hernandez alleges that his sentence of death is invalid under the federal constitutional guarantees of due process, the right to a fair trial and fair penalty hearing, and the right to be free from cruel and unusual punishment because the undue

influence of publicity on his trial denied him his right to due process. (ECF No. 221 at 138.) Specifically, Hernandez contends that his trial and sentencing hearing took place in an unfairly prejudicial atmosphere because Donna was a family court clerk who worked in the Eighth Judicial District Court, and "[m]assive publicity surrounded this case." (*Id*.)

### 1.    Background information

Some of the jury questionnaires indicated that the jurors were familiar with the case and/or had read or seen media reports about it. (*See e.g.*, ECF No. 28 at 73, 80; 29 at 17, 52, 87, 94, 108, 122, 150; 35 at 38, 94, 115, 157, 171.)

After the trial, during the postconviction evidentiary hearing, Schieck testified that "there was quite a bit" of media attention surrounding the case before the trial, explaining that he "believe[d] every time that [they] were in court at least some members of the media were present whether it was the television cameras or the print media." (ECF No. 27 at 6.) The trial court then made the following unsolicited comment:

> Let me help refresh your recollection here, Mr. Schieck. At the same time that this trial was going on, Zane Floyd was being tried, Donte Johnson three-judge panel was deliberating, and there was one other capital murder case going on in the system. . . . And I believe if you will do a press research, this case never got the front page headline until either the conviction or the penalty conviction because Zane Floyd always was on the front page of the paper.

(*Id*. at 7.) Schieck then testified that, based at least in part on the pretrial jury questionnaires, he and Oram "were able to find 12 [jurors] . . . that weren't influenced by publicity." (*Id*. at 13.) Oram later testified that "[t]here was media coverage in this case, but [he] didn't think it was excessive." (*Id*. at 17.) Finally, the prosecutor testified that "there was very little" pretrial publicity in this case and that none of the jurors "said that the media coverage had influenced their opinion." (*Id*. at 29.) The prosecutor also explained that "Donna's House," the non-profit established in honor of Donna, was not established until after the trial. (*Id*.)

### 2.    State court determination

Regarding the substantive claim, the Court's review is de novo. (*See* ECF No. 184 at 27–28 (finding that the substantive claim was not procedurally defaulted, even though

the Nevada Supreme Court found it to be procedurally barred, because that ruling rested an inadequate state ground).) And regarding the ineffective-assistance-of-counsel claim, in affirming the denial of Hernandez's first state habeas petition, the Nevada Supreme Court held as follows:

> Hernandez contends that the district court erred by denying his claim that counsel were ineffective for not seeking a change in venue in light of the publicity his case received. At the post-conviction evidentiary hearing, counsel testified that the media attention given Hernandez's case was not excessive and that the defense was able to seat twelve jurors and alternate jurors who were not influenced by the publicity. Further, nothing in Hernandez's submissions establish that he was unable to secure an impartial jury or that the publicity was so intent that "even an impartial jury would be swayed by the considerable pressure of public opinion." [*Hanley v. State*, 83 Nev. 461, 464, 434 P.2d 440, 442 (1967).] Therefore, we conclude that the district court did not err by denying this claim because Hernandez failed to demonstrate that counsel's performance was deficient in this respect or that he suffered prejudice. [To the extent Hernandez argues that his death sentence is unconstitutional because of overwhelming pretrial publicity, this is a claim appropriate for direct appeal, and he has not demonstrated good cause for his failure to raise it previously or prejudice. *See* NRS 34.810(1)(b)(2), (3).]

(ECF No. 14-2 at 71.)

### 3. Standard

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, indifferent jurors.'" *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (internal quotation marks omitted). "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *see also Skilling v. United States*, 561 U.S. 358, 378 (2010) ("The Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial."). However, "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy*, 421 U.S. at 799–800. "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified

62

to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

To determinate whether a petitioner did not receive a fair trial due to pretrial publicity, a petitioner must "show that the setting of the trial was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice." *Murphy*, 421 U.S. at 803. "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988). And "[t]o determine whether actual prejudice existed[,] . . . a court must determine if the jurors demonstrated actual partiality or hostility that could not be laid aside." *Id*. at 1363. "Actual prejudice is not demonstrated by a showing of exposure to pretrial publicity." *Id*. at 1363–64. Rather, "'[t]he relevant question is . . . whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Id*. at 1365.

### 4.    Analysis

To be sure, based on the jury questionnaires and Schieck's and Oram's postconviction testimonies, there was pretrial publicity in this case that reached the jurors. However, Hernandez fails to demonstrate either presumed or actual prejudice resulted therefrom. Regarding presumed prejudice, Hernandez's allegations and demonstrations fall short of showing that the pretrial publicity in this case was overwhelming or especially inflammatory. "A presumption of prejudice . . . attends only the extreme case." *Skilling*, 561 U.S. at 381. Even given Donna's employment at the court, this case is far from extreme in terms of pretrial publicity. Turning to actual prejudice, regardless of this case's prominence in the media, Hernandez's fails to demonstrate that the jurors acted with bias on account of their exposure to pretrial publicity. "Prominence does not necessarily produce prejudice." *Skilling*, 561 U.S. at 381. And here, Schieck testified that the 12 jurors

1  were not influenced by pretrial publicity.[15] Accordingly, the Court finds that Hernandez

2  was not denied a fair trial in light of any pretrial publicity.

3      Next, the Nevada Supreme Court reasonably concluded that Hernandez's trial

4  counsels' performance was not deficient, and that Hernandez suffered no prejudice.

5  Although Hernandez's trial counsel could have moved for a change of venue,[16] it is far

6  from clear that such a motion would have had any chance at success. In addition to

7  Hernandez failing to show excessive or overtly prejudicial pretrial publicity, the trial court

8  would likely have denied a motion for a change of venue based on the size of the Eighth

9  Judicial District, which includes Las Vegas. *See Skilling*, 561 U.S. at 382 ("Given this

10 large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could

11 not be empaneled is hard to sustain."). Therefore, because the Nevada Supreme Court's

12 determination constituted an objectively reasonable application of *Strickland*'s

13 performance and prejudice prongs, Hernandez is not entitled to federal habeas relief on

14 his ineffective-assistance-of-trial counsel claim.

15     Ground 12 is denied.

16 **I.    Ground 13—Instructions**

17     In ground 13, Hernandez alleges that his first-degree murder conviction and death

18 sentence are invalid under the federal constitutional guarantees of due process and equal

19 protection, the right to a fair trial and fair penalty hearing, the right to effective assistance

20 of counsel, and the right to be free from cruel and unusual punishment because the trial

21 court gave the jury unconstitutional jury instructions during his trial. (ECF No. 221 at 140.)

22     **1.    Standard**

23

24 [15]Hernandez's focus on prejudice being demonstrated by the public outreach
   efforts that followed the trial—namely, the establishment of Donna's House, a neutral spot

25 for the exchange of children—lacks merit given that they did not come about until after
   the trial.

26

27 [16]Although not discussed, deciding against moving for a change of venue could
   have been strategic given that the granting of such a motion would have resulted in the

28 trial taking place, according to Schieck, in "one of the outlying counties" of Nevada, which,
   notably, are less diverse. (ECF No. 27 at 7.)

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). The Court considers jury instructions "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72.

### 2.    Ground 13a

In ground 13a, Hernandez alleges that the malice instructions were unconstitutional. (ECF No. 221 at 140.)

#### a.  Background information

Guilt-phase Jury Instruction No. 13 provided: "Murder is the unlawful killing of a human being, with malice aforethought, whether express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned." (ECF No. 14-2 at 96.) Guilt-phase Jury Instruction No. 14 provided:

> Malice aforethought means the intentional doing of a wrongful act without legal cause or excuse or what the law considers adequate provocation. The condition of mind described as malice aforethought may arise, not alone from anger, hatred, revenge or from particular ill will, spite or grudge toward the person killed, but may result from any unjustifiable or unlawful motive or purpose to injure another, which proceeds from a heart fatally bent on mischief or with reckless disregard of consequence and social duty. Malice aforethought does not imply deliberation or the lapse of any considerable time between the malicious intention to injure another and the actual execution of the intent but denotes rather an unlawful purpose and design in contradistinction to accident and mischance.

(*Id*. at 97.) And guilt-phase Jury Instruction No. 15 provided as follows: "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice may be implied when no

considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." (*Id.* at 98.)

Although "conced[ing] that the current state of the law is [that guilt-phase Jury Instruction No. 15] is appropriate," Hernandez's trial counsel objected to it and proffered an alternative. (ECF No. 257-3 at 4.) Specifically, Hernandez's counsels' objection went to the "abandoned and malignant heart" language in guilt-phase Jury Instruction No. 15, arguing that this language was "archaic, vague and ambiguous, and has no real meaning to the jury." (*Id.* at 6.) Hernandez's counsels' alternative instruction provided as follows:

> Malice may be express or implied. Express malice is that deliberate intention to unlawfully take away . . . the life of a fellow creature, which is manifested by external circumstances capable of proof. Implied malice may be found by, one, the actual killing resulted from an intentional act. Two, natural consequences of the act are dangerous to human life, and, three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life. When it is shown that the killing resulted from an intentional act of which express or implied malice no other mental state need be shown to establish mental state of malice aforethought.

(*Id.* at 5–6.) The trial court held that it would "give the instruction approved by the Supreme Court," but it explained that it "believe[d] that the instruction that [defense counsel] proposed ha[d] a great deal of merit" because "the abandoned and malignant heart" language had been "used for a long, long time but . . . may be subject to different interpretations." (*Id.* at 6.)

### b. State court determination

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez also objected to guilt phase instruction no. 15 on express and implied malice, which stated in part that malice "may be implied . . . when all the circumstances of the killing show an abandoned and malignant heart," essentially the definition set forth in NRS 200.020(2). Hernandez argued that the language "abandoned and malignant heart" is archaic, vague, and ambiguous. In addition, Hernandez now challenges all the malice instructions, nos. 13, 14, and 15, arguing that they created an unconstitutional presumption, interfered with the presumption of innocence, and relieved the State of its burden to prove guilt beyond a reasonable doubt. These issues were not preserved below, and Hernandez does not demonstrate any plain error. As to whether implied malice is defined in impermissibly vague, archaic terms, this court considered and rejected this

argument last year. [*Leonard v. State*, 117 Nev. 53, 78–79, 17 P.3d 397, 413 (2001).]

(ECF No. 14-2 at 29–30.)

### c. Analysis

Hernandez argues that the "may be implied" language in guilt-phase Jury Instruction No. 15 could reasonably have been interpreted as imposing an impermissible mandatory presumption regarding malice, relieving the State of their burden of proof. (ECF No. 322 at 259.) Hernandez also argues that the term "abandoned and malignant heart" is vague and confusing. (*Id*. at 260.) Because both arguments lack merit, the Nevada Supreme Court reasonably denied Hernandez relief on this claim.

The Court first turns to Hernandez's contention that guilt-phase Jury Instruction No. 15 relieved the State of its burden of proving malice and, thus first-degree murder,[17] because it created a mandatory presumption. *See Sandstrom v. Montana*, 442 U.S. 510, 521 (1979) (holding that a petitioner's due process rights are violated if a jury instruction "ha[s] the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind"); *see also In re Winship*, 397 U.S. 358, 364 (1970) (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Guilt-phase Jury Instruction No. 15 did not create a mandatory presumption; instead, it created a permissive inference. *See United States v. Warren,* 25 F.3d 890, 897 (9th Cir. 1994) (explaining that "[a] mandatory presumptive instruction tells the jury that it must presume that an element of a crime has been proved if the government proves certain predicate facts" whereas "[a] permissive inference instruction allows, but does not require, a jury to infer a specific conclusion if the government proves certain predicate facts"). Guilt-phase Jury Instruction No. 15 allowed the jury to imply malice if it first found that Hernandez intended to kill without "considerable provocation" or where the circumstances indicated an "abandoned and malignant heart."

---

[17]The element of malice distinguishes murder from manslaughter. NRS §§ 200.010, 200.040.

Guilt-phase Jury Instruction No. 15 did not require the jury to presume malice where there was "no considerable provocation" or where there was a showing of an "abandoned and malignant heart." This sort of permissive inference did not shift the burden of proof. *See Francis v. Franklin*, 471 U.S. 307, 314 (1985) ("A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved."); *Warren*, 25 F.3d at 897 ("An instruction violates due process 'if it creates a mandatory presumption, either conclusive or rebuttable, which shifts from the prosecution the burden of proving beyond a reasonable doubt an essential element of a criminal offense.'").

Turning to Hernandez's second contention, the Supreme Court has explained the meaning of the phrase "an abandoned and malignant heart" and found no constitutional violation with its use. *See Arave v. Creech*, 507 U.S. 463, 475 (1993) (explaining that "an abandoned and malignant heart" is "a term of art that refers to unintentional homicide committed with extreme recklessness").

The Nevada Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, federal law, so Hernandez is not entitled to relief for ground 13a.

### 3.    Ground 13b

In ground 13b, Hernandez alleges that the felony-murder instruction was unconstitutional. (ECF No. 221 at 144.)

Guilt-phase Jury Instruction No. 26 provided as follows:

> There is a kind of murder which carries with it conclusive evidence of premeditation and malice aforethought. This class of murder is murder committed in the perpetration or attempted perpetration of Burglary or Kidnapping. Therefore, a killing which is committed in the perpetration or attempted perpetration of the felony of Burglary or Kidnapping is deemed to be Murder in the First Degree, whether the killing was intentional, unintentional or accidental. This is called the Felony-Murder rule.

(ECF No. 14-2 at 109.)

1    In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held

2   as follows: "Hernandez failed to object to . . . guilt phase instruction no. 26 defining felony

3   murder . . . . Hernandez must demonstrate that there was error in regard to these

4   instructions, that it was plain, and that it affected his substantial rights. He fails to do so."

5   (*Id.* at 26.)

6    Hernandez argues that guilt-phase Jury Instruction No. 26 unconstitutionally failed

7   to inform the jury that the homicide must occur *during* the commission of the felony and

8   not vice-versa.[18] (ECF No. 221 at 145.) This argument lacks merit. First, Nevada law

9   defines felony murder as "murder which is . . . [c]omitted in the perpetration or attempted

10   perpetration of" one of several enumerated felonies. NRS § 200.030(1)(b); *see also Nay*

11   *v. State*, 167 P.3d 430, 431 (Nev. 2007) (holding "that for purposes of the first-degree

12   felony-murder statute, the intent to commit the predicate enumerated felony must have

13   arisen before or during the conduct resulting in death"). Not only does guilt-phase Jury

14   Instruction No. 26 comply with NRS § 200.030(1)(b), but the Nevada Supreme Court has

15   also approved of an instruction much like guilt-phase Jury Instruction No.

16   26. *See Crawford v. State*, 121 P.3d 582, 585 (Nev. 2005). Consequently, there is no

17   issue with guilt-phase Jury Instruction No. 26 negating the requirement that the State

18   prove every element of felony murder beyond a reasonable doubt. Second, "in the

19   perpetration or attempted perpetration of" is synonymous in this context with "during."

20   Third, and most importantly, Hernandez does not cite any authority for the proposition

21   that guilt-phase Jury Instruction No. 26 violated his federal constitutional rights.

22    Because the Nevada Supreme Court's denial of this claim was not contrary to or

23   an unreasonable application of federal law, Hernandez is not entitled to federal habeas

24   relief for ground 13b.

25   ///

26

27    [18]Hernandez also argues that the felony-murder theory was not established in his
case because the felonies were incidental to the homicide. (ECF No. 221 at 145.) This
28   argument will be discussed in ground 17.

### 4.    Ground 13c

In ground 13c, Hernandez alleges that the murder by torture instruction was unconstitutional. (ECF No. 221 at 145.)

Guilt-phase Jury Instruction No. 27 provided as follows:

> The essential elements of murder by means of torture are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the calculated intent to cause cruel pain and suffering for the purpose of revenge, persuasion or for any other sadistic purpose.
> The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased nor does it necessarily require any proof that the deceased suffered pain.

(ECF No. 14-2 at 109.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held: "Hernandez failed to object to . . . guilt phase instruction no. 27 defining murder by torture . . . . Hernandez must demonstrate that there was error in regard to these instructions, that it was plain, and that it affected his substantial rights. He fails to do so." (*Id.* at 26.)

In a case involving a charge of murder by torture, the jury must first analyze whether the defendant acted with malice to warrant a murder conviction, and, if malice is found, then the jury must next determine whether the elements of torture have been met. *Collman*, 7 P.3d at 447 (explaining that "[a]lthough as a practical matter malice may almost always be factually present when there is a killing by torture, . . . it is conceivable that torture . . . can be done without legal malice"). Even though guilt-phase Jury Instruction No. 27 did not mention malice, it was not required to do so under *Collman*. Rather, because (1) the jury had already been properly instructed that murder required a finding of malice in guilt-phase Jury Instruction No. 13, and (2) guilt-phase Jury Instruction No. 27 then provided the additional elements of murder by torture if the jury found malice to be present, the jury instructions did not relieve the State of their burden to prove every element of murder by torture beyond a reasonable doubt.

The Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law, so Hernandez is not entitled to federal habeas relief for ground 13c.

### 5. Ground 13d

In ground 13d, Hernandez alleges that the instruction on voluntary manslaughter acted to reduce the State's burden of proving the elements of murder. (ECF No. 221 at 146.)

The Nevada Supreme Court did not address this ground, but AEDPA's deferential standards still apply because the Court presumes that the Nevada Supreme Court adjudicated the claim on the merits. *See Johnson v. Williams*, 568 U.S. 289, 293 (2013); *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Lacking a reasoned state-court decision, the Court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision." *Richter*, 562 U.S. at 102; *Carter v. Davis*, 946 F.3d 489, 502 (9th Cir. 2019).

Guilt-phase Jury Instruction No. 30 provided as follows:

> Voluntary Manslaughter is the unlawful killing of a human being, without malice aforethought and without deliberation and premeditation. It is a killing upon a sudden quarrel or heat of passion, caused by a provocation sufficient to make the passion irresistible.
> The provocation required for Voluntary Manslaughter must either consist of a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.
> For the sudden, violent impulse of passion to be irresistible resulting in a killing, which is Voluntary Manslaughter, there must not have been an interval between the assault or provocation and the killing sufficient for the voice of reason and humanity to be heard; for, if there should appear to have been sufficient time for a cool head to prevail and the voice of reason to be heard, the killing shall be attributed to deliberate revenge and determined by you to be murder. The law assigns no fixed period of time for such an interval but leaves its determination to the jury under the facts and circumstances of the case.

(ECF No. 14-2 at 112.) And guilt-phase Jury Instruction No. 31 provided as follows:

The heat of passion which will reduce a homicide to Voluntary Manslaughter must be such an irresistible passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the irresistible passion of the ordinarily reasonable man if likewise situated. The basic inquiry is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection and from such passion rather than from judgment.

(*Id*. at 113.)

Hernandez argues that these instructions misled the jurors into believe the burden was on him to establish the lack of malice. (ECF No. 322 at 268.) There is no dispute that the burden of proving malice is on the prosecution—rather than on the defendant to show a lack of malice. *See Mullaney v. Wilbur*, 421 U.S. 684, 702 (1975) ("[P]roving that the defendant did not act in the heat of passion on sudden provocation is similar to proving any other element of intent; it may be established by adducing evidence of the factual circumstances surrounding the commission of the homicide. And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not, as the Court has long recognized, justify shifting the burden to him."). However, there is no "require[ment that] special instructions on the burden of proof [must be given] where a heat of passion defense is raised." *Dunckhurst v. Deeds*, 859 F.2d 110, 113 (9th Cir. 1988). Rather, "[w]here lack of adequate provocation is an element of the charged crime, and the jury is instructed that the government must prove every element beyond a reasonable doubt, *Mullaney* . . . [is] satisfied." *Id*. at 114.

Although guilt-phase Jury Instruction Nos. 30 and 31 did not explicitly state that the burden of proof was on the State to negate that Hernandez acted with adequate provocation, the jury instructions did not shift the burden to Hernandez to show that adequate provocation existed. Because the jury was properly instructed that (1) the State was burdened with proving beyond a reasonable doubt every element of the offense of

murder,[19] and (2) a finding of malice was required for a murder conviction,[20] the jury necessarily had to find that the State proved beyond a reasonable doubt that Hernandez killed Donna with malice aforethought, *i.e.*, without adequate provocation.

Because the Nevada Supreme Court's implicit denial of this claim was not contrary to or an unreasonable application of federal law, Hernandez is not entitled to federal habeas relief for ground 13d.

### 6. Ground 13e

In ground 13e, Hernandez alleges that the deadly weapon enhancement instruction was unconstitutionally vague. (ECF No. 221 at 148.)

Guilt-phase Jury Instruction No. 44 provided as follows:

"Deadly Weapon" means any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death; or, any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death.

(ECF No. 14-2 at 126.) Relatedly, guilt-phase Jury Instruction No. 25 provided that "[t]he intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of its use, and the attendant circumstances characterizing the act." (*Id*. at 108.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

Hernandez objected to guilt phase instruction no. 44, defining "deadly weapon." The instruction was based on NRS 193.165(5), which provides in part that "deadly weapon" means:
(a)    Any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death; [or]
(b)    Any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death.

---

[19]ECF No. 14-2 at 129.

[20]ECF No. 14-2 at 96.

Hernandez contends that this definition is vague and ambiguous. He relies on *Zgombic v. State*. [106 Nev. 571, 798 P.2d 548 (1990).] In *Zgombic*, this court considered whether the Legislature intended a broad, functional definition of "deadly weapon" under a former version of NRS 193.165, which did not define the term. [*See id.* at 573–76, 798 P.2d at 549–51.] We concluded that the statutory "term 'deadly weapon' is indeed uncertain, and thus the broader functional interpretation is not warranted. . . . [T]he enhancement penalty for use of a deadly weapon in the commission of a crime pursuant to NRS 193.165 is limited to firearms and other instrumentalities that are inherently dangerous. [*Id.* at 575–76, 798 P.2d at 551.]

Hernandez fails to note that *Zgombic* preceded (and apparently prompted) the amendment of NRS 193.165 to include both a functional and an "inherently dangerous" definition of "deadly weapon." [*See* 1995 Nev. Stat., ch. 455, § 1, at 1431.] Therefore, the statute is no longer unclear in this regard. The definition set forth in NRS 193.165(5)(b) is broad, but that is clearly the Legislature's intent. The definition is not without limit, however; it requires an instrument to be "readily capable" of causing death as used, not that it simply caused death.

Because the statute does not implicate First Amendment interests, Hernandez has the burden to show that it is impermissibly vague in all its applications or at least as applied to him. [*Republic Entertainment*, 99 Nev. at 816, 672 P.2d at 638; *Lyons*, 105 Nev. at 320, 775 P.2d at 221.] He does not meet this burden. Even using the stricter, "inherently dangerous" test set forth in *Zgombic* and NRS 193.165(5)(a), the knife that Hernandez used—a kitchen knife with a seven-and-a-half-inch, serrated blade—was a deadly weapon. [*See Steese v. State*, 114 Nev. 479, 499, 960 P.2d 321, 334 (1998) (approving a jury instruction that "a large kitchen knife," a butcher's knife with a five- to seven-inch blade, was a deadly weapon as a matter of law); *Thomas v. State*, 114 Nev. 1127, 1146, 967 P.2d 1111, 1123 (1998) (following *Steese* in concluding that "a meat-carving knife with a five- to seven-inch blade" was a deadly weapon).] The statute gave Hernandez fair notice that the knife was a deadly weapon for purposes of sentence enhancement.

(*Id.* at 27–29.)

The threshold for declaring a law void for vagueness is high: due to "presumptive validity[,] . . . statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Instead, it is adequate if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). A statute is void for vagueness only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

The Nevada Supreme Court reasonably concluded that guilt-phase Jury Instruction No. 44, which was based on NRS § 193.165, was not impermissibly vague. As the Nevada Supreme Court reasonably noted, although the definition of a deadly weapon is broad, it is not without confines. Rather, because the definition requires the instrument to be "readily capable" of causing death, it is not standardless and provides sufficient notice to persons of ordinary intelligence of the term's meaning. Moreover, the Nevada Supreme Court also reasonably determined that guilt-phase Jury Instruction No. 44 was not impermissibly vague as applied to Hernandez given that he killed Donna with a seven-and-a-half-inch knife.

Because the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law, Hernandez is not entitled to federal habeas relief for ground 13e.

### 7.    Ground 13f

In ground 13f, Hernandez alleges that the voluntary intoxication instruction was unconstitutional. (ECF No. 221 at 149.)

Guilt-phase Jury Instruction No. 32 provided as follows:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, evidence of intoxication may be taken into consideration in determining such purpose, motive or intent.

(ECF No. 14-2 at 114.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez also challenges guilt phase instruction no. 32 on voluntary intoxication. Hernandez claims that he objected to this instruction below, while the State contends that he objected only to its final line. Our reading of the record reveals that defense counsel did not object to the instruction at all. Three alternative instructions were discussed, and defense counsel did not object to the instruction that the district court finally decided to give. Hernandez fails to show that the instruction given was erroneous in any way.

1    (*Id.* at 26–27.)[21]

2           Hernandez argues that guilt-phase Jury Instruction No. 32 failed to apprise the jury

3    that intoxication could be considered in determining whether he acted with premeditation

4    and deliberation (ECF No. 221 at 149.) This argument is belied by guilt-phase Jury

5    Instruction No. 32 and the instructions as a whole. Guilt-phase Jury Instruction No. 32

6    told the jury that "whenever . . . any particular purpose, motive or intent is a necessary

7    element . . . , evidence of intoxication may be taken into consideration." (ECF No. 14-2 at

8    114.) The jury was also instructed that (1) "[d]eliberation is the process of determining

9    upon a course of action to kill as a result of thought, including weighing the reasons for

10   and against the action and considering the consequences of the action," and (2)

11   "[p]remeditation is a design, a determination to kill, distinctly formed in the mind by the

12   time of the killing." (*Id.* at 102, 104.) Because deliberation and premeditation both require

13   a particular purpose—a determination upon a course of action to kill and a determination

14   to kill, respectively—it is apparent that the intoxication instruction would apply to both

15   deliberation and premeditation. And more importantly, guilt-phase Jury Instruction No. 32

16   complies with Nevada law,[22] and the Court may not second-guess the Nevada Supreme

17   Court or Nevada Legislature on the elements of Nevada criminal law.

18          Because the Nevada Supreme Court's denial of this claim was not contrary to or

19   an unreasonable application of federal law, Hernandez is not entitled to federal habeas

20   relief for ground 13f.

21                        **8.    Ground 13h**

22          In ground 13h, Hernandez alleges that the "anti-sympathy" instruction was

23   unconstitutional. (ECF No. 221 at 152.)

24          Penalty-phase Jury Instruction No. 19 provided as follows:

25

26          [21]Hernandez argues that the Court should review this ground *de novo* because the
     Nevada Supreme Court unreasonably determined that his trial counsel failed to object to
27   this ground. (ECF No. 322 at 273.) For the reasons discussed in this section, Hernandez
     is not entitled to relief under either deferential or *de novo* review.
28          [22] *See* NRS § 193.220.

1
2
3

> Although you are to consider only the evidence in the case in reaching a verdict, you must bring to the consideration of the evidence your everyday common sense and judgment as reasonable men and women. Thus, you are not limited solely to what you see and hear as the witnesses testify. You may draw reasonable inferences from the evidence which you feel are justified in the light of common experience, keeping in mind that such inferences should not be based on speculation or guess.

4
5

> A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law.

6    (ECF No. 19 at 36.)

7        In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held

8    as follows: "Hernandez failed to object to . . . penalty phase instruction no. 19 directing

9    the jury not to be influenced by sympathy. Hernandez must demonstrate that there was

10   error in regard to these instructions, that it was plain, and that it affected his substantial

11   rights. He fails to do so." (ECF No. 14-2 at 26.)

12       Hernandez argues that by prohibiting the jury from taking sympathy into account,

13   penalty-phase Jury Instruction No. 19 precluded the jury from considering mitigating

14   factors or concluding that a death sentence was not warranted even if the aggravating

15   circumstances outweighed the mitigating factors. (ECF No. 221 at 152.) This argument is

16   belied by penalty-phase Jury Instruction No. 8, which instructed the jury that (1) they

17   "shall" determine "[w]hether any mitigating circumstance or circumstances are found to

18   exist" and (2) they had the discretion to impose a sentence less than death even if the

19   aggravating circumstances outweighed the mitigating circumstances. (ECF No. 19 at 25.)

20       Hernandez also argues that penalty-phase Jury Instruction No. 19 precluded

21   consideration of any sympathy, including sympathy warranted by the evidence. (ECF No.

22   221 at 152.) To support this argument, Hernandez cites *Lockett v. Ohio*, in which the

23   United States Supreme Court concluded that the jury "not be precluded from considering,

24   *as a mitigating factor*, any aspect of a defendant's character or record and any of the

25   circumstances of the offense that the defendant proffers as a basis for a sentence less

26   than death." 438 U.S. 586, 604 (1978) (emphasis in original). However, the Supreme

27   Court has explained that "*Lockett* . . . do[es] not speak directly, if at all, to . . . whether the

28   State may instruct the sentencer to render its decision on the evidence without sympathy."

*Saffle v. Parks*, 494 U.S. 484, 490 (1990). Rather, the Court disagreed that "the Eighth Amendment . . . requires . . . that jurors be allowed to base the sentencing decision upon the sympathy they feel for the defendant after hearing his mitigating evidence." *Id*. at 489. In coming to this conclusion, the Court reasoned that "[w]hether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant," so "[i]t would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Id*. at 493; *see also California v. Brown*, 479 U.S. 538, 543 (1987) (holding that "[a]n instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial . . . serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors"); *Mayfield*, 270 F.3d at 923 (explaining that "federal courts have consistently held that jury instructions admonishing the jury to base its penalty determination on mitigating or aggravating evidence, not on sympathy for the defendant, pass constitutional muster").

Because the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law, Hernandez is not entitled to federal habeas relief for ground 13h.

### 9.    Ground 13i

In ground 13i, Hernandez alleges that the guilt-phase unanimity instruction—Jury Instruction No. 35—was unconstitutional because the jury was required to be unanimous in their theory of criminality. (ECF No. 221 at 153.) Guilt-phase Jury Instruction No. 35 provided as follows:

> Although your verdict must be unanimous as to the charge of Murder of the First Degree, you do not have to agree on the theory of guilt. Therefore, even if you cannot agree on whether the facts establish (1) premeditated murder, (2) felony murder, or (3) murder by means of torture, so long as all of you agree that the evidence establishes the Defendant's guilt of murder in the first degree, your verdict shall be Murder of the First Degree.

1  (ECF No. 14-2 at 117.)

2      In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held

3  as follows:

> Hernandez also objected to instruction no. 35 in the guilt phase that
> informed the jury that it did not need to agree unanimously on the theory of
> first-degree murder as long as its verdict of first-degree murder was
> unanimous. He argues that this violates due process, but concedes that this
> court has already ruled otherwise. [*See, e.g., Evans v. State*, 113 Nev. 885,
> 894–96, 944 P.2d 253, 259–60 (1997).] We decline to reconsider this issue.

8  (*Id.* at 29.)

9      This ground is entirely baseless. In *Schad v. Arizona*, the Supreme Court held that

10 "a first-degree murder conviction under jury instructions that did not require agreement

11 on whether the defendant was guilty of premeditated murder or felony murder [was not]

12 unconstitutional." 501 U.S. 624, 627 (1991). Hernandez attempts to evade *Schad* by

13 arguing that it was undermined by *Ramos v. Louisiana*. (ECF No. 322 at 280.) This

14 argument is unpersuasive. In *Ramos*, the Court held that a state jury must be unanimous

15 to convict a defendant of a serious offense. 590 U.S. 83 (2020). *Ramos* says nothing

16 about requiring juror unanimity on the factual basis or theory of guilt underlying a verdict.

17     Because the Nevada Supreme Court's denial of this claim was not contrary to or

18 an unreasonable application of federal law, Hernandez is not entitled to federal habeas

19 relief for ground 13i.

20          **10.    Ground 13j**

21     In ground 13j, Hernandez alleges that the "equal and exact justice" instruction was

22 unconstitutional. (ECF No. 221 at 154.)

23     Guilt-phase Jury Instruction No. 55 and penalty-phase Jury Instruction No. 22

24 instructed the jury that it was their "duty to be governed . . . by the evidence . . . and by

25 the law as given . . . , with the sole, fixed and steadfast purpose of doing equal and exact

26 justice between the Defendant and the State of Nevada." (ECF Nos. 14-2 at 137; 19 at

27 39.)

1    In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held

2  as follows:

3         Hernandez failed to object to . . . guilt phase instruction no. 55 and
      penalty phase instruction no. 22 directing the jury to do "equal and exact
4      justice" . . . . Hernandez must demonstrate that there was error in regard to
      these instructions, that it was plain, and that it affected his substantial rights.
5      He fails to do so.

6  (ECF No. 14-2 at 26.)

7    Hernandez argues that these instructions created a reasonable likelihood that the

8  jury would ignore the constitutionally mandated imbalance between the burdens placed

9  on the parties, which require the State to bear the burden of proof beyond a reasonable

10  doubt and afford him the presumption of innocence, and instead view the parties on "equal

11  footing." (ECF No. 221 at 154.) This argument lacks merit. A reasonable juror, taking the

12  instructions as a whole, would not interpret these instructions in such a manner. Because

13  guilt-phase Jury Instruction No. 47[23] specifically addressed the presumption of innocence

14  and the burden of proof necessary for a conviction, the notion that the jury was misled on

15  these concepts due to one potentially ambiguous phrase in a lengthy set of instructions

16  is illogical. Moreover, Hernandez fails to show these instructions conflict with clearly

17  established federal law. Hernandez cites *Winship* and *Sullivan v. Louisiana* to support his

18  argument (*see* ECF No. 322 at 282–83), but these cases only address the prosecution's

19  burden to prove their case—they do not discuss the phrase "equal and exact justice" or

20  its effect on the prosecution's burden. *See Winship*, 397 U.S. at 364; *Sullivan v.*

21  *Louisiana*, 508 U.S. 275, 279–82 (1993).

22    Because the Nevada Supreme Court's denial of this claim was not contrary to or

23  an unreasonable application of federal law, Hernandez is not entitled to federal habeas

24  relief for ground 13j.

25  ///

26

27    [23]Guilt-phase Jury Instruction No. 47 provided that "[t]he Defendant is presumed
    innocent until the contrary is proved. This presumption places upon the State the burden
28  of proving beyond a reasonable doubt every material element of the crime charged." (ECF
    No. 14-2 at 129.)

### 11.  Ground 13k

In ground 13k, Hernandez alleges that the instruction defining "mutilation" was unconstitutional. (ECF No. 221 at 155.)

Penalty-phase Jury Instruction No. 11 provided that "the term 'mutilate' means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect" and "[i]n order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim beyond the act of killing." (ECF No. 19 at 39.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> In the penalty phase, Hernandez objected to instruction no. 11, which informed the jury that
>> "mutilate" means to cut off or permanently destroy a limb or essential part of the body or to cut off or alter radically so as to make imperfect.
>>> In order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim beyond the act of killing.
>
> Hernandez argued that the instruction was vague, ambiguous, and overbroad, making every cause of death "mutilation." He makes two additional arguments on appeal: applying *Byford v. State*, [116 Nev. 215, 994 P.2d 700 (2000)] which held that mutilation can occur postmortem, to his case would be an improper retroactive application of law; and the mutilation aggravator duplicated the sexual-penetration aggravator. These last two issues were not preserved and do not have merit.
>> First, the aggravating circumstances in question are not duplicative. In this case, the same conduct gave rise to both the mutilation and the sexual penetration, but in other cases these two aggravating circumstances would likely be based on different facts since sexual penetration is generally accomplished without mutilation. This factor indicates that the aggravators are not duplicative. [*See Geary v. State*, 112 Nev. 1434, 1448, 930 P.2d 719, 728 (1996), *clarified on rehearing*, 114 Nev. 100, 952 P.2d 431 (1998).] So does a second factor: each aggravator addresses distinguishable state interests. One is apparently aimed at preventing disfigurement, the other at preventing sexual abuse and perversion. [*See id*.] We conclude that the gravamen of each aggravator is different and that basing them both on the same facts is not improper. [*Cf. Servin v. State*, 117 Nev. ___, ___, 32 P.3d 1277, 1287 (2001).]
>> Second, a finding of postmortem mutilation in this case does not implicate improper retroactivity. In *Byford*, this court noted that it had "never expressly decided whether postmortem mutilation" was an aggravating circumstance under NRS 200.033(8). We then explicitly held that it was, reasoning as follows. "Basing aggravating circumstances on the actions of the murdered following the victim's death is proper." [*Byford*, 116 Nev. at 241, 994 P.2d at 717.] This court's earlier case law "tends to support the

conclusion that the aggravating circumstance set forth in NRS 200.033(8) includes postmortem mutilation. More important, this conclusion is consistent with the statutory language." [*Id*.] This reasoning belies Hernandez's assertion that *Byford* pronounced a new, unexpected judicial expansion of NRS 200.033(8). "A judicial interpretation of a statute may be retroactively applied if it is both authoritative and foreseeable." [*Kreidel v. State*, 100 Nev. 220, 222, 678 P.2d 1157, 1158 (1984) (citing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)), *overruled on other grounds by Nevada Dep't Prisons v. Bowen*, 103 Nev. 477, 745 P.2d 697 (1987); *see also Stevens v. Warden*, 114 Nev. 1217, 1221, 969 P.2d 945, 948 (1998).] The holding in *Byford* was authoritative and foreseeable since it was consistent with prior case law and based on the language of the statute.

Finally, Hernandez argues that the aggravating circumstance of mutilation is unconstitutionally vague as set forth in NRS 200.033(8) and the jury instruction given in this case. This court upheld the constitutionality of this statute and this instruction in *Browne v. State*. [113 Nev. 305, 315–16, 933 P.2d 187, 193 (1997).] We decline to revisit the issue. Hernandez also contends that application of this aggravating circumstance to his case was unconstitutional because "the uterus has not previously been defined as an essential part of the body" and no evidence establishing it as such was presented. We consider this contention utterly without merit.

(ECF No. 14-2 at 30–32.)

Hernandez argues that penalty-phase Jury Instruction No. 11 was unconstitutional because (1) application of the instruction to him constituted an ex post facto application, (2) it is vague, (3) it was duplicative of another aggravating circumstance, and (4) it did not apply to the facts of this case. (ECF No. 322 at 285.) The Court will address these arguments in turn.

First, NRS § 200.033(8) provides that a jury can consider whether "[t]he murder involved torture or the mutilation of the victim" as an aggravating circumstance for first-degree murder. The Court acknowledges that the murder in this case took place in October 1999, but it was not until February 2000 that the Nevada Supreme Court "expressly" concluded that *postmortem* mutilation falls within the definition of NRS § 200.033(8). *See Byford v. State*, 994 P.2d 700, 717 (Nev. 2000). "The ex post facto prohibition forbids . . . the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981). Because "a criminal statute must give fair warning of the conduct that it makes a crime," the judicial construction of a criminal statute "must not be given retroactive effect" if that judicial construction "is unexpected and indefensible by reference

82

to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 350, 354 (1964) (internal quotation marks omitted) (determining that the South Carolina court's construction of a statute was unexpected and indefensible because it was at odds with the statute's plain language and had no support in prior South Carolina decisions); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (stating that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"). As the Nevada Supreme Court reasonably determined, their holding in *Byford* was foreseeable. In *Byford*, the Nevada Supreme Court explained that "[b]y including both [torture and mutilation] as the basis for the aggravator, the statute penalizes egregious behavior whether it occurs before or after a victim's death." 994 P.2d at 717. As such, the Nevada Supreme Court reasonably determined that it was expected and foreseeable that actions occurring before death—torture—and actions occurring after death—mutilation—were both inevitably included with the statute. Consequently, NRS § 200.033(8) was not unconstitutionally applied retroactively to Hernandez.

Second, regarding Hernandez's argument that penalty-phase Jury Instruction No. 11 was vague, Hernandez contends that the instruction did not define "essential part of the body" or "to cut off or alter radically." (ECF No. 322 at 287–88.) "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Because "essential part of the body" and "to cut off or alter radically" are not impermissibly vague, the Nevada Supreme Court reasonably rejected Hernandez's argument in this regard. *See Deutscher v. Whitley*, 884 F.2d 1152, 1162 (9th Cir. 1989), *judgment vacated on other grounds*, 500 U.S. 901 (1991) (analyzing a mutilation instruction, which defined mutilate as meaning "to cut off or permanently destroy a limb

or essential part of the body or to cut or alter radically so as to make imperfect," and finding that it was "sufficiently clear and objective").

Third, regarding duplication, Hernandez argues that penalty-phase Jury Instruction No. 11 was duplicative of the "sexual penetration of a dead body" aggravating circumstance. (ECF No. 221 at 158.) As the Nevada Supreme Court reasonably noted, the same conduct here gave rise to both the mutilation and the sexual penetration. However, as the Nevada Supreme Court also reasonably found, these two factors were not duplicative merely because they were supported by the same evidence. *See Jones v. United States*, 527 U.S. 373, 398 (1999) (explaining that the Court has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid," rather, "[w]hat we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor"). Rather these two aggravating factors had different elements and purposes, negating a duplicity finding. *Cf. Allen*, 395 F.3d at 1012 (taking issue with aggravating factors that "were effectively subsumed within each other").

Fourth, regarding Hernandez's argument that penalty-phase Jury Instruction No. 11 did not apply to the facts of this case, Hernandez asserts that the mutilation aggravating circumstance has never been held applicable to perforation of a uterus nor has any authority defined the uterus as an "essential part of the body." (ECF No. 221 at 157.) The Nevada Supreme Court reasonably determined that this argument was "utterly without merit." Indeed, it is nonsensical that an organ is nonessential or that a stabbing that resulted in a knife perforating the vagina wall and uterus and ending up in the abdominal cavity did not amount to mutilation.

Because the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law, Hernandez is not entitled to federal habeas relief for ground 13k.

///

///

12.    **Ground 13I**

In ground 13I, Hernandez alleges that the reasonable doubt instruction was unconstitutional. (ECF No. 221 at 158.)

Guilt-phase Jury Instruction No. 47 and penalty-phase Jury Instruction No. 15 provided as follows:

> A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

(ECF Nos. 14-2 at 129; 19 at 32.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez failed to object to . . . guilt phase instruction no. 47 and penalty phase instruction no. 15 defining reasonable doubt . . . . Hernandez must demonstrate that there was error in regard to these instructions, that it was plain, and that it affected his substantial rights. He fails to do so.

(ECF No. 14-2 at 26.)

The Nevada Supreme Court reasonably denied this claim. The Ninth Circuit Court of Appeals evaluated a nearly identical instruction in *Ramirez v. Hatcher*[24] before Hernandez's trial and found that "[a]lthough [it did] not herald the Nevada [reasonable doubt] instruction as exemplary, [it] conclude[d] that the overall charge left the jury with an accurate impression of the government's heavy burden of proving guilt beyond a

---

[24]The only difference between the reasonable doubt jury instruction provided in Hernandez's trial and the reasonable doubt jury instruction in *Ramirez* was the omission of the word "substantial." *Compare* ECF Nos. 14-2 at 129, 19 at 32 ("[D]oubt to be reasonable must be actual, not mere possibility or speculation.") *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210–11 (9th Cir. 1998) ("[D]oubt to be reasonable must be actual *and substantial*, not mere possibility or speculation." (emphasis added).) However, because "the use of the term 'substantial' to describe reasonable doubt has been disfavored," *Ramirez*, 136 F.3d at 1212, the reasonable doubt jury instruction provided in Hernandez's trial was even more acceptable than the reasonable doubt jury instruction in *Ramirez*.

1    reasonable doubt," so "the jury charge satisfied the requirements of due process." 136

2    F.3d 1209, 1210–11, 1215 (9th Cir. 1998); *see also Nevius v. McDaniel*, 218 F.3d 940,

3    944 (9th Cir. 2000) (holding that the reasonable doubt jury instruction was identical to the

4    one in *Ramirez*, so "[t]he law of this circuit thus forecloses Nevius's claim that his

5    reasonable doubt instruction was unconstitutional"). Because the Nevada Supreme

6    Court's denial of this claim was not contrary to or an unreasonable application of federal

7    law, Hernandez is not entitled to federal habeas relief for ground 13l.

8                    **13.    Ground 13m**

9         In ground 13m, Hernandez alleges that the cumulative jury instruction errors

10   prejudiced him. (ECF No. 221 at 160.) Because Hernandez has filed to identify any jury

11   instruction error, there are no errors to cumulate. Hernandez is denied federal habeas

12   relief for ground 13m.

13       **J.    Ground 16—Counsels' failures regarding Fifth Amendment**

14        In ground 16, Hernandez alleges that his convictions and death sentence are

15   invalid under federal constitutional guarantees of due process, effective assistance of

16   counsel, equal protection, and a reliable sentence due to his trial counsels' failures

17   regarding the introduction of statements made by him in violation of his Fifth Amendment

18   rights. (ECF No. 221 at 168.) Specifically, Hernandez contends that he was questioned

19   by officers after he had been handcuffed but before he had been formally arrested and

20   read his *Miranda* warnings, so his trial counsel should have objected to the statements

21   he made during this custodial interrogation. (*Id*.)

22                    **1.    State court determination**

23        In affirming the denial of Hernandez's first state habeas petition, the Nevada

24   Supreme Court held as follows:

25            Hernandez argues that the district court erred in denying his claim
         that counsel were ineffective for failing to address whether *Miranda*[ *v.*
26       *Arizona*, 384 U.S. 436 (1966)] barred admission of the statements he made
         to Officer Swoboda and police detective Tom Allen when he was arrested.
27       This claim lacks merit.
             *Miranda* affects the admissibility of statements made during "in-
28       custody interrogation." [*Id*. at 445.] "Custody" is defined as "'formal arrest or

                                    86

restraint on freedom of movement' of the degree associated with a formal arrest." [*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *see also Alward v. State*, 112 Nev. 141, 154, 912 P.2d 243, 252 (1996), *overruled in part on other grounds by Rosky v. State*, 121 Nev. 184, 111 P.3d 690 (2005).] "Interrogation" means explicit questioning as well as "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." [*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).]

After Officer Swoboda stopped Hernandez for speeding, Hernandez exited his car, said, "Just shoot me, just kill me," and told his daughter he was sorry. Although Hernandez was subsequently handcuffed due to his erratic behavior, there is no indication that at the time he made these comments he had been arrested or restrained or that Officer Swoboda suspected him of anything other than speeding. Hernandez only refers to one question asked him by a police officer: when Officer Swoboda noticed cuts on Hernandez's face and hand, he asked Hernandez what happened. Hernandez responded that he had fought with his ex-wife. Through his police computer, Officer Swoboda learned of Donna's restraining order against Hernandez. Deducing that a domestic violence incident had occurred, Officer Swoboda requested officers be sent to Donna's residence, where her body was discovered. Suspecting Hernandez of driving under the influence of alcohol, Hernandez was administered a horizontal gaze nystagmus test, which he failed. Officer Swoboda placed Hernandez under arrest, after which Hernandez said, "I killed her" and "I killed them." Officer Swoboda advised Hernandez of his Miranda rights, and Hernandez continued to say "I killed her" and "I killed them."

Applying the definitions of "custody" and "interrogation," explained above, Hernandez's statements were not made while he was in custody or subject to interrogation. Hernandez wholly fails to explain how any of these statements were made in violation of *Miranda*. We discern nothing in Officer Swoboda's words or actions that were reasonably likely to elicit an incriminating response. Because a motion to suppress any of the statements described above would not have succeeded, we conclude that the district court correctly ruled that trial counsel were not ineffective for failing to make such a motion. [To the extent Hernandez contends that his appellate counsel was ineffective for failing to raise this matter on direct appeal, we conclude that he failed to demonstrate that it had a reasonable probability of success. *See Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996).]

(ECF No. 14-2 at 63–65.)

## 2.    Standard

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. "[T]he

term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). And the term "custody" under *Miranda* refers to "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); *see Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (holding that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*").

### 3.    Analysis

The Nevada Supreme Court reasonably concluded that Hernandez was not subject to interrogation. Before giving Hernandez his *Miranda* rights, Officer Swoboda asked Hernandez various questions: he "asked him for his driver's license," he "asked him what happened" in reference to the "superficial cuts about his face" and his hand, he "asked him if he had been drinking," and he "asked what [Donna's] address was." (ECF No. 255-1 at 49–50, 52, 58.) Similarly, Detective Allen "asked him what happened to his face" and hand and asked if he "let the people at work know that [he] cut [his] hand." (*Id.* at 80–81.) These questions were not "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. Rather, these were routine, neutral questions of a general investigatory nature. And "a police officer is authorized to make limited inquiries when effecting an investigatory stop justified by reasonable suspicion." *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981) (explaining that "not every question is an interrogation," and "[m]any sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent"); *see also United States v. Foster*, 227 F.3d 1096, 1102 (9th Cir. 2000) ("Direct questioning by a police officer that leads an accused to make inculpatory statements is the most obvious form of impermissible interrogation, but not all direct questions constitute interrogation."); *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017) ("[T]he routine gathering of

background biographical information, such as identity, age, and address, usually does not constitute interrogation." (Internal quotation marks omitted).) Because Hernandez fails to demonstrate that he was interrogated, the Nevada Supreme Court also reasonably concluded that Hernandez's trial counsel was not ineffective for failing to file a motion to suppress. The Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance and prejudice prongs, so Hernandez is not entitled to federal habeas relief on ground 16.

### K.    Ground 17—Sufficiency of the Evidence

In ground 17, Hernandez alleges that his sentence of death is invalid under the federal constitutional guarantees of due process because there was insufficient evidence to support premeditation and deliberation, burglary and felony-murder, and murder by torture. (ECF No. 221 at 170–73.)

#### 1.    State court determination

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez claims that there was insufficient evidence of premeditation and deliberation, burglary, kidnapping, and torture.
> In reviewing the sufficiency of the evidence, this court must determine whether the jury, acting reasonably, could have been convinced by the competent evidence of the defendant's guilt beyond a reasonable doubt. [*Collman v. State*, 116 Nev. 687, 711, 7 P.3d 426, 441 (2000), *cert. denied*, 532 U.S. 978 (2001).] This court will not disturb a jury verdict where there is substantial evidence to support it, and circumstantial evidence alone may support a conviction. [*Id.*]
> Hernandez contends that there was insufficient evidence of premeditation and deliberation. He says that there is no suggestion in the record that he brought a weapon to Donna's home, engaged in any planning of the offense, or packed clothing in his car or otherwise prepared to leave town with his daughter. He notes that he parked his car in Donna's driveway without attempting to hide it and stresses that he was experiencing emotional turmoil and was heavily intoxicated.
> We conclude, on the contrary, that there was strong evidence of premeditation and deliberation. The record shows that Hernandez repeatedly threatened to kill Donna. He left such threats on her answering machine. He made a veiled threat to kill her when he told Landeros "you're going to die, dogs." Later that evening, he made the threat explicit over the phone to Donna's mother. And about two weeks before the murder, he told a friend that he wanted to kill Donna. Further, the jury could reasonably have found that Hernandez acted premeditatedly and deliberately in murdering

his ex-wife on October 6, the anniversary of their failed marriage. Hernandez's possession of over $1,000 in cash immediately after the murder could also reasonably be considered evidence that he planned the crime and his flight afterwards.

The evidence that Hernandez intended the murder also supports the jury's finding of burglary. If Hernandez entered Donna's house with the intent to murder her or to kidnap [A.H.], he committed burglary. [*See* NRS 205.060(1).] Hernandez emphasizes that he and Donna had been seen together on various occasions not long before her murder and that there was no sign that he forcibly entered her home. However, forcibly entry is not an element of burglary; so even if Donna consented to his entry, he still committed a burglary as long as he entered with a felonious intent. [*See id.*; *Barrett v. State*, 105 Nev. 361, 364, 775 P.2d 1276, 1277 (1989).]

Hernandez contends that there was also insufficient evidence of second-degree kidnapping. As discussed above, he argues that he had legal custody of his daughter. He further argues that the divorce decree permitted him to take Ana out of state. These arguments are of no avail. To reiterate, NRS 200.310(2) provides in relevant part that "[a] person who willfully and without authority of law seizes . . . another person . . . for the purpose of conveying the person out of the state without authority of law, . . . is guilty of kidnapping in the second degree." Hernandez violated a protective order, a custody decree, and criminal statutes when he murdered Donna and took Ana. Therefore, he seized Ana without authority of law. And the evidence that his purpose was to convey her out of state to Mexico is overwhelming: he had threatened more than once to do so, he was driving with her in that direction when stopped by the police, and she told the police that was where her father was taking her.

Hernandez contends that there was insufficient evidence of murder by torture and of torture as an aggravating circumstance. "Torture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose" and intent "to inflict pain beyond the killing itself." [*Domingues v. State*, 112 Nev. 683, 702 & n.6, 917 P.2d 1364, 1377 & n.6 (1996).] In *Domingues v. State*, this court concluded that there was insufficient evidence of torture where the evidence did not indicate that the appellant's "intent was anything other than to kill" the victim and there was "no evidence that the specific intent behind the attempted electrocution or the stabbing was to inflict pain for pain's sake or for punishment or sadistic pleasure." [*Id.* at 702, 917 P.2d at 1377.]

Hernandez argues that the record here shows simply that he stabbed Donna to death and did not intend to torture her. We disagree. Coupled with the multiple injuries he inflicted on her before her death, Hernandez's act of thrusting the knife into Donna's vagina reflects an intent to inflict pain beyond the killing itself for a sadistic purpose. Hernandez counters that this act occurred after Donna's death and therefore cannot be torture; he cites *Byford v. State*. [116 Nev. at 241, 994 P.2d at 717 ("Although a victim who has died cannot be tortured, mutilation can occur after death.").] Although the evidence was not conclusive that Donna was dead when the act occurred, we presume that she was because in the guilt phase the jurors found Hernandez guilty of sexual penetration of a dead body. Nevertheless, even if the knife was thrust into Donna's vagina after her death, it is relevant evidence of his state of mind before her death as he beat her, stabbed her repeatedly, and strangled her. We conclude that this evidence was sufficient to prove torture as an aggravator under NRS 200.033(8) and murder by torture under NRS 200.030(1)(a). There was also sufficient evidence of the "torture or mutilation" aggravator on the basis of the mutilation evident in the record. [*See id.* at 240, 994 P.2d and 716 (stating that establishing either

1    torture or mutilation is sufficient to support the aggravating circumstance set
     forth in NRS 200.033(8)).]

2    (ECF No. 1-2 at 34–37.)

3                    **2.    Standard**

4          "[T]he Due Process Clause protects the accused against conviction except upon

5    proof beyond a reasonable doubt of every fact necessary to constitute the crime with

6    which he is charged." *In re Winship*, 397 U.S. at 364. A federal habeas petitioner "faces

7    a heavy burden when challenging the sufficiency of the evidence used to obtain a state

8    conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th

9    Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must

10   determine whether "any rational trier of fact could have found the essential elements of

11   the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

12   The evidence is to be viewed "in the light most favorable to the prosecution." *See id*.

13   Federal habeas relief is available only if the state-court determination that the evidence

14   was sufficient to support a conviction was an "objectively unreasonable" application of

15   *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13. Sufficiency of the evidence claims are

16   judged by the elements defined by state law. *See Jackson*, 443 U.S. at 324 n.16.

17                   **3.    Analysis**

18         First, regarding premeditation and deliberation, Nevada Revised Statute §

19   200.030(1)(a) provides "[m]urder of the first degree is murder which is . . . [p]erpetrated

20   by means of . . . any . . . kind of willful, deliberate and premeditated killing." The Nevada

21   Supreme Court reasonably determined that there was sufficient evidence that

22   Hernandez's killing of Donna was premeditated and deliberate. Hernandez argues that

23   the evidence supports a finding of only voluntary manslaughter or second-degree murder

24   because there was no evidence that he brought a weapon to Donna's home or engaged

25   in any planning or preparation—such as packing clothing or passports to leave town with

26   A.H. or hiding his car to conceal his activities at Donna's home. (ECF No. 221 at 170–

27   71.) However, under Nevada law, it is inconsequential that Hernandez did not create a

28   well thought out plan. *See Leonard v. State*, 969 P.2d 288, 296 (Nev. 1998) (explaining

1    that premeditation "may be instantaneous as successive thoughts in the mind" (internal

2    quotation marks omitted).) And here, as the Nevada Supreme Court reasonably noted,

3    Hernandez had previously threatened to kill Donna on numerous occasions. Viewing the

4    evidence in the light most favorable to the prosecution, the Nevada Supreme Court

5    reasonably determined that a rational trier of fact could have found beyond a reasonable

6    doubt that Hernandez committed premeditated and deliberate first-degree murder. *See*

7    *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; NRS § 200.030(1)(a).

8        Second, regarding felony murder by means of burglary, Nevada law provides that

9    felony murder is "murder which is . . . [c]omitted in the perpetration or attempted

10   perpetration of" one of several enumerated felonies. NRS § 200.030(1)(b); *see also Nay*

11   *v. State*, 167 P.3d 430, 431 (Nev. 2007) (holding "that for purposes of the first-degree

12   felony-murder statute, the intent to commit the predicate enumerated felony must have

13   arisen before or during the conduct resulting in death"). And burglary is defined as

14   "unlawfully enter[ing] or unlawfully remain[ing] in any . . . [d]welling with the intent to

15   commit . . . any felony." NRS § 205.060(1)(a). The Nevada Supreme Court reasonably

16   determined that there was sufficient evidence that Hernandez entered Donna's house

17   with the intent to murder her or to kidnap A.H. Hernandez argues that there was no sign

18   of forced entry into Donna's home and no evidence that he was not welcomed within the

19   home, especially since he and Donna had been seen together before the murder. (ECF

20   No. 221 at 171–72.) However, as the Nevada Supreme Court reasonably noted, these

21   factors are irrelevant given that entering with a felonious intent is all that is required to

22   support his conviction for felony murder by means of burglary. And here, there was

23   sufficient evidence for the jury to have found that Hernandez entered Donna's home with

24   a felonious intent—e.g., Hernandez entered Donna's home and took A.H. in violation of

25   a protective order and custody decree. Viewing the evidence in the light most favorable

26   to the prosecution, the Nevada Supreme Court reasonably determined that a rational trier

27   of fact could have found beyond a reasonable doubt that Hernandez committed felony

28

1  murder by means of burglary. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274;

2  NRS § 200.030(1)(b); NRS § 205.060(1)(a).

3       Third, under Nevada law, murder "[p]erpetrated by means of . . . torture" is first-

4  degree murder. NRS § 200.030(1)(a). To support a murder by torture conviction, the

5  perpetrator must have tortured someone, resulting in their death, and have acted with

6  malice aforethought. *Collman*, 7 P.3d at 447. "Torture involves a calculated intent to inflict

7  pain for revenge, extortion, persuasion or for any sadistic purpose." *Domingues*, 917 P.2d

8  at 1377. The Nevada Supreme Court reasonably determined that there was sufficient

9  evidence that Hernandez's killing of Donna amounted to first-degree murder by torture.

10  Hernandez argues that there was no evidence that he acted with the intent to cause cruel

11  pain; rather, the evidence only showed he had the intent to kill but was unable to cause

12  death in a quick and painless manner. (ECF No. 221 at 172.) As the Nevada Supreme

13  Court reasonably noted, Hernandez inflicted multiple injuries on Donna by beating her,

14  stabbing her, and strangling her. Hernandez then thrust a knife into her vagina. These

15  actions were sufficient to show Hernandez's state of mind at the time of the murder and

16  that he acted with the calculated intent to cause cruel pain and suffering. Viewing the

17  evidence in the light most favorable to the prosecution, the Nevada Supreme Court

18  reasonably determined that a rational trier of fact could have found beyond a reasonable

19  doubt that Hernandez committed murder by torture. *In re Winship*, 397 U.S. at 364; *Juan*

20  *H.*, 408 F.3d at 1274; NRS § 200.030(1)(a).

21       The Nevada Supreme Court's denial of Hernandez's sufficiency-of-the-evidence

22  claim was neither contrary to, nor an unreasonable application of, clearly established

23  federal law and was not based on an unreasonable determination of the facts. Hernandez

24  is not entitled to federal habeas relief for ground 17.

25       **L.    Ground 18—Motion for New Counsel**

26       In ground 18, Hernandez alleges that his convictions and death sentence are

27  invalid under federal constitutional guarantees of due process, equal protection, the

28  effective assistance of counsel, the right to be free from cruel and unusual punishment,

93

and a reliable sentence because the trial court failed to conduct a sufficient inquiry in response to his motion for new counsel. (ECF No. 221 at 174.)

Hernandez asserted this claim on appeal following the denial of his first state habeas petition, and the Nevada Supreme Court held that the claim was procedurally barred under NRS § 34.810 because Hernandez did not raise the claim on his direct appeal. (ECF No. 184 at 33–34.) However, because NRS § 34.810 is not adequate to support application of the procedural default doctrine, the Court previously determined that ground 18 was not barred in this action. (*Id.* at 34.) Because the Nevada Supreme Court did not adjudicate this ground on the merits, the Court reviews it *de novo*.

### 1. Background information

Approximately 2.5 months before trial, Hernandez filed a pro se motion to dismiss counsel and appoint alternate counsel. (ECF No. 22 at 66.) In the motion, Hernandez alleged that his counsel was not communicating or visiting with him, not investigating his innocence, and was not using all available resources to obtain a fair sentence. (*Id.* at 67.)

A hearing was held on Hernandez's motion, and the following discussion took place:

THE DEFENDANT: My honor, I have serious conflict with my attorneys. On October 27, I let my attorney know a name of witnesses. I let my attorney know lot activities me and Donna shared together. Me and Donna have wonderful time and if I - -

MR. SCHIECK: I would ask the court to advise Mr. Hernandez please not talk about the facts of this case here in open court. It is something the district attorney may be able to use against him at a later time. If he has complaints about what we have not done that is fine, if he can please not talk about the facts of the case.

THE COURT: Your attorney is giving you good advice. . . . So you tell me anything you would like to tell me about the disagreement you have with these attorneys, and you can tell me anything at all about the witnesses, witness list you gave them.

What I am now finding advisable is that in these cases, especially important cases containing significant sentencing, I am requiring that the attorneys who represent defendants at the trial level get a written witness statement from all proposed witnesses. It is not necessarily discoverable by the other side. It is part of attorney work product, but it is to be used for post

94

conviction relief because we all know that is where we get to. . . . Mr. Hernandez, I guarantee from the time you gave them the list of witnesses and the time of trial these fellows will either individually visit every one of the witnesses you gave them or they will send an investigator to do so and the investigators have to do the same thing the attorneys have to do, synopsize what the witness knows, put the date on it of the interview and have the witness sign it, not discoverable by the State.

What other problems do you have, other than witnesses?

THE DEFENDANT: I am asking for some like time of death because only thing I know I have death penalty. I don't know what time of death, victim dead.

MR. ORAM: Mr. Hernandez was present at the preliminary hearing. He has been provided with a copy of the preliminary hearing transcript with the details of what the coroner can and cannot say about time of death.

THE COURT: Well, have you gone over the coroner's report in writing with him?

MR. ORAM: Yes. He was there. He had it. We have an independent forensic pathologist appointed who is reviewing the case and will be providing reports to us, and I have informed Mr. Hernandez he can talk to that independent expert who is from the state of California and talk to him about the cause of death once that doctor has reviewed all the information.

THE COURT: What other complaints have you got, Mr. Hernandez?

THE DEFENDANT: And I have complaint - - time, whenever I review my police report because there is a lot of conflicts in the police report.

MR. SCHIECK: We provided all the discovery State provided to us, Your Honor. We still need to look at the homicide detective's book. I'll work with Mr. Jorgenson to get that.

THE COURT: Does he have - - does Mr. Hernandez have his discovery in his possession at the jail.

MR. SCHIECK: He has everything we have including the preliminary hearing transcript, all the reports from the investigator on the witness interviews.

THE COURT: Mr. Hernandez, you have all of those reports. Are you telling me your attorney never comes to see you?

THE DEFENDANT: Come to see me in beginning every months and now every month and a half, you know, well, actually, Your Honor, the only thing I have is police report and I ask for, you know, for something else.

THE COURT: You can't get something that doesn't exist.

MR. SCHIECK: We have provided him with additional discovery which includes DNA results which came after the preliminary hearing. We have an independent DNA expert appointed who is reviewing that data. Mr. Hernandez has asked about having someone testify concerning the DNA results.

THE COURT: Mr. Hernandez, it seems to me your attorneys have been working diligently on your behalf. You, of course,

1
2

have the right to hire anyone that you would like to defend you. If you do not choose to hire anyone, then these are the two attorneys who will be representing you.

3
4

THE DEFENDANT: Your Honor, I like to ask you all this question with all my respect. In beginning, I have possibility to hire own attorney, but judge and department send me to hole for 93 days. At that time, I lose my house. I lose everything now. What now. I don't have no money to get it.

5

THE COURT: Then Mr. Schieck and Mr. Oram will represent you. Your trial date stands.

6
7
8

MR. ORAM: I would like to point out our investigator every single witness we have been told about we have reports from our investigator back, for example, a marriage counselor, a place where he previously work in a Mexican restaurant. Our investigator has provided us reports as to what the witnesses are saying.

9
10

THE COURT: I appreciate that and we anticipate that these will remain with your file for the inevitable post conviction relief proceedings.

11

THE COURT: Mr. Hernandez.

12
13

THE DEFENDANT: Your Honor, one more question. I let my attorney know long time ago in November they supposed to switch my court to federal court because at time of arrest my police arrest me outside of - - they arrest me in rural highway and not highway patrol and this - -

14
15
16

MR. SCHIECK: He was arrested down near Searchlight, which is a rural area. And, apparently, he believes that is not part of Clark County and, therefore, a federal court has jurisdiction over the case. When, in fact, clearly, that is part of Clark County. The crime for which he is primarily charged occurred here in Las Vegas.

17
18

THE COURT: Mr. Hernandez, your attorneys don't have a right to remove this case to federal court because jurisdiction lies in the state court proceeding, state court process. You are where you belong. Anything else?

THE DEFENDANT: I don't trust my attorneys, Your Honor.

19

. . .

20

THE COURT: Who is the world would you like to represent you?

THE DEFENDANT: I cannot represent myself. I don't want to.

21
22
23
24

THE COURT: You will not be allowed to represent yourself on a death case. If you don't want these attorneys to represent you, I presume that if that is your true desire, I'm going to require that you file a formal motion for that, and we will set it for a formal Ferretta Canvas. But, Mr. Hernandez, do you know how to go about getting witnesses to testify for you to do independent DNA analysis? You know how to go about getting the expert forensic person to come here and testify?

25

THE DEFENDANT: Your Honor, other than that I don't know but.

26

THE COURT: I think you should think real long and hard about wanting to represent yourself.

27

THE DEFENDANT: I don't have very good communication with my attorney. It's unhealthy.

28

THE COURT: I understand that if you're convicted, you are the one that will do the time and not the attorneys. However,

Mr. Hernandez, I appointed these attorneys. I have seen them in court on numerous occasions. I know they are highly qualified. I know if you are paying them you would be paying about $250,000 to be represented by them because they are not the Public Defender's Office. They are private attorneys out there on the street, and they have defended numerous high level cases.

You, sir, are extremely lucky to be represented by people of this caliber. The fact that you don't get along with them is fine. You want to hire somebody else, you go hire somebody else. If you don't have the means to hire them, Mr. Schieck and Mr. Oram are going to be representing you.

(ECF No. 22 at 72–80.)

### 2.    Standard

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. However, the Sixth Amendment does not "guarantee[ ] a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983) (explaining that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel"). "[T]he ultimate constitutional question" to ask when a state court has denied a motion for substitute counsel is whether the state court "violated [Petitioner's] constitutional rights in that the conflict between [Petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000). To answer this question, a state court is required to make "an appropriate inquiry into the grounds for such a motion." *Id*. at 1025.

### 3.    Analysis

Hernandez fails to demonstrate that the trial court failed to conduct a sufficient inquiry in response to his motion for new counsel. The trial court conducted meaningful inquiries into Hernandez's various concerns, allowing both Hernandez and his trial counsel sufficient opportunity to present their arguments on the record. Although the trial

court could have held a hearing outside the presence of the prosecution to allow Hernandez to discuss the facts of the case more freely, it does not appear that such an in-camera hearing was necessary. None of Hernandez's issues—interviews of witnesses, discovery issues, jail visits, jurisdictional concerns, and lack of trust—necessitated a private hearing; rather, the trial court was able to sufficiently address all these issues without needing to get into any privileged information. *See United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986) ("McClendon's description of the problem and the judge's own observations provided a sufficient basis for reaching an informed decision."). Further, based on the record, the trial court's inquiry into Hernandez's motion appropriately assessed the lack of any conflict between Hernandez and his attorneys and the level of communication between Hernandez and his attorneys. *See Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) ("[C]ompel[ling] one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever."). Because the trial court's inquiry was appropriate under the circumstances, Hernandez is not entitled to federal habeas relief for ground 18.

### M.    Ground 20—Ineffective Assistance of Appellate Counsel

In ground 20, Hernandez alleges that his sentence of death is invalid under the federal constitutional guarantees of due process and equal protection, the right to meaningful appellate review, the right to effective assistance of counsel, and the right to be free from cruel and unusual punishment because his direct appellate counsel was ineffective for abandoning claims 9, 10, 11, 16, and 18 after the Nevada Supreme Court instructed her to conform the length of her brief to the mandated page limits. (ECF No. 221 at 187.)

### 1.    Background information

At the postconviction evidentiary hearing, Hernandez's appellate counsel explained the process that went into filing Hernandez's direct appeal:

My general practice is to, as I did in this case, was to prepare a very rough draft of a brief. I have a vague recollection of that initially being somewhere in the nature of 280 to 300 pages, and that would be a very rough draft. From that I then go through and take out what I think are issues that have no chance of succeeding either in the state court or in the federal courts. I also do some formatting and cut down on citations and try to tighten up the statement of facts. And after doing all of that, I had a brief that I believe was 124 pages long which I believed was a proper brief to file in this case.

I filed a motion for extension of the page limit as I had done in previous cases. The Nevada Supreme Court denied that motion in a published decision which was a first for me stating that 80 pages would be the maximum that they would allow. We had some disagreements over the federal law on this issue, but in any event they directed me to file a brief that was 80 pages long.

So I then went back to the brief. I tried to tighten up the formatting as much as I could, would combine paragraphs, shorten sentences, shorten explanatory phrases on citations and take out some of the things that I thought made the brief more readable but I didn't interfere with the content, but I was still over the page limit that they had permitted. So I decided that I needed to take out a few issues. I selected the issues that I believed were probably less likely to prevail in the federal courts or state courts. There were still issues I wanted to include, but I did omit those.

. . . .

I deleted the following issues: Fernando's right to counsel was denied because of the district court's failure to conduct sufficient inquiry on his motion for appointment of new counsel. A Miranda violation, evidence of uncharged misconduct, evidence of statements admitted from [A.H.], and an issue concerning discovery obligations under Brady. And I also limited some of the arguments concerning prosecutorial misconduct. I presented quite a few, but I cut back.

(ECF No. 27 at 26.)

## 2.    State court determination

In affirming the denial of Hernandez's first state habeas petition, the Nevada Supreme Court held as follows:

Hernandez contends that the district court erred by denying his claim that appellate counsel was ineffective for failing to raise issues he specifically requested be brought forth on direct appeal and for not offering any excuse for the omission other than this court's order requiring appellate counsel to reduce the length of her opening brief. Hernandez neglects, however, to identify what additional issues he desired to be raised in his direct appeal. Further, during the post-conviction evidentiary hearing, appellate counsel testified that in an effort to reduce her brief to the length allowed by this court, she eliminated claims that were less likely to prevail on appeal. Nothing in appellate counsel's testimony indicated that she excluded a claim from the reduced opening brief that she considered likely to prevail on appeal. [*See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that appellate counsel is not required to raise every nonfrivolous issue on appeal).] Because this testimony is supported by the record, we conclude that the district court did not err by denying this claim.

99

1  (ECF No. 14-2 at 74–75.)

2  ### 3.    Analysis

3  The *Strickland* standard is utilized to review appellate counsel's actions: a
4  petitioner must show "that [appellate] counsel unreasonably failed to discover
5  nonfrivolous issues and to file a merits brief raising them" and then "that, but for his
6  [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have
7  prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

8  The Nevada Supreme Court reasonably determined that Hernandez failed to show
9  that his appellate counsel's representation fell below an objective standard of
10  reasonableness. "[C]ounsel is strongly presumed to have rendered adequate assistance
11  and made all significant decisions in the exercise of reasonable professional judgment."
12  *Strickland*, 466 U.S. at 690. Here, it is presumed that Hernandez's appellate counsel's
13  decision to omit the weakest issues from her appellate brief due to page limitations was
14  based on reasonable professional judgment. *See Pollard v. White*, 119 F.3d 1430, 1435
15  (9th Cir. 1997) ("A hallmark of effective appellate counsel is the ability to weed out claims
16  that have no likelihood of success, instead of throwing in a kitchen sink full of arguments
17  with the hope that some argument will persuade the court."). Hernandez fails to rebut this
18  presumption. Rather, Hernandez's appellate counsel's strategy—as she explained during
19  the postconviction evidentiary hearing—was sound given the circumstances and is
20  entitled to deference.

21  The Nevada Supreme Court's determination constituted an objectively reasonable
22  application of federal law and was not based on an unreasonable determination of the
23  facts. Hernandez is not entitled to federal habeas relief on ground 20.

24  ### N.    Ground 21—Lethal Injection

25  In ground 21, Hernandez alleges that his death sentence is invalid under the
26  federal constitutional guarantees of due process, freedom of information, equal
27  protection, and a reliable sentence because execution by lethal injection violates the
28  constitutional prohibition against cruel and unusual punishments. (ECF No. 221 at 189.)

Specifically, Hernandez contends that (1) lethal injection constitutes cruel and unusual punishment, and (2) Nevada's execution protocol is cruel and unusual. (*Id*. at 189–213.)

Nevada law provides for only one method of execution—lethal injection. NRS § 176.355. Nevada law assigns the Nevada Department of Correction's ("NDOC") Director the responsibility of selecting the drug or combination of drugs to be used for the execution after consulting with the Chief Medical Officer of Nevada. *Id*. NDOC's Director may also consult with any other qualified medical and pharmaceutical professionals to ensure the selected lethal drug or combination of drugs and dosages are sufficient to cause death. NDOC Execution Manual 103.01. Upon determination of the method of lethal injection, the NDOC Director and Deputy Director publish an execution protocol detailing the method of execution, dosages, concentrations, and preparation instructions, among other subjects. Absent a stay of execution, the Director shall execute a sentence of death within the week the judgment is to be executed. *See* NRS § 176.495.

In *Baze v. Rees,* the Supreme Court, on an appeal from a judgment in a civil rights action, ruled Kentucky's lethal injection protocol to be constitutional. 553 U.S. 35 (2008). The *Baze* holding forecloses any argument that lethal injection, no matter how administered, is necessarily unconstitutional and demonstrates that lethal injection can be administered in a manner that does not constitute cruel and unusual punishment in violation of the Eighth Amendment.

Further, a challenge to Nevada's execution protocol is not cognizable in this federal habeas corpus action. In *Nelson v. Campbell,* a state prisoner sentenced to death filed a civil rights action, alleging that the state's proposed use of a certain procedure, not mandated by state law, to access his veins during a lethal injection would constitute cruel and unusual punishment. 541 U.S. 637 (2004). The Supreme Court reversed the lower courts' conclusion that the claim sounded in habeas corpus and could not be brought as a § 1983 action. *Id*. at 645. The Court stated that the prisoner's suit challenging "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself—by simply altering its method of execution, the

State can go forward with the sentence." *Id.* at 644. In *Hill v. McDonough,* the Supreme Court reaffirmed the principles articulated in *Nelson,* ruling that an as-applied challenge to lethal injection was properly brought by means of § 1983 action. 547 U.S. 573, 580–83 (2006). Both *Nelson* and *Hill* suggest that a § 1983 claim is the more appropriate vehicle for an as-applied challenge to a method of execution. *See also Beardslee v. Woodford,* 395 F.3d 1064, 1068–69 (9th Cir. 2005) (holding that a condemned inmate's claim that California's lethal injection protocol violates the Eighth and First Amendments "is more properly considered as a 'conditions of confinement' challenge, which is cognizable under § 1983, than as a challenge that would implicate the legality of his sentence and thus be appropriate for federal habeas review"). Moreover, it is possible— and, given the amount of time that passes before a death sentence is carried out, it may be likely—that execution protocols will change between the time when a death sentence is imposed and the time when the death sentence is carried out. Therefore, the constitutionality of an execution protocol may change after the judgment is entered imposing the death sentence. Habeas corpus law and procedure have not developed, and are not suited, for the adjudication of such issues.

Hernandez is not entitled to federal habeas relief for ground 21.

## O.    Ground 22—Unrecorded Bench Conferences

In ground 22, Hernandez alleges that his convictions and death sentence are invalid under federal constitutional guarantees of due process, effective assistance of counsel, and equal protection because he was denied the right to meaningful appellate review by the trial court's unconstitutionally holding unrecorded bench conferences. (ECF No. 221 at 214.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez complains that numerous bench and in-chamber conferences were conducted during the trial but not reported. He claims that this violated his right to meaningful appellate review. SCR 250(5)(a) generally requires proceedings in a capital case to be reported and transcribed. However, defense counsel did not object to holding these

1    unreported conferences, and Hernandez fails to show that any plain error
     affecting his substantial rights occurred.

2    (ECF No. 14-2 at 37.)

3        A state must provide an indigent criminal defendant with "a record of sufficient

4    completeness to permit proper consideration of (his) claims" to satisfy the constitutional

5    guarantees of due process. *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (internal

6    quotation marks omitted); *Britt v. North Carolina*, 404 U.S. 226, 227 (1971) ("[T]here can

7    be no doubt that the State must provide an indigent defendant with a transcript of prior

8    proceedings when that transcript is needed for an effective defense or appeal."); *see*

9    *also Draper v. Washington*, 372 U.S. 487, 495 (1963). "A 'record of sufficient

10   completeness' does not translate automatically into a complete verbatim

11   transcript." *Mayer*, 404 U.S. at 194. Rather, whether a transcript is needed for an effective

12   defense or appeal depends on: "(1) the value of the transcript to the defendant in

13   connection with the appeal or trial for which it is sought, and (2) the availability of

14   alternative devices that would fulfill the same functions as the transcript." *Britt*, 404 U.S.

15   at 434. The Ninth Circuit has held that the *Britt* criteria apply in evaluating a habeas

16   petitioner's claim regarding unrecorded bench conferences. *See Madera v. Risley*, 885

17   F.2d 646, 648 (9th Cir. 1989). As to the first criterion, which regards prejudice, a petitioner

18   is "not required to make a showing of need tailored to the facts of the specific case," so

19   long as "[h]e identifies a tenable theory as to what error might have [been] involved." *Id.*

20       Hernandez identifies various unrecorded proceedings from his trial, including (1)

21   an unrecorded bench conference that occurred during Detective Thowsen's testimony

22   about whether he found out where the knife found next to Donna came from; (2) an

23   unrecorded bench conference that occurred during Landeros's testimony about what

24   words Hernandez used to insult Donna on her answering machine; (3) an unrecorded

25   bench conference during Griego's penalty-phase testimony about Donna's answering

26   machine recordings; and (4) the lack of any recording during discussions about the

27   penalty-phase jury instructions. (ECF No. 322 at 354–58.) Although these unrecorded

28   bench conferences and discussions *may* have had some value in identifying errors on

103

1    appeal (and should have been recorded), the weight of that value is entirely speculative.

2    Indeed, Hernandez alleges that it is unknown what was said during these times by the

3    parties, the trial court's reasoning in allowing or precluding evidence, and whether, as a

4    result, his due process rights were violated. The Court acknowledges that Hernandez is

5    placed in the difficult position of having to demonstrate prejudice from missing portions of

6    the record. However, the Court is not convinced that Hernandez has identified even a

7    tenable theory as to what error might have occurred. Because the Nevada Supreme

8    Court's denial of this claim was not contrary to or an unreasonable application of federal

9    law, Hernandez is not entitled to federal habeas relief for ground 22.

10        **P.    Ground 23—Motion to Argue Last**

11        In ground 23, Hernandez alleges that his sentence of death is invalid under the

12    federal constitutional guarantees of due process because the trial court erred by denying

13    his motion to argue last. (ECF No. 221 at 216.)

14        In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held

15    as follows:

16        Hernandez contends that he should have been allowed to argue last
      in the penalty phase and that this court should overrule precedent to the
17    contrary. This court has held that the State properly argues last in a capital
      penalty phase because NRS 175.141 mandates it and because the State
18    has the burden of proving aggravators beyond a reasonable doubt. [*See
      Witter v. State*, 112 Nev. 908, 923, 921 P.2d 886, 896 (1996), receded from
19    on other grounds in Byford, 116 Nev. 215, 994 P.2d 700.] Hernandez
      argues that the aggravators in his case were already proved in the guilt
20    phase so he had the more significant burden in the penalty phase. We
      conclude that he has provided no justification for this court to disregard NRS
21    175.141.

22    (ECF No. 14-2 at 37–38.)

23        Hernandez argues that to preserve constitutional due process protections at the

24    penalty phase, the trial court should have departed from a strict reading of NRS § 175.141

25    and allowed the defense to argue last. (ECF No. 322 at 369.) Instead, according to

26    Hernandez, the trial court permitted the prosecution to have the final word—introducing

27    inflammatory rhetoric and misdirecting the jury—without providing Hernandez the

28    opportunity to explain, defend, or negate the State's argument. (*Id*.)

A petitioner is "denied due process of law when [a] death sentence [is imposed], at least in part, on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977). This is based on the "belief that debate between adversaries is often essential to the truth-seeking function of trials [which] requires [Courts] also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases." *Id.* 360.

The issue in *Gardner* regarded the petitioner being sentenced to death based, at least in part, on information—a confidential presentence report—that was never disclosed to him, resulting in an inopportunity to deny or explain the information. That is not the case here. The State did not introduce new evidence during its rebuttal argument, and *Gardner* has not been expanded to the petitioner's ability to deny or explain mere arguments made by the State. Thus, because the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law, Hernandez is not entitled to federal habeas relief for ground 23.

### Q.    Ground 24—Nevada's Death Penalty Scheme

In ground 24, Hernandez alleges that his sentence of death is invalid under the federal constitutional guarantees of due process and equal protection, the right to a fair trial and fair penalty hearing, and the right to be free from cruel and unusual punishment because Nevada's death penalty scheme fails to narrow the number of people eligible for the death penalty. (ECF No. 221 at 218.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez . . . argues that Nevada's death penalty scheme is unconstitutional because it does not sufficiently narrow the number of people eligible for the death penalty. He asserts that statistics from the U.S. Department of Justice show that Nevada has more persons on death row per capita than any other state in the country. He also claims that this court reverses an inordinately low number of death sentences. At trial defense counsel voiced a "general objection" to the constitutionality of the death penalty in Nevada. This was not sufficient to preserve the issue now raised on appeal, nor do we consider the claim to have merit. [*See Gallego v. State*, 117 Nev. __, __, 23 P.3d 227, 242 (2001); *Leonard*, 117 Nev. at 82–83, 17 P.3d at 415–16.]

(ECF No. 14-2 at 38.)

Under Nevada law, the following circumstances may be found as aggravators for a first-degree murder conviction:

1.  The murder was committed by a person under sentence of imprisonment.
2.  The murder was committed by a person who . . . is or has been convicted of: (a) Another murder and the provisions of subsection 12 do not otherwise apply to that other murder; or (b) A felony involving the use or threat of violence to the person of another and the provisions of subsection 4 do not otherwise apply to that felony.
    . . .
3.  The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person.
4.  The murder was committed while the person was engaged, alone or with others, in the commission of, or an attempt to commit or flight after committing or attempting to commit, any robbery, arson in the first degree, burglary, invasion of the home or kidnapping in the first degree, and the person charged: (a) Killed or attempted to kill the person murdered; or (b) Knew or had reason to know that life would be taken or lethal force used.
5.  The murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody.
6.  The murder was committed by a person, for himself or herself or another, to receive money or any other thing of monetary value.
7.  The murder was committed upon a peace officer or firefighter who was killed while engaged in the performance of his or her official duty or because of an act performed in his or her official capacity, and the defendant knew or reasonably should have known that the victim was a peace officer or firefighter. . . .
8.  The murder involved torture or the mutilation of the victim.
9.  The murder was committed upon one or more persons at random and without apparent motive.
10. The murder was committed upon a person less than 14 years of age.
11. The murder was committed upon a person because of the actual or perceived race, color, religion, national origin, physical or mental disability, sexual orientation or gender identity or expression of that person.
12. The defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree. . . .
13. The person, alone or with others, subjected or attempted to subject the victim of the murder to nonconsensual sexual penetration immediately before, during or immediately after the commission of the murder. . . .
14. The murder was committed on the property of a public or private school, at an activity sponsored by a public or private school or on a school bus while the bus was engaged in its official duties by a person who intended to create a great risk of death or substantial bodily harm to more than one person by means of a weapon, device or course of action that would normally be hazardous to the lives of more than one person. . . .

106

15.    The murder was committed with the intent to commit, cause, aid, further or conceal an act of terrorism. . . .

NRS § 200.033. The jury is then tasked with deciding "[w]hether an aggravating circumstance or circumstances are found to exist," "[w]hether a mitigating circumstance or circumstances are found to exist," and "whether the defendant should be sentenced to imprisonment for a definite term of 50 years, life imprisonment with the possibility of parole, life imprisonment without the possibility of parole or death." NRS § 175.554(2). "The jury may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." NRS § 175.554(3). A death sentence is automatically "reviewed on the record by the appellate court of competent jurisdiction" to determine, among other things, "[w]hether the evidence supports the finding of an aggravating circumstance or circumstances" and "[w]hether the sentence of death is excessive, considering both the crime and the defendant." NRS § 177.055(2).

As was explained in ground 5, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield*, 484 U.S. at 244 (quoting *Zant*, 462 U.S. at 877). Although the range of aggravators outlined in NRS § 200.033 cover a variety of different types of murders, Hernandez's claim that these aggravators effectively encompass every first-degree murder, making it overly broad and unconstitutional, lacks merit. *See Proffitt v. Florida*, 428 U.S. 242, 255 (1976) (rejecting the petitioner's argument "that the enumerated aggravating . . . circumstances are so vague and so broad that virtually any capital defendant becomes a candidate for the death penalty" because it could "not say that the provision . . . provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases" (internal quotation marks omitted)); *Jurek v. Texas,* 428 U.S. 262, 270–71 (1976) (upholding Texas's capital punishment statute that required the jury to find that the defendant's crime fell within one

107

of the following statutory categories of death-eligible murder: "murder of a peace officer or fireman; murder committed in the course of kidnaping, burglary, robbery, forcible rape, or arson; murder committed for remuneration; murder committed while escaping or attempting to escape from a penal institution; and murder committed by a prison inmate when the victim is a prison employee").

Rather, because NRS § 200.033 genuinely narrow the class of persons eligible for the death penalty in Nevada, the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law. Hernandez is not entitled to federal habeas relief for ground 24.

### R.    Ground 25—Cruel and Unusual Punishment

In ground 25, Hernandez alleges that his death sentence is invalid under the federal constitutional guarantees of due process, equal protection, the right to a fair trial and fair penalty hearing, and the right to be free from cruel and unusual punishment because the death penalty is unconstitutional under all circumstances. (ECF No. 221 at 223.)

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez asserts that the death penalty is unconstitutionally cruel and unusual punishment. . . . At trial defense counsel voiced a "general objection" to the constitutionality of the death penalty in Nevada. This was not sufficient to preserve the issue now raised on appeal, nor do we consider the claim to have merit. [*See Gallego v. State*, 117 Nev. __, __, 23 P.3d 227, 242 (2001); *Leonard*, 117 Nev. at 82–83, 17 P.3d at 415–16.]

(ECF No. 14-2 at 38.)

Hernandez argues that the national consensus is against the death penalty, as evidenced by decreasing numbers of executions, increasing numbers of states that have abolished the death penalty, the refusal of the drug industry to participate in executions, and acknowledgement by state courts that the death penalty is inflicted arbitrarily. (ECF No. 322 at 376.) While this may be true, the United States Supreme Court has held—and thereafter consistently affirmed—that the death penalty is not cruel and unusual

108

1   punishment as long as various safeguards have been met, e.g., mitigating circumstances

2   have been considered and the sentence is not mandatory or grossly disproportionate to

3   the crime. *See Gregg v. Georgia*, 428 U.S. 153, 168–69 (1976) ("We now hold that the

4   punishment of death does not invariably violate the Constitution."); *Baze*, 553 U.S. at 47

5   (holding that "Kentucky's lethal injection protocol satisfies the Eighth Amendment").

6       Because the Nevada Supreme Court's denial of this claim was not contrary to or

7   an unreasonable application of federal law, Hernandez is not entitled to federal habeas

8   relief for ground 25.[25]

9       **S.   Ground 26—Death Penalty Excessiveness**

10      In ground 26, Hernandez alleges that his convictions and death sentence are

11  invalid under federal constitutional guarantees of due process, equal protection, the right

12  to be free from cruel and unusual punishment, and a reliable sentence because the death

13  penalty was constitutionally excessive under the facts of his case. (ECF No. 221 at 225.)

14  Hernandez argues that the death penalty has not been imposed in nearly any Nevada

15  cases involving the murder of a person by their spouse or ex-spouse. (*Id*.) Further,

16  Hernandez contends that the following factors warrant a finding that a death sentence is

17  excessive: he did not have a criminal history before this case, he had been gainfully

18  employed and was a contributing member of the community, he was extremely

19  intoxicated at the time of the crime, and he had the support of a large family. (*Id*.)

20      In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held

21  as follows:

22          In arguing that his death sentence is excessive, Hernandez claims
        that "[i]n nearly all other recent Nevada cases involving the murder of a
23      person by their spouse or ex-spouse, the death penalty has not been
        imposed." He then cites with little or no analysis six opinions by this court.
24      This court has stated that "our determinations regarding excessiveness of

25  _____

26      [25]Hernandez also argues that the death penalty is cruel or unusual under the
    Nevada Constitution. (ECF No. 322 at 380.) The Court declines to address this argument.
27  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not
    lie for errors of state law."); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997)
28  (explaining that a petitioner "may not . . . transform a state-law issue into a federal one
    merely by asserting a violation of due process").

the death sentence of similarly situated defendants may serve as a frame of reference for determining the crucial issue in the excessiveness analysis: are the crime and defendant before us on appeal of the class or kind that warrants the imposition of death?" [*Dennis v. State*, 116 Nev. 1075, 1085, 13 P.3d 434, 440 (2000).] Here, Hernandez provides no cogent argument demonstrating that the cases he cites involve "similarly situated defendants."

The jury recognized seven mitigating circumstances, but finding that the three aggravating circumstances outweighed them, imposed a death sentence. We perceive no basis to set aside this decision. Hernandez stalked his wife, murdered her without provocation in a horrific, savage manner; and did so in the presence of her, and his own, young daughter. We conclude that the death sentence is not excessive in this case.

(ECF No. 14-2 at 40.)

Under the Eighth Amendment, "punishment [must] not be 'excessive,'" which means (1) "the punishment must not involve the unnecessary and wanton infliction of pain" and (2) "the punishment must not be grossly out of proportion to the severity of the crime." *Gregg*, 428 U.S. at 173. Appellate review of a death sentence must ensure that the "death sentence [is] not imposed capriciously or in a freakish manner." *Id*. at 195 (explaining "that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action").

The Nevada Supreme Court reasonably determined that Hernandez's death sentence is not excessive. Contrary to Hernandez's contention, it appears that the Nevada Supreme Court reasonably considered the mitigating circumstances along with the aggravating circumstances in concluding that there was no basis to set aside the jury's imposition of the death sentence. Even acknowledging the mitigating factors here—Hernandez's lack of a criminal history, gainful employment, intoxication at the time of the murder, and supportive family—Hernandez's horrendously violent murder of Donna in front of their young child and postmortem mutilation of her body supports a finding that the jury's death sentence was not arbitrary, capricious, excessive, or disproportionate.

Because the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of the facts, Hernandez is not entitled to federal habeas relief for ground 26.

**T.     Ground 27—Cumulative Error**

In ground 27, Hernandez alleges that his conviction and death sentence are invalid under the federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, a fair tribunal, an impartial jury, and a reliable sentence due to the cumulative errors in the admission of evidence and instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of his right to the effective assistance of counsel. (ECF No. 221 at 226.)

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle*, 387 F.3d at 1045 (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly*, 416 U.S. at 643).

In affirming Hernandez's judgment of conviction, the Nevada Supreme Court held as follows:

> Hernandez argues that his conviction and sentence should be reversed due to cumulative error. The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually. [*Byford*, 116 Nev. at 241–42, 994 P.2d at 717.] We conclude that any errors which occurred were minor and, even considered together, do not warrant reversal.

(ECF No. 14-2 at 38–39.) This holding was reasonable given that the Court has found no errors to cumulate amongst Hernandez's direct appeal claims.

Hernandez is not entitled to federal habeas relief for ground 27.

**U.     Ground 28—Absence of Instruction Regarding Standard of Proof**

In ground 28, Hernandez alleges that his death sentence must be vacated because the absence of a jury instruction defining the standard of proof as beyond a reasonable

doubt in the weighing stage of his penalty hearing violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (ECF No. 221 at 228.)

Penalty-phase Jury Instruction No. 5 provides as follows:

The jury may impose a sentence of death only if:
(1)    The jurors find unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists;
(2)    Each and every juror determines that the mitigating circumstance or circumstances, if any, which he or she has found do not outweigh the aggravating circumstance or circumstances; and
(3)    The jurors unanimously determine that in their discretion a sentence of death is appropriate.

(ECF No. 19 at 22.)

Hernandez's contention here is that the jury's weighing of aggravating and mitigating circumstances, within the context of Nevada's death penalty scheme, is an "element" of the offense and must be proved beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"); *Ring v. Arizona*, 536 U.S. 584 (2002) (extending *Apprendi* to the capital sentencing context); *Hurst v. Florida*, 577 U.S. 92, 97 (2016) (applying *Apprendi* and confirming "that each element of a crime be proved to a jury beyond a reasonable doubt"). This contention lacks merit. First, *Hurst* did not establish a new rule of constitutional law with respect to what determinations qualify as an "element" that must be submitted to a jury. *Hurst*, 577 U.S. at 97 (holding that Florida's scheme was unconstitutional because it allowed a judge to exercise his or her own judgment about the existence of aggravating and mitigating factors in determining whether the defendant was eligible for the death penalty). Second, Hernandez fails to demonstrate that the weighing determination is a "fact" amenable to proof beyond a reasonable doubt. Third, even if *Hurst* created a new rule, *Hurst* has been found to not apply retroactively to cases on collateral review. *See McKinney v. Arizona*, 589 U.S. 139, 145 (2020) ("*Hurst* do[es] not apply retroactively on collateral review."); *Ybarra v. Filson*, 869 F.3d 1016, 1030–1033 (9th Cir. 2017) (explaining that even assuming "for the sake

1  of argument . . . that *Hurst* creates a new rule . . . establish[ing] that the 'weighing

2  determination' is an element, . . . [the petitioner] cannot obtain relief under *Hurst*" because

3  "*Hurst* does not apply retroactively"); *Williams v. Filson*, 908 F.3d 546, 581 (9th Cir. 2018)

4  (explaining that the rule in *Hurst* "would not apply retroactively in cases . . . on collateral

5  review").

6          Hernandez is not entitled to federal habeas relief for ground 28.

7  **V.     Ground 29—Nevada Supreme Court Re-Weighing Penalty Factors**

8          In ground 29, Hernandez alleges that his death sentence is invalid under the

9  federal constitutional guarantees of due process, equal protection, a reliable sentence,

10  and a jury trial because the Nevada Supreme Court, on collateral review, struck an

11  aggravating circumstance and proceeded to reweigh the two remaining aggravators

12  against the seven mitigators that the jury found during the penalty phase. (ECF No. 221

13  at 230.)

14          In affirming the state court's denial of Hernandez's first state habeas petition, the

15  Nevada Supreme Court found that "the burglary aggravator is invalid under *McConnell*[

16  *v. State*, 102 P.3d 606 (Nev. 2004)]," but "[a]fter striking the burglary aggravating

17  circumstance, [the Nevada Supreme Court] conclude[d] beyond a reasonable doubt that

18  the jury would have found Hernandez death eligible and sentenced him to death." (ECF

19  No. 14-2 at 54–55.) The Nevada Supreme Court explained its reweighing:

20          After striking the burglary aggravating circumstance, we may
       reweigh the aggravating and mitigating evidence or conduct a harmless-
21     error review. [*See Clemons v. Mississippi*, 494 U.S. 738, 741 (1990);
       *Browning v. State*, 120 Nev. 347, 363, 91 P.3d 39, 51 (2004).] The question
22     is whether it is "clear that absent the erroneous aggravator the jury would
       have imposed death." [*Browning*, 120 Nev. at 364, 91 P.3d at 51.]
23          The jurors found seven mitigating circumstances: Hernandez lacked
       a significant criminal history; he committed the murder while under extreme
24     mental or emotional disturbance; he accepted responsibility for the crime;
       he had been gainfully employed throughout his adult life; and he spared the
25     life of his three-year-old daughter, who was present during the crime, even
       though he had threatened to kill her. Two valid aggravating circumstances
26     remain against Hernandez: the murder involved torture or mutilation of the
       victim, and he subjected the victim to nonconsensual sexual penetration
27     immediately before, during, or after the murder.
            In reweighing the aggravating and the mitigating evidence, we are
28     convinced beyond a reasonable doubt that the jury would have found

Hernandez death eligible. An autopsy revealed that Donna died from strangulation, evidenced by bruising on her neck caused by fingers and the placement of a foot or knife against her neck. The viciousness of Hernandez's attack on Donna was manifestly illustrated by evidence of a stab wound inflicted near her heart, piercing her left lung with such force as to strike a rib in her back. Donna also sustained stab wounds to each side of her neck, penetrating into the area of her carotid arteries. These injuries were inflicted in addition to other multiple stab and slash wounds and blunt force head trauma.

The brutality of the killing did not end with the injuries described above. The autopsy revealed the tip of the handle of a dinner knife protruding from Donna's vagina. Hernandez thrust the dinner knife into Donna's vaginal cavity with such force as to perforate the vaginal wall and penetrate the abdominal cavity. Although this injury was likely inflicted after Donna expired, the abject viciousness of this act exemplifies the utterly reprehensible and cruel nature of the killing. We recognize that Hernandez presented credible evidence in mitigation that he had accepted responsibility and expressed remorse for the murder, he was a hard-working, law-abiding person prior to the event, he was under extreme emotional distress and intoxicated when he killed Donna, and he spared his daughter's life despite threats to kill her. However, we conclude that this evidence is woefully insufficient to outweigh the two remaining aggravating circumstances.

In addition to the horrific nature of the crime, the evidence presented at trial revealed that Donna had secured a protective order in March 1999 against Hernandez as a result of his repeated threats to kill her. The protective order was in effect at the time of Donna's death in October 1999. And approximately two weeks before the murder, Hernandez conveyed to a friend that he wanted to kill Donna, their daughter, and himself. Moreover, inflicting this brutal attack on Donna in clear view of his three-year-old daughter and then kidnapping her is beyond the pale. The trauma young [A.H.] suffered as result of witnessing her mother's attack left an indelible mark on her. Therefore, we are convinced beyond a reasonable doubt that the jury would have sentenced Hernandez to death in the absence of the erroneous aggravating circumstance. Accordingly, we affirm Hernandez's death sentence.

(*Id.* at 59–61 (internal footnotes omitted).)

In *Clemons v. Mississippi*, the United States Supreme Court "h[e]ld that the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." 494 U.S. 738, 741 (1990). The United States Supreme Court has recently confirmed that *Clemons* is still good law. In *McKinney v. Arizona*, the United States Supreme Court explained that "*Ring* and *Hurst* did not overrule *Clemons* so as to prohibit appellate reweighing of aggravating and mitigating circumstances." 589 U.S. 139, 145 (2020). Rather, the "Court's precedents establish that state appellate courts may

114

conduct a *Clemons* reweighing of aggravating and mitigating circumstances, and may do so in collateral proceedings as appropriate and provided under state law." *Id*. at 147.

Although the Nevada Supreme Court was permitted to reweigh the aggravating and mitigating evidence, it was not permitted to make factual findings. *See Hurst*, 577 U.S. at 102. The Nevada Supreme Court treaded closely to crossing the line between reweighing and making factual findings, including, for example, stating that the murder took place "in clear view" of A.H., which was never definitively proven at the trial. Moreover, the Nevada Supreme Court's finding that it was convinced *beyond a reasonable doubt* that, after striking one of three aggravating circumstances and reweighing those remaining two aggravating circumstances against the seven mitigating circumstances, the jury would have found Hernandez death eligible is debatable. In fact, Nevada Supreme Court Justice Cherry dissented "from the majority's conclusion that after reweighing the aggravating and mitigating evidence Hernandez's death sentence may nonetheless be upheld." (ECF No. 14-2 at 77.) Justice Cherry explained that the remaining aggravating circumstances "are not persuasive enough to convince me beyond a reasonable doubt that the jury would have found Hernandez death eligible and imposed death absent the erroneous burglary aggravating circumstance." (*Id*.) That being said, Hernandez fails to demonstrate that the Nevada Supreme Court's reweighing amounted to an unreasonable determination of the facts given that it appears to have fully considered the mitigating circumstances presented by Hernandez and the remaining aggravating circumstances in its analysis.

Because the Nevada Supreme Court's denial of relief was not obviously contrary to, or an unreasonable application of, *Hurst* and was not based on an unreasonable determination of the facts, Hernandez is not entitled to federal habeas relief for ground 29.

### W.    Ground 30—Counsel Conceding Guilt

In ground 30, Hernandez alleges that his convictions and death sentence are invalid under federal constitutional guarantees of due process, equal protection, the

effective assistance of counsel, a fair and impartial jury, and a reliable sentence because trial counsel were ineffective in conceding his guilt without obtaining his consent. (ECF No. 221 at 235.)

### 1.    Background information

During a break in voir dire, the trial court held a hearing "outside the presence of the jury panel and outside the presence of the district attorney." (ECF No. 205-1 at 401.) Oram explained the following:

> Your Honor, I along with Mr. Schieck have spoken with Mr. Hernandez over the last few weeks on several occasions.
> Actually, I think that I've spoken with him about eight or nine, approximately eight or nine times, in contact visits over at the Clark County Detention Center.
> In that time, I had discussed with Mr. Hernandez along with Mr. Schieck the possibility of conceding guilt to a certain point and to permit us, with his permission, to argue for a lesser included offense of first degree murder, that being either manslaughter or second degree murder, most probably second degree murder.
> Mr. Hernandez had indicated that that would be acceptable to us [sic]. We also indicated to him that we would be fighting on the kidnapping and the burglary. But with regard to the murder, we wanted him to let us argue for second degree murder, and I believe that he is willing to do that.

(*Id.* at 401–02.) The trial court responded, "from my review of appellate decisions I would think that it would be unwise for any defense attorney ever to admit guilt to anything in front of a jury" because "when defense attorneys stand up in opening statement and admit guilt, in my opinion that relieves the State of their burden of proving everything." (*Id.* at 402.) Rather, in the trial court's opinion, it is more appropriate "for counsel to argue for a lesser included or lesser related offense" at the time of closing argument. (*Id.* at 402–03.) Oram responded:

> Our concern is this, your Honor, under the - - pursuant to the evidence in this case, it is our contention that the State cannot prove murder in the first degree, but that it would be foolish to argue to the jury that there was no culpability of Mr. Hernandez to the killing of his wife.
> In doing so, it wouldn't be about destroying credibility. It would be about destroying the defense.
> And, in other words, I think that our, and I think Mr. Schieck agrees, I know that he agrees that our best chance in this case to avoid the penalty phase is to try to convince this jury that this is not murder of the first degree.
> And it would be difficult. I know the court does not know the evidence in this case, but it would be very difficult under the circumstances to try and

1  attempt to argue that he has no culpability, and under those circumstances
   it was our intention to concede that he had some involvement but that this
2  is an overcharged case and it does not result in a conviction of murder in
   the first degree.
3          And we want to plant that in their heads right away and not just sort
   of stand around in an opening argument saying they have the burden of
4  proof, they have the burden of proof, they have the burden of proof. And
   then at the end spring it on the jury that, look, this is murder of the second
   degree.
5          We want to put the jury -- we want the jury to know right up front what
   the issue is, and I cannot believe that having reviewed the evidence that I
6  have reviewed that any jury could come up with a situation where our client
   was not guilty of that killing.
7

8  (*Id*. at 404–05.) The trial court then canvassed Hernandez:

9  THE COURT:         Mr. Hernandez, do you understand what Mr. Oram has
                      just said?
10 THE DEFENDANT: Yes, I do.
   THE COURT:         And do you concur with his trial strategy and for your
11                    defense that he may have to admit that you have some
                      involvement and some culpability in this case early on
12                    in the trial to best carry out his defense goal, which is
                      to eliminate murder in the first degree as a sentence
13                    that the jury could possibly return?
   THE DEFENDANT: Yes, I do.
14 THE COURT:         Do you understand that?
   THE DEFENDANT: Yes.
15 THE COURT:         Are you in accord with that? Do you agree with their
                      trial strategy?
16 THE DEFENDANT: Yes.
   THE COURT:         All right. Thank you.
17

18 (*Id*. at 405–06.)

19     At the postconviction evidentiary hearing, Schieck testified that the decision "to

20 concede that Mr. Hernandez committed the acts that caused the death of Donna

21 Hernandez but that they did not rise to the level of first degree murder" was a decision

22 discussed between him, Oram, and Hernandez. (ECF No. 27 at 27 at 9, 11.) According

23 to Schieck, the physical evidence was "[o]verwhelming as to Mr. Hernandez being

24 culpable," so they "conceded that point to the jury . . . to gain credibility and try to convince

25 them of less than first degree murder." (*Id*. at 11.) Schieck testified that "this was not a

26 decision that Mr. Oram and [he] made lightly" and that "Oram discussed th[e] strategy

27 with [Hernandez] and obtained his consent." (*Id*. at 12, 15.) Oram confirmed this fact,

28 testifying that he discussed the issue with Hernandez "at great length" and that

117

1  Hernandez did not "resist [his] efforts when it came to obtaining his consent." (*Id.* at 20,

2  22.)

3             **2.**        **State court determination**

4        In affirming the denial of Hernandez's first state habeas petition, the Nevada

5  Supreme Court held as follows:

6        Hernandez argues that the district court erred by denying his claim
   that trial counsel were ineffective for conceding his culpability for Donna's
7  death without obtaining his consent. Hernandez relies on *Jones v. State*,
   [110 Nev. 730, 877 P.2d 1052 (1994)] to support his claim. In *Jones*, a death
8  penalty case, we concluded that counsel was ineffective for conceding
   Jones' guilt to second-degree murder in the penalty phase without Jones'
9  consent. We emphasized, however, "that our decision [was] limited to the
   situation present [in *Jones*], where counsel undermined his client's
10 testimonial disavowal of guilt during *the guilt phase of the trial*." [*Id.* at 739,
   877 P.2d at 1057.] Here, Hernandez's claim that he did not consent to
11 counsel's concession of guilt is belied by the record and therefore lacks
   merit. [*See Hargrove v. State*, 100 Nev. 498, 503, 686 P.2d 222, 225
12 (1984).]
         Counsel, Hernandez, and the district court met in chambers, without
13 the State, to discuss the decision to concede culpability to second-degree
   murder. At that hearing, counsel explained the strategy of conceding guilt.
14 The district court judge admonished counsel, in Hernandez's presence, that
   she felt it unwise for any defense counsel to admit guilt of anything in front
15 of a jury because it relieves the State of its burden of proof. The district court
   also reminded counsel that there can be unanticipated changes in the
16 strength and weakness of a case during trial. Counsel explained that due to
   the physical evidence tying Hernandez to the crime, they felt it would be
17 "foolish" to argue to the jury that Hernandez was not culpable for Donna's
   death. Counsel further indicated that the defense's goal was to gain
18 credibility with the jury and thereby hopefully avoid a death sentence. The
   district court twice asked Hernandez if he understood that counsel would
19 admit that he was culpable in Donna's death to try to avoid a first-degree
   murder conviction, and Hernandez twice responded that he understood and
20 agreed with this strategy.
         A concession of guilt involves the waiver of a constitutional right that
21 must be voluntary and knowing. [*See State v. Perez*, 522 S.E.2d 102, 106
   (N.C. Ct. App. 1999) (stating that "[d]ue process requires that [consent to a
22 concession of guilt] must be given voluntarily and knowingly by the
   defendant after full appraisal of the consequences"); *see generally Gallego*
23 *v. State*, 117 Nev. 348, 368, 23 P.3d 227, 241 (2001) (noting that United
   States Supreme Court has held that "a valid waiver of a fundamental
24 constitutional right ordinarily requires 'an intentional relinquishment or
   abandonment of a known right or privilege'" (quoting *Johnson v. Zerbst*, 304
25 U.S. 458, 464 (1938)))).] Hernandez argues that his "apparent consent" was
   involuntary and unknowing due to counsel's repeated efforts to persuade
26 him to accept a plea offer while also discussing with him the defense
   strategy of conceding culpability at trial. At the post-conviction evidentiary
27 hearing, counsel testified that plea discussions with Hernandez were
   contentious. While the plea discussions may have been intense, it would
28 have been ineffective for counsel not to discuss with Hernandez pending

offers or trial strategy that required his consent. Further, nothing in the record before us shows that Hernandez's consent was coerced. Accordingly, we conclude that Hernandez failed to demonstrate that his counsel's actions rendered his consent to the concession of culpability involuntary or unknowing.

We take this opportunity, however, to address the proper procedure when a defense strategy at trial includes a concession of guilt. As noted above, in *Jones*, we held that counsel was ineffective for conceding his client's guilt in closing argument without obtaining the client's consent and after the client had testified and proclaimed his innocence. [110 Nev. At 738, 877 P.2d at 1057.] *Jones*, however, did not explain the inquiry necessary to determine the voluntariness of a defendant's consent to concede guilt to an offense. At a minimum, the district court should canvass the defendant outside the presence of the State and the jury to determine whether the defendant has consented to the concession of guilt and that the defendant's consent is voluntary and knowing. During the canvass, the district court must ensure and accordingly make findings in the trial record that the defendant understands the strategy behind conceding guilt or degree of guilt to the subject charges. Additionally, the district court must inform the defendant that conceding guilt relieves the State of its burden to prove an offense and that the defendant has the right to challenge the State's evidence. [*See Perez*, 522 S.E.2d at 106 (stating that defendant must be given full appraisal of consequences of conceding guilt before his consent to this trial strategy will be considered to be voluntary and knowing).] The hearing conducted in Hernandez's case satisfied these concerns.

(ECF No. 14-2 at 65–68.)[26]

### 3.    Analysis

"An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). This duty mandates that "an attorney must both consult with the defendant and obtain consent to the recommended course of action." *Id.* If a defendant consents to relinquish or abandon a right or privilege, that consent must be voluntary, knowing, and intelligent. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Here, the Nevada Supreme Court reasonably concluded that Schieck and Oram consulted with Hernandez about conceding the fact that he killed Donna, Hernandez agreed to the concession, and Hernandez's concession was valid and not coerced.

---

[26]The Court held that, to the extent that Hernandez added theories to this ground as compared to his state proceeding, it is unexhausted. (ECF No. 242 at 11.) However, the Court noted that it is possible that, under *Martinez*, Hernandez could overcome the procedural default by showing that his first state postconviction counsel was ineffective. (*Id.*)

Schieck and Oram both testified at the postconviction evidentiary hearing that they discussed the concession with Hernandez. Then, on the record, Oram explained the basis of the concession, and the trial court canvassed Hernandez. There is nothing in the record to suggest that Hernandez was in any way coerced into agreeing with his trial counsels' strategy, or that Hernandez did not understand his counsels' representation to the trial court or the trial court's questions. Rather, the record shows that Hernandez answered in the affirmative when asked if he understood and concurred with the concession. Further, based on the blood and fingerprint evidence against Hernandez, Hernandez's trial counsels' strategy of conceding that he killed Donna was sound. *See Nixon*, 543 U.S. at 191 ("Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear."); *United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (finding that counsel "had a sensible reason for not contesting [one of the charges because] it was, for all practical purposes, incontestable, and he believed that doing so would enhance his credibility on counts where the evidence was somewhat less clear and the penalties significantly greater").

The Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law and was not based on an unreasonable determination of the facts. Hernandez is not entitled to relief for ground 30.

### X.    Ground 31—Counsels' Failure to Challenge Blood Evidence

In ground 31, Hernandez alleges that his convictions and death sentence are invalid under federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, a fair and impartial jury, and a reliable sentence because trial counsel were ineffective in failing to adequately challenge the State's blood and DNA evidence. (ECF No. 221 at 247.)

In affirming the denial of Hernandez's first state habeas petition, the Nevada Supreme Court held: "Hernandez has not provided adequate facts or argument establishing that his counsel were deficient or, assuming any deficiency, that he was prejudiced by counsel's omissions." (ECF No. 14-2 at 73.)

1          **1.    Background information**

2          Before trial, the trial court granted Hernandez's counsels' motion for appointment

3   of an expert DNA analyst, approving Mary L. Pierson's fee in the amount of $2,000. (ECF

4   No. 205-1 at 428.) Hernandez's counsels' investigator contacted Ms. Pierson and sent

5   her materials to review. (*Id*. at 431.) Several months later, on July 6, 2000, Hernandez's

6   counsels' investigator sent "additional information concerning blood work conducted by

7   the State" to Ms. Pierson and indicated that he was "looking forward to meeting [Ms.

8   Pierson] next Tuesday evening, July 11." (*Id*. at 433.) Hernandez's counsels' investigator

9   indicated that he would pick her up from the airport on that date. (*Id*.) July 11, 2000, was

10  the first day of testimony in Hernandez's trial. Ms. Pierson never testified.

11         During postconviction proceedings, the court asked Hernandez's postconviction

12  counsel if he had "spoke to trial counsel Schieck to find out if he, in fact, had independent

13  testing of the blood samples done." (ECF No. 205-1 at 417.) Hernandez's postconviction

14  counsel responded, "You know I cannot tell you if I spoke to him specifically about that

15  issue right now. I don't have a recollection if I have seen his independent testing of DNA

16  because it did not appear to be, in my view, one of the more salient issues." (*Id*.) The

17  court then hypothesized that the "DNA testing didn't come up with anybody's blood but

18  [Hernandez] and the victim's blood." (*Id*. at 424.)

19         **2.    Analysis**

20         Hernandez's counsel had a duty to test the blood and DNA evidence. It is unclear

21  from the record whether Hernandez's counsel fulfilled this duty given the uncertainty of

22  whether Ms. Pierson conducted an evaluation. However, given the lack of any evidence

23  in the record showing a miscalculation or mismanagement in testing the evidence on the

24  part of Hernandez's counsel in combination with the fact that Hernandez's counsel sought

25  funds to hire an expert and then hired Ms. Pierson, Hernandez fails to demonstrate that

26  the Nevada Supreme Court's deficiency analysis was contrary to *Strickland*. Further, the

27  presence of blood on Hernandez's ring when he was pulled over and the presence of

28  blood on A.H., who was in Hernandez's car, circumstantially linked Hernandez to the

murder. Given this circumstantial evidence related to the blood and the lack of any direct evidence showing that testing the blood would have been fruitful for the defense, Hernandez also fails to demonstrate that the Nevada Supreme Court's prejudice analysis was contrary to *Strickland*.

Because the Nevada Supreme Court's denial of this claim was not contrary to or an unreasonable application of federal law and was not based on an unreasonable determination of the facts, Hernandez is not entitled to federal habeas relief for ground 31.

## V.    MOTION FOR DISCOVERY

Hernandez moves for leave to conduct discovery. (ECF No. 324.) Respondents opposed the request, and Hernandez replied. (ECF Nos. 342, 347.)

### A.    Governing law

Discovery in habeas matters is governed by Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, which states: "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." The Supreme Court has construed Rule 6, holding that if through "specific allegations before the court," the petitioner can "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). This inquiry is informed by the essential elements of the claims for which petitioner seeks discovery. *Id*. at 904. Thus, the purpose of discovery in a habeas proceeding is not to develop new claims, but, rather, to develop factual support for specific allegations contained in existing claims. *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) ("Habeas is an important safeguard whose goal is to correct real and obvious wrongs. It was never meant

1    to be a fishing expedition for habeas petitioners to 'explore their case in search of its

2    existence.'").

3        **B.    Discussion**

4        Hernandez seeks discovery of the following: (1) records from the Juror Services

5    Department of the Eighth Judicial District Court regarding the composition of all jury pools

6    for 2000, (2) to depose those with information about the process in 2000 for ensuring a

7    fair cross section was gathered, (3) records concerning the identities of those individuals

8    involved in the execution itself, the process for securing drugs, and all information known

9    to the Department of Corrections regarding the drugs, (4) records from any involved drug

10   companies regarding potential side effects of their use in a lethal injection protocol that

11   would cause cruel pain and suffering, (5) to depose those with information about the drugs

12   and processes to be carried out in any execution, (6) to serve interrogatories upon the

13   Clark County District Attorney's Office seeking information regarding all first-degree

14   murders charged from 1997-2003, and for each murder charge, a case number and

15   whether at least one aggravating circumstance was available, and whether a death notice

16   was filed, (7) records form the Eighth Judicial District Court for all cases where notices of

17   death were filed for the years 1997-2003, and (8) records from the Clark County District

18   Attorney's office reflecting how many and what cases were charged as first-degree

19   murder for the years 1997-2003. (ECF No. 324.) Hernandez elaborates that requests 1

20   and 2 support his claim in ground 4 that minorities were systematically excluded from his

21   jury pool, requests 3 through 5 support his claim in ground 21 that lethal injection is

22   unconstitutional in Nevada, and requests 6 through 8 support his claim in ground 24 that

23   Nevada's death-penalty scheme is overly broad and does not narrow the jurors'

24   discretion. (*Id.*)

25       First, addressing the discovery related to ground 4, the discovery requested

26   pertains to the portion of ground 4 that is procedurally defaulted. As is discussed further

27   in the motion for evidentiary hearing portion of this Order, *infra*, under *Ramirez*, the Court

28   is prohibited from considering newly developed evidence related to the procedurally

defaulted portion of ground 4. As such, the Court finds that there is no good cause for the requests related to ground 4 because it would be an errand in futility to discover information that the Court is prohibited from considering.

Second, turning to the discovery requests related to ground 21 to support the argument that lethal injection is unconstitutional in Nevada, the Court finds that discovery is unwarranted. As discussed previously in this Order, a § 1983 action is the more appropriate vehicle for an as-applied challenge to a method of execution. And since it is possible that execution protocols will change between now and the time when Hernandez's death sentence is carried out, it would be unproductive to conduct discovery on drugs that may never be used.

Third, moving to the discovery requests related to ground 24, the Court finds that there is no good cause for these requests. Whether Nevada's death penalty scheme fails to narrow the number of people eligible for the death penalty is a question of law, so any factual findings that may be obtained during discovery would not affect the Court's decision in this matter.

The motion for discovery is denied.

## VI.    EVIDENTIARY HEARING

Hernandez argues that an evidentiary hearing is warranted to prove the merits of the claims in his Fifth-Amended Petition, particularly grounds 1, 2, 3, 4, 21, and 24. (ECF No. 325.) Respondents opposed the motion, and Hernandez replied. (ECF Nos. 340, 346.)

### A.    Governing law

U.S.C. § 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
> (A)    the claim relies on--
>     (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and

1
2

> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

3    In *Ramirez*, the Supreme Court of the United States reinforced that when reviewing
4 a federal habeas petition, the federal court may not consider any facts beyond the factual
5 record presented to the state postconviction relief court, unless one of the exceptions of
6 28 U.S.C. § 2254(e)(2) applies. 596 U.S. at 382. The *Ramirez* Court also held that, with
7 respect to procedurally defaulted claims not adjudicated on their merits in state court, the
8 federal habeas court may not hold an evidentiary hearing or otherwise consider new
9 evidence, either regarding the question of cause and prejudice relative to a procedural
10 default or regarding the merits of the claim, unless the requirements of 28 U.S.C. §
11 2254(e)(2) are met. *Id*. at 382–91. The Court of Appeals for the Ninth Circuit has read
12 *Ramirez* to preclude a federal habeas court's consideration of evidence presented only
13 in a procedurally barred state postconviction action. *McLaughlin v. Oliver*, 95 F.4th 1239
14 (9th Cir. 2024) (finding that the petitioner's failure to present the evidence to the state
15 courts "in compliance with state procedural rules" counts as a "fail[ure] to develop the
16 factual basis of a claim in State court proceedings" under § 2254(e)(2)).

17    For purposes of determining whether a petitioner must first meet the prerequisites
18 of § 2254(e)(2), the term "fail" means "the prisoner must be 'at fault' for the undeveloped
19 record in state court." *Williams*, 529 U.S. at 432, 434 ("[A] failure to develop the factual
20 basis of a claim is not established unless there is lack of diligence, or some greater fault,
21 attributable to the prisoner or the prisoner's counsel."); *see also Ramirez*, 596 U.S. at
22 383 (affirming the prerequisites in § 2254(e)(2) apply only "when a prisoner 'has failed to
23 develop the factual basis of a claim'"). "Diligence for purposes of [§ 2254(e)(2)'s] opening
24 clause depends upon whether the prisoner made a reasonable attempt, in light of the
25 information available at the time, to investigate and pursue claims in state court; it does
26 not depend . . . upon whether those efforts could have been successful." *Id*. at 435.
27 "Diligence will require in the usual case that the prisoner, at a minimum, seek an
28 evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437; *see*

*also Baja v. Ducharme*, 187 F.3d 1075, 1079 (9th Cir. 1999) (denying evidentiary hearing because petitioner did not comply with state law that required petitioner to come forward with affidavits or other evidence to the extent his claim relied on evidence outside the record).

## B. Discussion

Hernandez makes the following arguments: (1) the failure to develop the factual record for grounds 1 and 2, which were not raised during his first state postconviction proceedings, occurred through no fault of his own but were due to his postconviction counsel's deficient performance, (2) the trial court's fact-finding procedure for ground 3 was not adequate, (3) his postconviction counsel was limited from exploring ground 4 during his first state postconviction evidentiary hearing, (4) there was no mechanism for state court review for ground 21, and (5) ground 24 was rejected at the pleading stage in state court, meaning he lacked any opportunity for factual development. (ECF No. 325 at 10, 12, 13, 15, 17.)

Regarding grounds 1, 2, and 4, Hernandez argues that he diligently pursued and presented these claims in his second state habeas proceedings, and because the state court imposed a procedural default rule, he should not bear any fault for the state's failure to allow him to develop the evidence for these claims. (ECF No. 322 at 54–55.) Hernandez also argues that diligence under § 2254(e)(2) refers to diligence in connection with the state proceeding where the ineffective assistance of trial counsel claim being reviewed was raised, meaning here the Court would look to his diligence during his second state habeas proceedings. (*Id*. at 57.) Otherwise, according to Hernandez, the omission of the same ineffective state postconviction attorney who failed to raise the claim also forever dooms Hernandez's ability to receive evidentiary development in federal court. (*Id*. at 60.)

The Ninth Circuit has squarely addressed and rejected this argument. In *McLaughlin*, the Court explained that "a petitioner 'fails' to develop the state court record within the meaning of § 2254(e)(2) when he *or his state post-conviction counsel* is 'at fault

for the underdeveloped record in state court.'"[27] 95 F.4th at 1248 (emphasis in original). In *Ramirez*, the United States Supreme Court explained that "a prisoner bears the risk in federal habeas for all attorney errors made in the course of the representation, unless counsel provides constitutionally ineffective assistance," so "because there is no constitutional right to counsel in state postconviction proceedings, a prisoner ordinarily must bear responsibility for all attorney errors during those proceedings," meaning "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record." 596 U.S. at 382–83.

Here, grounds 1, 2, and the relevant portion of ground 4 have been found to be procedurally defaulted because they were not raised during Hernandez's first state habeas proceedings. Under *Ramirez*, the failure to develop the factual basis of these grounds is due to the negligence of Hernandez or his first state postconviction counsel. *See McLaughlin*, 95 F.4th at 1249 ("[A] failure to present evidence to the state courts 'in compliance with the state procedural rules,' counts as a 'fail[ure] to develop the factual basis of a claim in State court.'" (Internal citation omitted).) Accordingly, the requirements of § 2254(e)(2) are triggered, and Hernandez fails to demonstrate that he has met these requirements. *See Ramirez*, 596 U.S. at 382 (holding that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the prisoner can satisfy 28 U.S.C. § 2254(e)(2)'s stringent requirements).

Moving to ground 3 and the remainder of ground 4, the Court has already determined that de novo review is unwarranted, so supplementing the record for these

---

[27]Hernandez argues that *McLaughlin* is distinguishable and does not apply to the evidence presented in his second state postconviction petition because state law provides the opportunity for *capital* petitioners to file a second state petition that permits the raising of claims and development of facts in support of those claims. The Court is unpersuaded. Although the petitioner *McLaughlin* was not sentenced to death, the Court does not find that *McLaughlin* is otherwise distinguishable. Because the state court denied Hernandez's second state habeas petition on procedural grounds, which was affirmed by the Nevada Supreme Court, and did not allow factual development of his claim, *McLaughlin* is applicable.

grounds is prohibited. *See Pinholster*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

Finally, regarding grounds 21 and 24, the Court has already determined that Hernandez is not entitled to relief, and further factual development would not affect the Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

The motion for an evidentiary hearing is denied.

**VII.    CERTIFICATE OF APPEALABILITY**

This is a final order adverse to Hernandez. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a Certificate of Appealability. The Court has *sua sponte* evaluated the claims within the Fifth-Amended Petition for suitability for the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Turner*, 281 F.3d at 864–65. Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the Court's procedural ruling was correct. *See id*.

Applying these standards, the Court finds that a Certificate of Appealability is warranted for grounds 1a, 1b, 1e, 1f, 4, and 29.

First, regarding ground 1a, reasonable jurists could debate whether Hernandez's counsels' lack of a thorough investigation into his mental health issues amounted to ineffective assistance of counsel given that (1) Hernandez's mental health issues—if

1    proven—could have been the foundation of his defense that he lacked the culpability for

2    first-degree murder and (2) could have enticed the jury into repudiating a death sentence.

3    Regarding the latter point, a deeper understanding of Hernandez's mental illnesses could

4    have provided explanatory mitigating evidence given that his mental illnesses—brain

5    damage, delusional disorder, fetal alcohol spectrum disorder, and a predisposition toward

6    alcohol-induced psychosis—may have explained Hernandez's actions on the night of the

7    murder and contextualized the aggravating evidence. *See Allen v. Woodford*, 395 F.3d

8    979, 1006 (9th Cir. 2005) (stating that it is rare that habeas relief is granted "based solely

9    upon humanizing, rather than explanatory, mitigating evidence in the face of extensive

10   aggravating circumstances").

11       Second, regarding ground 1b, reasonable jurists could debate whether Hernandez

12   suffered prejudice as a result of his counsels' deficient presentation of a second-degree

13   murder defense. Even though Hernandez's supplemental second-degree murder

14   evidence is relatively speculative, the strength of the prosecution's evidence in support of

15   first-degree murder is flimsy. *See Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir.

16   2001) ("[I]n order to determine whether counsel's errors prejudiced the outcome of the

17   trial, it is essential to compare the evidence that actually was presented to the jury with

18   the evidence that might have been presented had counsel acted differently.") (Internal

19   quotation marks omitted).

20       Third, regarding ground 1e, reasonable jurists could debate whether the litany of

21   potential unpresented mitigation evidence is sufficient to outweigh the evidence in

22   aggravation, especially if those jurists' hands are not tied by *Ramirez*.

23       Fourth, regarding ground 1f, reasonable jurists could debate whether cumulating

24   the deficiencies on the part of Hernandez's counsel in grounds 1b and 1e and potential

25   deficiencies on the part of Hernandez's counsel in ground 1a amounts to a finding of

26   prejudice.

27       Fifth, regarding ground 4, reasonable jurists could debate the fairness of denying

28   relief on a petitioner's ineffective-assistance-of-counsel claim on the sole basis of said

1  counsels' failure to develop factual support for the claim, especially in light of the Court's
2  prohibition on conducting an evidentiary hearing under *Ramirez*.

3  Sixth, regarding ground 29, reasonable jurists could debate whether the Nevada
4  Supreme Court made factual findings when, after striking an aggravating circumstance,
5  it reweighed the remaining aggravating circumstances with the mitigating circumstances.
6  Relatedly, the reasonable jurists could debate whether the Nevada Supreme Court's
7  reweighing amounted to an unreasonable determination of the facts given that it
8  discussed Hernandez's mitigating circumstances in cursory fashion while prioritizing its
9  discussion on the "brutal," "vicious," "reprehensible," and "cruel" details in aggravation.

10  A certificate of appealability is unwarranted for the remainder of Hernandez's
11  grounds.

12  **VIII.  CONCLUSION**

13  It is therefore ordered that the Fifth-Amended Petition for Writ of Habeas Corpus
14  under 28 U.S.C. § 2254 (ECF No. 221) is denied.

15  It is further ordered that the motion for leave to conduct discovery and motion for
16  evidentiary hearing (ECF Nos. 324, 325) are denied.

17  It is further ordered that a Certificate of Appealability is granted for grounds 1a, 1b,
18  1e, 1f, 4, and 29, and denied for the remaining grounds.

19  The Clerk of Court is further directed to enter judgment accordingly and close this
20  case.

21  DATED THIS 27th Day of March 2025.

22
23
24  MIRANDA M. DU
    UNITED STATES DISTRICT JUDGE
25
26
27
28